# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DISABILITY RIGHTS NORTH CAROLINA, | ) ) ) | |
| *Plaintiff,* | ) ) ) | |
| v. | ) ) ) | **COMPLAINT** |
| THE NORTH CAROLINA DEPARTMENT OF HEALTH AND AND HUMAN SERVICES and KODY KINSLEY, in his official capacity as Secretary of the North Carolina Department of Health and Human Services, | ) ) ) ) ) ) ) ) ) ) | Case No. 1:24-cv-335 |
| *Defendants.* | ) | |

_____

## INTRODUCTION

1.      Under the Fourteenth Amendment's Due Process Clause, a person with a mental health disability who is charged with a crime and detained "solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

1

2.    In violation of this bedrock principle, North Carolinians with serious mental health disabilities[1] and other cognitive disabilities are languishing in jails for months, and in some severe cases, years at a time. Their prolonged detention extends well beyond what is reasonable under the circumstances for an evaluation and determination of whether they possess the requisite mental capacity to proceed to trial.

3.    This is an action for declaratory and injunctive relief to reduce the profoundly harmful and unconstitutionally prolonged detention times experienced by people with mental health disabilities who have been charged with crimes and who await capacity assessments or restoration services administered by the North Carolina Department of Health and Human Services ("NCDHHS").

4.    Plaintiff Disability Rights North Carolina ("DRNC"), the organization mandated under federal law to protect and advocate for North Carolinians with disabilities, brings this action under 42 U.S.C. § 1983, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"), and alleges as follows:

---

[1] "Mental health disabilities," often referred to as mental illnesses, includes psychiatric conditions including, but not limited to, schizophrenia, schizoaffective disorder, and bipolar disorder.

2

5.     NCDHHS, the agency charged with delivering services to people suspected of incapacity to proceed due to mental health disabilities or cognitive disabilities, is systemically violating the Fourteenth Amendment, ADA, and RA by failing to provide capacity assessments and restoration services to pretrial detainees who are suspected of, or adjudicated to be, incapable to proceed (collectively, "ITP detainees"), in a timely and adequate manner.  This manifests in two ways:

6.      First, individuals in North Carolina who have been charged with a crime and had their capacity to stand trial questioned often spend months waiting for a capacity assessment by Local Management Entities / Managed Care Organizations ("LME/MCOs") or Central Regional Hospital ("Central Regional").

7.     Second, individuals in North Carolina who have been charged with a crime, adjudicated incapable to proceed to trial, and ordered to a state psychiatric hospital to undergo an involuntary commitment examination or capacity restoration services wait months for bed space necessary to receive these court-ordered services.

8.     Due to NCDHHS' failure to administer mental health assessments, services, and treatment in a timely fashion at state hospitals or other appropriate integrated community settings, ITP detainees wait an

3

average of two months for their capacity assessment to be completed and nearly five months for treatment at a state psychiatric hospital. During such time, ITP detainees, who have not been adjudicated guilty of the charges against them, remain incarcerated and untreated. In fact, the wait times for bed space at licensed NCDHHS facilities can be so long that some ITP detainees spend more time in pretrial detention awaiting a capacity assessment and subsequent treatment than they ever would receive as a sentence if convicted.

9. Making matters worse, the number of beds in state facilities for people with mental health disabilities has declined significantly over the last decade. A report by the Treatment Advocacy Center, a non-profit organization that advocates for the needs of people with severe mental health disabilities, indicates that North Carolina's capacity has fallen from 892 to 453 beds during the last seven years.[2]

---

[2] *See* Shanti Silver & Elizabeth Sinclair Hancq, *Prevention Over Punishment: Finding the Right Balance of Civil and Forensic State Psychiatric Hospital Beds*, Treatment Advocacy Center at 5 (January 2024), https://www.treatmentadvocacycenter.org/wp-content/uploads/2024/01/Prevention-Over-Punishment-Full-Report.pdf.

4

10.    Of the 435 remaining beds at state psychiatric facilities, about 35% are occupied by individuals who are ready for discharge but unable to leave.[3] Most often in these instances, individuals who are ready for discharge are unable to be discharged because of a lack of appropriate services available in the community.  Defendants are charged with ensuring that LME/MCOs fulfill their statutory and contractual duties to develop and maintain adequate provider networks in the community.  42 C.F.R. § 438.206(b)(1).

11.    As a result of these systemic failures, North Carolina's ITP detainees who have severe mental health disabilities or cognitive disabilities are left in county jails and receive little to no treatment, which exacerbates their conditions.  Adam Anderson, Barbara Brown, Carl Cline, Devin Davis, and Eliza Evans,[4] ITP detainees whose experiences are discussed herein, were all left to languish in county facilities for prolonged periods of time waiting for NCDHHS to comply with its constitutional and statutory obligations.

12.    County jails are intense and stress-inducing environments, generally not suitable for those diagnosed with any kind of debilitating

---

[3] *See* NCDHHS, LMEMCO/TP Dashboard, https://www.ncdhhs.gov/lmemcotp-dashboardjan/open, (last visited April 16, 2024).

[4] Except where otherwise noted, Plaintiff has created pseudonyms to protect the privacy of the ITP detainees described here.  Should the Court request disclosure of these individuals' real names, Plaintiff will file appropriate motions under Local Rule 5.4 seeking leave to submit this information under seal.

5

ailment, let alone severe mental health disabilities. Prolonged detention in such environments can lead ITP detainees to experience a further decline in mental health, which can result in self-harm and threats to ITP detainee safety.

13. This is a statewide crisis. NCDHHS's mismanagement and failure to provide essential mental health services on a timely basis exacerbates existing problems and inflicts cruel and unusual pain and suffering on ITP detainees who wait at length for the services NCDHHS is legally obligated to provide.

14. ITP detainees in North Carolina wait far longer for these services than similarly situated individuals in other states. In neighboring Virginia, for example, the average reported wait time for an ITP detainee to receive a capacity assessment is seven days.[5]

15. DRNC brings this action against Defendant Kody Kinsley, NCDHHS Secretary, in his official capacity under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment to the United States Constitution. Further, DRNC asserts claims against NCDHHS and Kinsley, in his official capacity, under 42 U.S.C. § 12132 for violations of Title II of the ADA and under 29 U.S.C. § 794(a) for violations of Section 504 of the RA.

---

[5] Silver and Hancq *supra* note 2, at 10.

Case 1:24-cv-00335-UA-JLW   Document 1   Filed 04/18/24   Page 6 of 46

## JURISDICTION AND VENUE

16.     Plaintiff brings this action under 42 U.S.C. § 1983; the ADA, 42 U.S.C. § 12101 et seq.; and the RA, 29 U.S.C. § 701 et seq.

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, which provides federal district courts original jurisdiction in civil actions arising under the U.S. Constitution and the laws of the United States, and 28 U.S.C. § 1343(a)(3), which provides federal district courts original jurisdiction in civil actions to redress the deprivation, under color of state law, of any right secured by the U.S. Constitution.

18.     This Court has personal jurisdiction over Defendants because they are residents of North Carolina.

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendants are charged with administering court-ordered capacity assessment, treatment, and restoration services throughout the state, including for all counties within the Middle District of North Carolina.  Therefore, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

Case 1:24-cv-00335-UA-JLW   Document 1   Filed 04/18/24   Page 7 of 46

# PARTIES

## I.  Plaintiff

20.     DRNC is the federally designated protection and advocacy agency charged with protecting the rights of people with disabilities in North Carolina. DRNC handles cases involving discrimination, abuse, and other violations of protected rights, providing services at no cost to North Carolinians with disabilities. DRNC is a private, independent, 501(c)(3) nonprofit, and a member of the National Disability Rights Network, the nonprofit membership organization for the federally mandated Protection and Advocacy System for individuals with disabilities.

21.     As the protection and advocacy organization for North Carolina, DRNC is federally mandated and empowered to conduct monitoring and investigations in facilities where people with disabilities live and receive services, and pursue legal remedies on behalf of North Carolinians with disabilities.  *See* 42 U.S.C. § 15043(a)(2)(A)(i); 42 U.S.C. § 15041, *et seq*.; 42 U.S.C. § 10801, *et seq*.; 29 U.S.C. § 794e.

22.     More than half of DRNC's board of directors and advisory council members are individuals with disabilities or are family members, guardians, or advocates for people with disabilities.  DRNC conducts annual surveys of the disability community to determine the specific areas of advocacy on which

8

the organization will focus. Members of the disability community have the right to file grievances if they disagree with actions taken by DRNC or if they are wrongly denied services by DRNC.

23.    Defendants have failed to provide DRNC's constituents — including, but not limited to, Adam Anderson, Barbara Brown, Carl Cline, Devin Davis, and Eliza Evans — timely capacity assessments and restoration services required by law, resulting in unnecessarily prolonged and harmful imprisonment in county jails. *See Timothy B. v Kinsley*, No. 1:22-CV-1046, 2024 WL 1350071, at *11 (M.D.N.C. Mar. 29, 2024) ("[g]iven DRNC's statutory mandates, and the ability of DRNC's constituents to influence its priorities and activities, this court finds that DRNC may sue on behalf of its constituents as a traditional membership organization may").

24.    DRNC sues on behalf of ITP detainees in North Carolina who are detained in county jails for extended periods of time while they await ITP or involuntary commitment examinations and/or treatment at a state psychiatric hospital or other appropriate integrated settings.

9

## II. Defendants

### a. NCDHHS

25.     NCDHHS manages the delivery of health-related services for all North Carolinians, including North Carolina's most vulnerable citizens.[6]

26.     NCDHHS has the statutory duty to provide the necessary management, policy development, and establishment and enforcement of standards for the provision of services in the fields of public and mental health and rehabilitation with the intent to assist North Carolinians in achieving and maintaining an adequate level of health, social and economic well-being, and dignity. *See* N.C. Gen. Stat. § 143B-137.1.

27.     NCDHHS, through the Division of State Operated Health Facilities ("DSOHF") and the Division of Mental Health, Developmental Disabilities, and Substance Use Services, is charged with operating state facilities and overseeing other services for the assessment and treatment of persons accused of crimes who have mental health disabilities or other cognitive disabilities that may affect their mental capacity (for example, a traumatic brain injury). Specifically, NCDHHS is responsible for administering and overseeing services necessary to determine an individual's

---

[6] NCDHHS, https://www.ncdhhs.gov/ (last visited April 16, 2024).

capacity to proceed, to assess criteria for involuntary commitment, and to provide treatment aimed at restoring capacity.[7]

28.     State-funded mental health, substance use disorder, and developmental disability services are provided in communities through one of four LME/MCOs approved by NCDHHS.[8]  *See* N.C. Gen. Stat. §§ 122C-115.4(a), (b), 122C-112.1(a)(1), (6)-(7).  NCDHHS, through Defendant Kinsley, oversees and administers the LME/MCOs designated to provide forensic capacity assessments for ITP detainees.  *See* N.C. Gen. Stat. §§ 143B-138.1(b)(6), 143B-147.

29.     Defendant NCDHHS is a public entity as defined by Title II of the ADA and constitutes a program or activity receiving federal financial assistance under the RA.

### b. Kody Kinsley

30.     Defendant Kody Kinsley is the Secretary of NCDHHS.  Defendant Kinsley oversees a department that has broad responsibility for all aspects of health and human services, a staff of 18,000 and an annual budget of $38

---

[7] *See* NCDHHS, *State Operated Healthcare Facilities: Facilities*, https://www.ncdhhs.gov/divisions/state-operated-healthcare-facilities/facilities (last visited April 16, 2024); and, NCDHHS, *Mental Health, Developmental Disabilities, and Substance Use Services*, https://www.ncdhhs.gov/divisions/mhddsus (last visited April 16, 2024).

[8] *See* NCDHHS, *Providers*, https://www.ncdhhs.gov/providers/lme-mco-directory (last visited April 16, 2024).

billion.[9]  As the head of NCDHHS, Defendant Kinsley "may assign or reassign any function vested in him or in his department to any subordinate officer or employee of his department."  N.C. Gen. Stat. § 143B-10(a).

31.     Defendant Kinsley is responsible for all management functions of NCDHHS and its subdivisions. *See* N.C. Gen. Stat. § 143B-10(e). This responsibility includes planning, organizing, delegating, directing, and reporting the activities of NCDHHS. *Id.*  Defendant Kinsley oversees and administers the state's provision of mental health care in local communities and state-run facilities.  *See generally* N.C. Gen. Stat. § 122C-112.

32.     Defendant Kinsley, in his official capacity, is a public entity as defined by Title II of the ADA and constitutes a program or activity receiving federal financial assistance under the RA.

---

[9] NCDHHS, *Kody Kinsley*, https://www.ncdhhs.gov/about/leadership/kody-kinsley#:~:text=Secretary%20Kinsley's%20accomplishments%20exemplify%20his,annual%20budget%20of%20%2438%20billion (last visited April 16, 2024).

## FACTUAL ALLEGATIONS

### I.     Background

33.     Prosecuting an individual who does not have the capacity to stand trial violates the Due Process Clause of the Fourteenth Amendment. *Pate v. Robinson*, 383 U.S. 375, 377-78 (1966).

34.     To have capacity, a criminal defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." *Dusky v. U.S.*, 362 U.S. 402, 402 (1960).

35.     Under North Carolina law, "[n]o person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner." N.C. Gen. Stat. § 15A-1001(a). This condition is referred to by state statute as "incapacity to proceed." *Id.*

36.     In a criminal proceeding, the defendant, prosecutor, defense counsel, or court can make a motion at any time to question the capacity of the defendant. N.C. Gen. Stat. § 15A-1002(a). Upon such a motion, the criminal

13

court must hold a hearing to determine the defendant's capacity to proceed. N.C. Gen. Stat. § 15A-1002(a)(b)(1).

37.     To help determine capacity, the criminal court may appoint medical experts, including local forensic evaluators, to perform a capacity assessment and produce a report for the court.  N.C. Gen. Stat. § 15A-1002(b)(1a).  If the court orders a capacity assessment, the capacity hearing cannot be held until after the assessment.  N.C. Gen. Stat. §15A-1002(b)(1).

38.     If a person who may be ITP is charged with a felony, the criminal court also may order the defendant to a state facility for the mentally ill for "observation and treatment" not to exceed 60 days.  N.C. Gen. Stat. § 15A-1002(b)(2).

39.     To assess capacity, the criminal court inquires whether the defendant can:

   a.  understand the nature and object of the proceedings;

   b.  comprehend his or her situation in reference to the proceedings; and

   c.  assist in his or her defense in a rational or reasonable manner.

*See* N.C. Gen. Stat. § 15A-1001(a).  If the court determines that a defendant is unable to satisfy one or more of these criteria, the defendant is incapable to proceed.  *Id.*

14

40.     If the criminal court determines that a person is incapable to proceed, North Carolina law requires that the court next determine whether there are "reasonable grounds to believe the defendant meets the criteria for involuntary commitment under Part 7 of Article 5 of Chapter 122C." N.C. Gen. Stat. § 15A-1003(a).

41.     The following criteria for involuntary commitment ("IVC") are evaluated by a mental health professional authorized by NCDHHS to conduct IVC examinations:

> a. (for inpatient commitment) the person is mentally ill and is a danger to themselves or others, N.C. Gen. Stat. § 122C-268(j); or,
>
> b. (for outpatient commitment) the person is mentally ill and needs treatment to prevent deterioration that would result in dangerousness, N.C. Gen. Stat. § 122C.261(b).

42.     Where an examiner determines that a person meets criteria for inpatient commitment, the person may be temporarily detained in a 24-hour facility designated by NCDHHS.[10] N.C. Gen. Stat. § 122C-263(d)(2). However, a civil district court, not the criminal court, will decide whether a person will

---

[10] A "24-hour facility" is a facility that provides a structured living environment and services for a period of 24 consecutive hours or more and includes hospitals. N.C. Gen. Stat. § 122C-3(14)(g). State law governing IVC procedures authorizes the NCDHHS Secretary to designate 24-hour facilities "for the custody and treatment of involuntary clients" and specifies that [d]esignation of these facilities shall be made in accordance with rules of the Secretary that assure the protection of the client and the general public." N.C. Gen. Stat. Ann. § 122C-252.

Case 1:24-cv-00335-UA-JLW   Document 1   Filed 04/18/24   Page 15 of 46

be involuntarily committed after an appropriate hearing. N.C. Gen. Stat. §122C-268(a).

43.     In practice, the ITP and IVC processes are intertwined, reflecting legislative intent to comply with the limits on non-therapeutic detention announced in *Jackson v. Indiana*.  As the *Jackson* Court held:

> [A] person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.  If it is determined that this is not the case, *then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen or release the defendant.* Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal.

> 406 U.S. 715, 738 (internal citation omitted) (emphasis added).

44.     The North Carolina General Assembly expressly drafted the ITP statutes to ensure compliance with *Jackson*'s mandate:

> In order to accomplish [*Jackson's*] requirements, this Article provides that when the trial court determines that the defendant does not have capacity to proceed, it will direct the initiation of civil commitment proceedings.  *This will eliminate the possibility that a defendant suffers extended commitment simply because he has been accused of a crime.  Thus the defendant who is not dangerous, but who lacks capacity for trial, can be released.*  That result is required by the *Jackson* case.  What the criminal court

16

can do is to enter appropriate orders to provide for the return of the defendant for trial, as it can do for any other defendant.[11]

45.     Thus, after finding a defendant ITP, a criminal court judge must determine whether there are reasonable grounds to believe the defendant meets the criteria for involuntary commitment.  If that judge finds reasonable grounds, they must initiate the IVC process by entering a custody order that requires the ITP defendant to undergo an IVC examination.  From this point on, IVC proceedings are governed by the civil involuntary commitment statutes (Part 7 of Article 5 of Chapter 122C).  *See* N.C. Gen. Stat. § 15A-1003.

46.     Under the civil IVC process, the ITP defendant must be examined by a mental health professional to determine if they meet the IVC criteria and should be involuntarily committed.  *See* N.C. Gen. Stat. § 122C-263(c).  A civil district court, separate from the criminal court, then reviews the medical professional's examination results and other relevant evidence at a district court hearing.  N.C. Gen. Stat. § 122C-268.  If the district court finds that an ITP defendant meets the standard for involuntary commitment, the defendant is committed to state-designated mental health facility.  N.C. Gen. Stat. § 122C-271(b)(2).

---

[11]   North Carolina General Statutes, Article 56. Incapacity to Proceed. CRIMINAL CODE COMISSISSION COMMENTARY (available at https://www.sog.unc.edu/sites/default/files/course_materials/StatutesandForms.pdf) (emphasis added).

47. Upon information and belief, during an ITP detainee's commitment at a state psychiatric hospital for IVC proceedings, they may receive restoration services.

48. After an ITP detainee receives restoration services, they are reevaluated to determine whether their capacity has been restored. If capacity is restored, the ITP detainee's criminal case continues.

49. If an ITP detainee does not meet the involuntary commitment standard, and there is not a substantial probability of capacity restoration in the foreseeable future, the ITP detainee must be released under *Jackson*.

50. Notably, even if an individual's capacity is not restored during IVC proceedings, North Carolina law allows the state to reinitiate criminal proceedings against an individual who later regains capacity. Any facility housing an ITP detainee with active criminal charges remains under "appropriate orders to safeguard the defendant and to ensure his return for trial" should they regain capacity. N.C. Gen. Stat. § 15A-1004(a). These orders "must require and provide for the return of the defendant to stand trial in the event that he gains capacity to proceed[.]" N.C. Gen. Stat. § 15A-1004(e).

51. The following chart indicates the progression of ITP cases according to North Carolina law, with the red octagons indicating steps in the process where ITP detainees are frequently detained in county jails awaiting

18

capacity assessments or restoration treatment that Defendants are obligated to provide.



## II. ITP Detainees are Frequently Jailed for Months Awaiting Court-Ordered Capacity Assessments and Restoration Services that Defendants are Obligated to Provide.

52. ITP detainees often languish in jail for prolonged periods of time during the ITP process. They remain in jail as they wait for judges to order capacity assessments. And, since 2022, ITP detainees wait more than two months for their report to be completed after their assessment is ordered. If detainees are found to be ITP, they spend nearly another five months in jail awaiting placement in state psychiatric hospitals for IVC examination and capacity restoration services.

53. Dr. Robert Cochrane, Statewide Director of the Forensic Services at DSOHF, has acknowledged "Many people do sit months and months, over a

year, not getting the treatment that they need, . . . [a]nd the jails . . . just don't have the resources.  You know, they're not hospitals, they're not clinics."[12]

### a. Delays Awaiting Initial Capacity Assessments.

54.     Initial capacity assessments are conducted either by local forensic evaluators through LME/MCOs or evaluators at Central Regional.

55.     Defendant NCDHHS is the single state agency responsible for the oversight of the LME/MCOs that provide mental health services, including the local forensic evaluators who are charged with conducting capacity assessments.  Defendants have the authority and responsibility to ensure that each LME/MCO maintains an adequate number of providers to deliver all necessary services in a timely manner.

56.     As of the date of this filing, there are four LME/MCOs responsible for initial capacity assessments: (1) Vaya Health; (2) Trillium Health Resources; (3) Partners Behavioral Health Management; and (4) Alliance Health.

57.     Central Regional conducts capacity assessments only for individuals charged with felonies.

---

[12] Lyons, Kelan, *Experts: Lack of mental health services is spurring a 'capacity crisis' in NC Jails*, NC Newsline (April 4, 2024), https://ncnewsline.com/2024/04/04/panel-discusses-the-capacity-crisis-facing-many-of-those-in-nc-jails/?emci=e8fd6c9b-1cf2-ee11-aaf0-002248089b1e&emdi=c2928ad7-7af2-ee11-aaf0-002248089b1e&ceid=238938.

58.     From January 2022 to the present, ITP detainees waited an average of 68 days from the day the LME/MCO or Central Regional received the order for their capacity assessment until the LME/MCO (or Central Regional) issued its capacity assessment report.

59.     Individuals charged with felonies often wait almost twice as long for their capacity assessments to be completed, as Central Regional takes an average of 127 days to complete a capacity assessment report after receiving an assessment order.

60.     To make matters worse, upon information and belief, local capacity assessments are often deemed inadequate by the criminal court, necessitating a referral for a *second* capacity assessment at Central Regional. These second assessments further delay the capacity hearing and restoration process for the person under evaluation, increase the amount of time the person spends in jail and the harms of incarceration, and further bog down the criminal legal system.

61.     On information and belief, Defendants have failed to hold LME/MCOs accountable for the lack of available qualified providers to conduct local capacity assessments.

21

## b. Delays Awaiting Restoration Services Conducted by State Psychiatric Hospitals.

62.     Central Regional is one of North Carolina's three state psychiatric hospitals and is the only one to operate a forensic services unit dedicated to the examination and treatment of people who are facing criminal charges.  The other state psychiatric hospitals, Broughton Hospital ("Broughton") and Cherry Hospital ("Cherry"), do not have a forensic services unit and do not conduct initial capacity assessments.[13]

63.     From 2016 to 2023, the number of state psychiatric beds in North Carolina decreased by about 51%.[14]

64.     Since at least 2017, wait times for capacity assessments and restoration services at state psychiatric hospitals have increased steadily.

65.     In 2023, out of the 453 state psychiatric beds, only 82 beds, or 18 percent, were designated forensic beds.[15]  There were 197 people on the forensic wait list for a treatment bed.[16]

---

[13] While Broughton and Cherry do not have a dedicated forensic unit for ITP individuals facing charges, these hospitals still provide restoration services. Broughton provides restoration services for ITP detainees in the western part of the state and Cherry services the eastern part of the state.
[14] *See* Silver & Hancq, supra note 2, at 5.
[15] *Id*. at 27.
[16] *Id*. at 29.

22

66.     Currently, Central Regional's forensic unit is operating at reduced capacity. Central Regional has been limiting admissions to the hospital and the forensic unit for over a year due to staffing shortages.

67.     Although there are 120 beds in the forensic unit, Central Regional utilizes only about 65% of those beds at a time.

68.     During the COVID-19 pandemic, DSOHF reduced the available forensic service beds to 78 in total (58 for males and 20 for females).  Capacity has not been restored to the full 120 available beds.  The current capacity of the forensic unit is still between 75 and 78 beds.

69.     As a result, individuals with mental health disabilities or other cognitive disabilities wait months for placement at Central Regional to undergo a capacity assessment or receive restoration treatment services.

70.     From 2022 to the present, the average wait time from a court order for restoration services to placement at any of the state's three psychiatric hospitals is 145 days — almost five months.  More recently, from January 2024 to February 2024, the wait time was 197 days — over 6.5 months.

## III.     Delays Awaiting Involuntary Commitment Examination and/or Treatment.

71.     ITP detainees also face long delays and significant time in local jails awaiting transfer to a state psychiatric hospital for IVC examinations.

23

72. Upon information and belief, many ITP detainees are placed on a wait list for placement at a 24-hour facility for IVC examinations. During this waiting period, many ITP detainees spend months incarcerated in local jails that are not equipped to provide the intensive mental health care they need.

73. Upon completion of the IVC examination, the superior court clerk is required to schedule the district court IVC hearing and appoint counsel for IVC proceedings.[17] N.C. Gen. Stat. §§ 122C-264(b)-(d). These duties — necessary to move the ITP detainee's case forward and prevent extended detention — are only triggered when the clerk receives the findings from the state-provided IVC examination.

74. While awaiting IVC examinations, many ITP detainees remain in a due process "limbo," without legal representation or a scheduled hearing. This limbo exists because their criminal case is paused while they are processed through the civil commitment proceedings, but their legal representation in the IVC proceedings does not begin until the IVC examination is complete and an IVC hearing is scheduled.

---

[17] Counsel appointed in an ITP detainee's criminal case ordinarily does not represent the detainee in civil IVC proceedings, which take place in a different court.

## IV. The Significant Harms of Prolonged Detention in County Jails that are Not Equipped to Treat ITP Detainees.

75. The extended incarceration of ITP detainees in jails, arising in large part from Defendants' inadequate provision of assessment and treatment services, places the burden on county jail administrators and personnel to meet the mental health needs of these individuals and keep them safe.

76. Almost all county jails lack the resources, staff, and training necessary to provide services for individuals with serious mental health disabilities. As a result, the long detention of ITP detainees in jail frequently exacerbates their mental health disability.

77. Detained for long periods of time without appropriate mental health care or restoration services, persons with serious mental health disabilities will often decompensate, increasing their risk of harm and making capacity restoration more difficult.

78. Because persons who have severe mental health disabilities or other cognitive disabilities often have problems following jail rules and regulating their conduct, jail staff often resort to solitary confinement, restraints, or other extreme confinement and isolation measures to manage physical aggression, outbursts, or other problematic behaviors. Use of these

measures, especially if prolonged, often increases the risk of further decompensation and self-harm.

79.     When housed among other jail detainees, persons with mental health disabilities and other cognitive disabilities are especially vulnerable to manipulation, threats, and aggression by others.

80.     Compounding the problem, some North Carolina jails are overcrowded, posing safety risks to mentally ill detainees and those around them.  In a recent interview, Wake County Sheriff Willie Rowe commented: "We house inmates in cells, and sometimes due to limited space, we have to house them outside of the cells . . . .  So we provide bedding that's placed in the open areas, and that's where they'll be sleeping."[18]

81.     Each year, at least half of North Carolina jails undergoing biannual inspections fail, often for issues such as overcrowding and failure to adequately supervise detainees.

82.     Many jails house more people than they were designed to hold, and others are so severely understaffed they cannot control the flow of contraband or maintain jail safety, leading to an increase in violent incidents.

---

[18] Tom George, *Wake County jails near capacity; sheriff calls for long-term fix*, ABC 11 (February 28, 2024), https://abc11.com/jail-overcrowding-wake-county-willie-rowe-detention-center/14476666/.

26

83.     North Carolina jail death rates have climbed precipitously over the past few years, with 77 detainees dying in 2022.  Many of these deaths are suicides, which accounted for 23 (about 30%) of the deaths in 2022.

84.     In 44 of those 77 deaths, the jail where it occurred failed the resulting death inspection by the Division of Health Services Regulation ("DHSR").  Forty-two of those inspections cited the jails for failure to properly supervise people in their custody. Of the 23 suicides, 15 jails failed the DHSR death inspections, all for failing to properly supervise people in their custody.

85.     Durham County, which has a jail capacity of 576, reported that 136 detainees were placed on suicide precautions in 2023.  Cabarrus County reported 13 suicide attempts in 2022.  Buncombe County reported 44 suicide attempts in 2021 and 10 suicide attempts in the first four months of 2022.

## V.     Illustrative Examples of How Defendants' Failure to Provide Timely Assessments and Services Impacts ITP Detainees.

86.     Defendants' failure to provide timely assessment and treatment services to ITP detainees inflicts a terrible toll, as illustrated by the following cases:

### a. Adam Anderson

87.     Adam Anderson is a 46-year-old man who had been diagnosed with schizophrenia and bipolar type schizoaffective disorder.  Mr. Anderson also

27

experienced a traumatic brain injury. In February 2021, he was convicted and placed on supervised probation for larceny of a motor vehicle. On June 7, 2021, he was arrested in Columbus County for a felony probation violation. On August 10, 2021, Mr. Anderson was ordered to receive a capacity assessment by an LME/MCO evaluator. That assessment was completed on October 1, 2021. On November 3, 2021, the Court ordered a second capacity assessment to be completed by Central Regional Hospital. That assessment was conducted by video on December 15, 2021, and the assessment report was completed on December 21, 2021. On February 10, 2022, the Court found Mr. Anderson incapable of proceeding to trial and ordered him to be admitted to Cherry State Hospital for IVC examinations and restoration services. Mr. Anderson was not admitted to Cherry until nine months later, on November 15, 2022.

88.     From the time of his initial arrest to his admission to Cherry, Mr. Anderson spent 17 months in Columbus County Jail, often in acute psychiatric distress, before he received appropriate treatment. Jail staff noted that Mr. Anderson experienced unstable moods, paranoia, and combative behavior and was eventually shackled due to aggressive behavior. He was frequently placed in solitary confinement because of behaviors resulting from his mental distress. Twelve of the 17 months Mr. Anderson was detained in Columbus County jail were spent waiting on services to be rendered by Defendants.

28

### b. Barbara Brown

89.     Barbara Brown is a 34-year-old woman who has been diagnosed with bipolar disorder, schizophrenia, and post-traumatic stress disorder. Ms. Brown was first arrested in Caswell County on March 25, 2023, based on a failure to appear warrant issued by Alamance County. During her transfer to Alamance County jail, Ms. Brown became combative, kicked the cage of the transport van, and spat through the gate onto the transport officer. She was later charged with malicious conduct by a prisoner. On August 2, 2023, the Caswell County district court ordered a capacity assessment to be completed by Central Regional Hospital. The capacity assessment report was submitted to the Court over three months later, on November 15, 2023.

90.     While in jail, Ms. Brown repeatedly committed acts of self-harm that consisted of pulling her hair, slapping herself, punching herself, and giving herself a black eye. She was placed in solitary confinement for six months.

91.     On January 22, 2024, the Court determined that Ms. Brown was incapable of proceeding to trial and ordered her to be committed. On January 26, 2024, she was admitted at Central Regional. While she was detained in county jail, Ms. Brown's father advocated vigorously on her behalf. Upon

29

information and belief, this advocacy significantly benefited Ms. Brown as she went through the ITP process.

### c. Carl Cline

92.     Carl Cline is a 26-year-old man who was born without lower arms and survived cancer as a teenager.  Mr. Cline has been diagnosed with bipolar affective disorder, manic with psychotic features, schizophrenia, and schizoaffective disorder.  Mr. Cline was arrested in March 2020 for felony stalking.  On April 6, 2020, his need for intensive mental health treatment was identified, and he was sent to Central Prison for mental health treatment that Alexander County jail could not provide.  He stayed in Central Prison until July 2020.  Upon return to Alexander County, Mr. Cline was released to his family. He entered a deferred prosecution agreement and was placed on probation.  On January 2, 2022, he was arrested for a probation violation.  On January 5, 2022, the Court ordered a capacity assessment to be completed by Central Regional Hospital.  The capacity assessment was conducted by video on March 24, 2022.  The examiner's report was produced on April 11, 2022.

93.     On April 28, 2022, the Court found Mr. Cline ITP and ordered his admission to Broughton State Hospital for restoration services.  Broughton refused to accept him due to a lack of available beds.  Eight months later, Mr. Cline was still in Alexander County jail.  On June 1, 2022, Captain Lunsford

of Alexander County jail called Broughton to ask when Mr. Cline would be admitted. Captain Lunsford was informed that Mr. Cline was number 38 on the wait list.

94. On December 16, 2022, Mr. Cline's counsel moved for review of his case. On January 9, 2023, the Court ordered Broughton to admit Mr. Cline within 30 days or appear and show cause. On February 10, 2023, the Court again ordered Broughton to admit Mr. Cline or appear and show cause. Finally, on February 21, 2023, more than 10 months after the order for treatment was entered, Mr. Cline was admitted to Broughton for services. In total, Mr. Cline was in custody for 13 months. Approximately 12 of those months were the result of waiting to be evaluated and admitted for services by Defendants. Mr. Cline experienced acute psychiatric harm due to his unnecessarily prolonged incarceration. Consequently, Mr. Cline was placed in segregation and was repeatedly on suicide watch while in jail.

### d. Devin Davis

95. Devin Davis is a 21-year-old young man who has been diagnosed with schizophrenia and a cognitive disability. In January 2023, Mr. Davis was charged in Iredell County for felony assault on an emergency personnel for allegedly punching a hospital staff member while he was in the hospital. On May 12, 2023, the Court ordered a capacity assessment to be conducted by a

31

local forensic evaluator.  On May 26, 2023, Mr. Davis was arrested for Assault on a Female, after he allegedly hit his mother multiple times in the head while holding car keys.  His mother called law enforcement to have him involuntarily committed.  On August 4, 2023, the Court ordered a capacity assessment to be conducted by Central Regional Hospital.  Over six months later, on February 21, 2024, the assessment was conducted. As of the date this complaint was filed, Mr. Davis remains in the custody of Iredell County jail,[19] and his capacity evaluation has yet to be submitted to the court.

### e. Eliza Evans

96.     Eliza Evans is a 34-year-old woman who has been diagnosed with schizophrenia and schizoaffective disorder.  On October 13, 2021, she was arrested in Sampson County for possession of methamphetamines, and was subsequently charged with assault causing physical injury to a detention officer.  On February 24, 2022, the court ordered a capacity assessment to be conducted by Central Regional.   On May 2, 2022, a forensic evaluator submitted a report finding her ITP.  On June 26, 2023, the court adjudicated Ms. Evans ITP and ordered her to be involuntarily committed to Cherry State Hospital.   Over 11 months later, on April 1, 2024, Ms. Evans was finally

---

[19] Mr. Davis is at Central Prison for medical attention but remains in the custody of Iredell County jail.

admitted to Cherry. Ms. Evans spent over 11 months in Sampson County jail waiting for assessment and treatment services that Defendants are statutorily obligated to provide.

### f. Devonte Watson and other Cleveland County ITP Detainees

97.    In March 2024, PBS Frontline aired a documentary titled "Fractured," about the ITP detainee crisis in North Carolina jails. The documentary featured an interview with Durwin Briscoe, Chief Deputy of the Cleveland County Sheriff's Office.[20] At the time of his interview, Chief Briscoe reported that Cleveland County jail held about six ITP detainees. Chief Briscoe stated that one individual had been waiting for about eight months, while another had been waiting for over a year.

98.    Chief Briscoe disclosed that his own nephew, Devonte Watson,[21] was subjected to extended jail detention while waiting for Defendants to provide services. Mr. Watson is 31 years old and was arrested in July 2022 for three pending charges, including assault on a law enforcement officer that

---

[20]      *Fractured*,       Frontline,      (March       5,       2024), https://www.pbs.org/wgbh/frontline/documentary/fractured/.

[21] Unlike the ITP detainees mentioned above, Devonte Watson has not been provided a pseudonym. His story and name have already been publicized in "Fractured." *See id.*

allegedly occurred when he was arrested for stealing his mother's car.[22]  Four months later, in November 2022, Mr. Watson was declared ITP. Upon information and belief, in March 2024, Mr. Watson was still waiting for a bed in Broughton. Chief Briscoe commented:

> I truly feel that the longer he sits in jail, it changes his mental status and he's going to continue to go downhill. It's difficult for me to see that he's inside the jail not getting the proper care that he needs. And it's no fault of the jail. Jails are not designed to give the proper care for mentally ill inmates.[23]

## COUNT 1

### 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution (Substantive Due Process)

*Against Defendant Kinsley in his official capacity for declaratory and injunctive relief*

99.     Plaintiff incorporates the allegations in all preceding paragraphs as if stated fully herein.

100.     Plaintiff asserts this claim for violation of the Due Process Clause of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

101.     The Due Process Clause prohibits state officials from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

---

[22] *Id.*

[23] *Id.*

102. ITP detainees have a liberty interest in freedom from incarceration. When an individual accused of a crime is detained pre-trial, the Due Process Clause requires that the nature and duration of the individual's involuntary confinement bear a reasonable relation to the purpose for which they are committed.

103. Prolonged confinement of an ITP detainee, during which the detainee is not receiving capacity assessments or treatment, does not bear a reasonable relation to any legitimate purpose of such confinement.

104. ITP detainees have a life and liberty interest in personal safety and receiving adequate mental health care while in government custody.

105. While detained, ITP detainees also have a constitutional right to individualized treatment to provide a realistic opportunity for capacity restoration, mitigation of severe mental pain, improvement of their mental condition, and prevention of suicide and other forms of self-harm.

106. No legitimate state interest justifies the confinement of mentally ill individuals in county jails for months. The extended non-therapeutic confinement of many ITP detainees is not reasonably related to the purpose of their current confinement — to determine whether they have capacity or to restore their capacity to proceed to trial. Because individuals are not receiving capacity assessments or restoration services during these prolonged wait times

(and often decompensate during prolonged detention), the duration of their confinement is unrelated to the purpose of their confinement.

107.    Once an individual is found unable to aid and assist in his or her own defense, the only lawful purpose of confinement is treatment to restore the individual's capacity or otherwise appropriately treat their cognitive disability.

108.    County jails in North Carolina currently do not have the ability or resources to provide capacity assessments and restorative mental health services required by the United States Constitution and North Carolina law.

109.    Under state law, NCDHHS bears sole responsibility to administer the statutorily mandated system of capacity assessment and restoration services for ITP detainees.

110.    The prolonged confinement also amounts to further punishment imposed without conviction in instances when an ITP detainee has been, or will be, incarcerated for longer than his or her maximum criminal exposure.

111.    Defendant Kinsley has failed and continues to fail in his duty to provide an adequate level of health care for ITP detainees in a constitutionally timely manner.

112.    Defendant Kinsley has violated ITP detainees' rights under the Due Process Clause of the Fourteenth Amendment.

113.    Unless    enjoined    from    continuing    NCDHHS's    current
unconstitutional policies and practices, Defendant Kinsley will continue to
violate the constitutional rights of ITP detainees.

## COUNT 2

### 42 U.S.C. § 1983 and the Fourteenth Amendment to the U.S. Constitution (Procedural Due Process)

*Against Defendant Kinsley in his official capacity for
declaratory and injunctive relief*

114.    Plaintiff incorporates the allegations in all preceding paragraphs
as if stated fully herein.

115.    Plaintiff asserts this claim for violation of the Due Process Clause
of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.

116.     The Due Process Clause of the Fourteenth Amendment to the
United States Constitution prohibits state officials from "depriv[ing] any
person of life, liberty, or property, without due process of law."  U.S. Const.
amend. XIV, § 1.

117.    ITP detainees possess a protected liberty interest in avoiding
prolonged detention in local county jails.  ITP detainees have liberty interests
in assessments and treatment that could enable them to participate in
defending against criminal charges and would enable their criminal cases to

expeditiously proceed to resolution, whether by plea bargains, trial, dismissal, or involuntary commitment.

118.    Defendant Kinsley, by the inadequate administration and operation of the ITP system, has violated these detainees' rights to procedural due process under the Fourteenth Amendment to the U.S. Constitution.

119.    Unless enjoined from continuing NCDHHS's current unconstitutional policies and practices, Defendant Kinsley will continue to violate the constitutional rights of ITP detainees.

## COUNT 3

### Discrimination in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

*Against Defendant North Carolina Department of Health and Human Services and Defendant Kinsley, in his official capacity, for declaratory and injunctive relief*

120.    Plaintiff incorporates the allegations in all preceding paragraphs as if stated fully herein.

121.    Title II of the ADA requires, *inter alia*, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. "Discrimination" includes:

38

a. failing to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d);

b. employing "criteria or methods of administration" . . . "[t]hat have the effect of subjecting qualified individuals with disabilities to discrimination" or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3); and

c. failing to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7).

122. NCDHHS and Defendant Kinsley, in his official capacity, are "public entities" as used in Title II of the ADA. *See* 42 U.S.C. § 12131(1)(B). Defendant Kinsley is charged with oversight and operation of NCDHHS. *See* N.C. Gen. Stat. §§ 143B-138.1(b)(6), 143B-147.

123. ITP detainees qualify as individuals with disabilities as defined under 42 U.S.C. § 12131 because they have, or are regarded as having, mental health disabilities severe enough that their capacity to stand trial has been called into question, or they have already been deemed incapable to proceed to trial. *See* 42 U.S.C. § 12102.

124. Defendants have failed to administer their ITP-related services in the most integrated setting appropriate to the needs of ITP detainees.

39

125. Extended confinement of ITP individuals due to the lack of timely capacity assessment and restoration constitutes unlawful discrimination under the integration mandate of Title II of the ADA. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999) (holding that unnecessary segregation of individuals with mental health disabilities constitutes discrimination).

126. Defendants have utilized methods of administering ITP services that result in discrimination against ITP detainees. Defendants' methods of administration defeat or substantially impair benefits of the capacity assessment and restoration programs controlled by NCDHHS.

127. Defendants have failed to make reasonable modifications in policies, practices, or procedures which are necessary to avoid discrimination against ITP detainees.

128. Unless enjoined from continuing current unlawful policies and practices, Defendants will continue to violate the ADA rights of ITP detainees.

## COUNT 4
## Discrimination in Violation of the Rehabilitation Act, 29 U.S.C. § 794

*Against Defendant North Carolina Department of Health and Human Services and Defendant Kinsley, in his official capacity, for declaratory and injunctive relief*

129. Plaintiff incorporates the allegations in all preceding paragraphs as if stated fully herein.

40

130. DRNC brings this claim under the RA on behalf of North Carolinians with mental health disabilities and other cognitive disabilities. These individuals are subject to the protections of Section 504 of the RA and are otherwise qualified for nondiscriminatory services from Defendants. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.3.

131. The RA prohibits discrimination based on disability by entities receiving federal financial assistance. 29 U.S.C. § 794(a).

132. Defendant NCDHHS and Defendant Kinsley, in his official capacity, are recipients of federal financial assistance as defined in 45 C.F.R. § 84.3(h).

133. Section 504 of the RA states: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Prohibited acts of discrimination include:

    a. failing to "administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d); and

    b. employing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the

41

public entity's program with respect to individuals with disabilities. 28 C.F.R. § 41.51(b)(3); and

c. failing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 41.51(b).

134. ITP detainees qualify as individuals with disabilities as defined under Section 504 because they have or are regarded as having mental health disabilities severe enough that their capacity to stand trial has been called into question, or they already have been deemed incapable to proceed to trial. 28 C.F.R. § 41.31(a).

135. Defendants have failed to administer their ITP-related services in the most integrated setting appropriate to the needs of ITP detainees.

136. Extended confinement of ITP individuals due to the lack of timely capacity assessment and restoration constitutes unlawful discrimination under the integration mandate of the RA. 28 C.F.R. § 41.51(d).

137. Defendants have utilized methods of administering its ITP services that result in discrimination against ITP detainees. Defendants' methods of administration defeat or substantially impair the benefits of the capacity assessment and restoration programs controlled by NCDHHS.

42

138. Defendants have failed to make reasonable modifications to their policies, practices, or procedures necessary to avoid discrimination against ITP detainees.

139. Unless enjoined from continuing current unlawful policies and practices, Defendants will continue to violate the RA rights of ITP detainees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of North Carolinians with disabilities, requests that this court grant the following relief:

a. Issue a judgment declaring that the policies, practices, and conduct of Defendants, as described in this Complaint, constitute violations of the rights of North Carolinians who are believed or found to be mentally incapable to participate in their own defense under the Fourteenth Amendment to the United States Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act;

b. Issue preliminary and permanent injunctions enjoining Defendants from failing to provide timely access to capacity assessment, restoration services, and IVC examinations;

c.     Order Defendants to develop a remedial plan to reduce wait times for capacity assessments, capacity restoration treatment, and IVC examinations to within constitutional limits;

d.     Award Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 12205 and 29 U.S.C. § 794a(b); and 28 U.S.C. § 1920.

e.     Allow such other and further relief as the Court deems just and proper.


Respectfully submitted this the 18th day of April 2024.


/s/ Michele Delgado
Michele Delgado
N.C. Bar No. 50661
Kristi L. Graunke
N.C. Bar No. 51216
Ivy A. Johnson
N.C. Bar No. 52228
Amika M. Singh
N.C. Bar No. 61111
**ACLU OF NORTH CAROLINA
LEGAL FOUNDATION**
P.O. Box 28004
Raleigh, NC 27611-8004
Tel. (Delgado): (919) 256-5891
Tel. (Graunke): (919) 354-5066
Tel. (Johnson): (919) 532-3681
Tel. (Singh): (919) 885-0051
mdelgado@acluofnc.org
kgraunke@acluofnc.org

44

ijohnson@acluofnc.org
asingh@acluofnc.org

Susan H. Pollitt
N.C. Bar No. 12648
Lisa Grafstein
N.C. Bar No. 22076
Luke Woollard
N.C. Bar No. 48179
**Disability Rights NC**
801 Corporate Center Drive
Suite 118
Raleigh, North Carolina 27607
Tel.: (919) 856-2195
Fax: (919) 856-2244
susan.pollitt@disabilityrightsnc.org
lisa.grafstein@disabilityrightsnc.org
luke.woollard@disabilityrightsnc.org

John A. Freedman*
Michael L. Walden*
Colleen Couture*
**Arnold & Porter Kaye Scholer
LLP**
601 Massachusetts Avenue N.W.
Washington, DC 20001
Tel.: (202) 942-5316
john.freedman@arnoldporter.com
mike.walden@arnoldporter.com
colleen.couture@arnoldporter.com

Andrew C. Johnson*
**Arnold & Porter Kaye Scholer
LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111
Tel.: (415) 471-3321
Andrew.johnson@arnoldporter.com

45

*Special appearance forthcoming

*Attorneys for Plaintiff*