# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DISABILITY RIGHTS NORTH CAROLINA,<br><br>*Plaintiff,*<br><br>v.<br><br>THE NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES and KODY KINSLEY, in his official capacity as Secretary of the North Carolina Department of Health and Human Services,<br><br>*Defendants.* | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Case No. 1:24-cv-335 |

## <u>INTRODUCTION</u>

Defendants' Motion to Dismiss, ECF No. 22 (the "Motion"), is fatally flawed because (1) Plaintiff has standing; (2) the individual Defendants are properly named, and there are no unnamed indispensable parties; (3) *Younger* abstention is not applicable; and (4) Plaintiff sets forth detailed, well-pled allegations for which relief can, and should, be granted. For these reasons, set forth fully below, Defendants' Motion should be denied.

1

## FACTS AS PLEADED IN THE COMPLAINT

Plaintiff Disability Rights North Carolina ("DRNC"), is a private, independent, 501(c)(3) nonprofit organization and the federally mandated Protection and Advocacy ("P&A") Agency for individuals with disabilities in North Carolina. Compl. (ECF No. 1) ¶¶ 20, 21; 42 U.S.C. §§ 10801-10851. As a P&A, DRNC is federally mandated and empowered to protect and advocate for the rights of individuals with disabilities, including monitoring and investigating facilities where people with disabilities live and receive services, and pursuing legal remedies on behalf of North Carolinians with disabilities. Compl. (ECF No. 1) ¶ 21. Indeed, [1] regularly files litigation to vindicate the rights of North Carolinians with disabilities. Consistent with its statutory mandate to protect the rights of North Carolinians with disabilities, DRNC represents and sues on behalf of (i) its constituents—including Adam Anderson, Barbara Brown, Carl Cline, Devin Davis, and Eliza Evans, and Devonte Watson; and (ii) other pretrial detainees who are suspected of, or adjudicated to be, incapable to proceed (collectively "ITP detainees") and are

---

[1] *See, e.g., Timothy B. v Kinsley*, M.D.N.C. No. 1:22-CV-1046; *Disability Rights N.C. v. N.C. State Bd. of Elections*, E.D.N.C No. 5:21-CV-361; *Bone v. University of North Carolina Health Care System,* M.D.N.C. No. 1:18-cv-994; *Disability Rights N.C. v. Sprouse,* W.D.N.C. No. 1:17-cv-197; *Wilson v. Thomas*, E.D.N.C. No. 5:14-cv-85; *Disability Rights N.C. v. Frye Regional Medical Center,* WDNC No. 5:13-cv-102; *Disability Rights N.C. v. Moses H Cone Mem. Hosp.,* MDNC No. 1:11-cv-812.

2

detained in county jails for lengthy periods of time while they await capacity assessments or admission to a state psychiatric hospital for restoration services. *Id*. ¶¶ 23, 24, 87-9

NCDHHS manages the delivery of health-related services for all North Carolinians, including North Carolina's most vulnerable citizens. *Id*. ¶ 25. NCDHHS, through the Division of State Operated Health Facilities and the Division of Mental Health, Developmental Disabilities, and Substance Use Services, is charged with operating state facilities and overseeing assessment and treatment services for pretrial detainees who have mental health disabilities or other cognitive disabilities (for example, a traumatic brain injury) that may affect their mental capacity. *Id*. ¶ 27. Under North Carolina law, Defendant NCDHHS bears sole responsibility to administer the statutorily-mandated system of capacity assessment and restoration services for ITP detainees. *Id*. ¶ 109. Significant delays in NCDHHS' system result in the wrongful confinement of ITP detainees in county jails for prolonged periods of time without access to capacity assessments or treatment. *Id*. ¶¶ 2, 8, 11, 52, 64-70, 72.

Since 2022, ITP detainees have waited an average of more than two months – 68 days – for capacity assessments to be completed, and as long as eight months for some individuals. *Id*. ¶¶ 52, 58, 97. Individuals charged with

3

felonies wait far longer. *Id.* ¶ 59. NCDHHS-operated Central Regional Hospital, the primary facility conducting such assessments, takes an average of 127 days to complete a capacity assessment report after receiving an assessment order. *Id.* ¶ 59. Since 2022, detainees found to be ITP have spent an average of another five months – 145 days – awaiting placement in NCDHHS-operated state psychiatric hospitals for IVC examination and capacity restoration services. *Id.* ¶ 70. And wait times are getting longer. *Id.* In early 2024, the wait time was 197 days — over 6.5 months. *Id.*

ITP detainees in North Carolina wait far longer for assessment and treatment than similarly situated individuals in other states. *Id.* ¶ 14. For example, in Virginia, the average reported wait time for an ITP detainee to receive a capacity assessment is seven days. *Id.* As the wait time for hospital admissions has increased over the last decade, NCDHHS has dramatically *reduced* the number of treatment beds in state facilities. *Id.* ¶¶ 9, 62-68. In fact, a report by the Treatment Advocacy Center, a non-profit organization that advocates for the needs of people with severe mental health disabilities, indicates that North Carolina's capacity has fallen from 892 to 453 beds during the last seven years. *Id.* ¶ 9. Of the 435 remaining beds at state psychiatric facilities, about 35% are occupied by individuals who are ready for discharge but unable to leave. *Id.* ¶ 10. Most often in these instances, individuals who

4

otherwise are ready for discharge are not discharged because of a lack of appropriate services available in the community – a situation for which Defendant NCDHHS is responsible. *Id.*; *see also* 42 C.F.R. § 438.206(b)(1) (requiring state Medicaid agencies (here, NCDHHS) to ensure that managed care entities provide for adequate community-based mental health services.)

As a result of NCDHHS' failure to provide timely assessment and capacity restoration services, ITP detainees are languishing in county jails that lack facilities and resources to provide appropriate treatment. Compl. (ECF No. 1) ¶¶ 11, 52-53, 58-60, 75-76. This prolonged confinement is profoundly harmful to ITP detainees, putting them at risk for decompensation, making capacity restoration more difficult. *Id.* ¶¶ 2, 77. Additionally, ITP detainees detained for long periods of time are at risk of suicide and often experience solitary confinement, restraints, or other extreme confinement and isolation measures to manage physical aggression, outbursts, or other problematic behaviors. *Id.* ¶¶ 78-80, 83-84.

## LEGAL STANDARDS

In ruling on a motion under Rule 12(b)(1), the court must accept the jurisdictional allegations in the complaint unless the defendant provides evidence to dispute the veracity of such allegations. *See, e.g., Kerns v. United States*, 585 F.3d 187, 192-93 (4th Cir. 2009) (citing *Adams v. Bain*, 697 F.2d

5

1213, 1219 (4th Cir. 1982)). The court "may consider evidence outside the pleadings," *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citation omitted) and should assume the truth of the facts presented by a plaintiff's affidavits. *Fair Hous. in Huntington Comm., Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 362 (2d Cir. 2003).

In reviewing a motion to dismiss under Rule 12(b)(6), the court "must accept as true all of the factual allegations contained in the complaint" and "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).

Federal Rule of Civil Procedure 12(b)(7) provides for dismissal of an action where a litigant fails to join a party as required under Rule 19 if the court concludes that the party is "necessary" and it is feasible to join the party, and if so, whether the party is "indispensable" to the action. *National Union Fire Inc. Co. of Pittsburgh, PA v. Rite Aid of South Carolina, Inc.*, 210 F.3d 246, 249 (4th Cir. 2000). Dismissal under Rule 19(a) & (b) is "a drastic remedy" to be "employed . . . sparingly," and "pragmatically, in the context of the substance of each case, rather than by procedural formula." *Teamsters Local Union No. 171 v. Keal Driveaway Co.*, 173 F.3d 915, 918 (4th Cir. 1999) (citation omitted).

## ARGUMENT

### I. Plaintiff Has Standing To Assert Claims On Behalf Of Individuals With Mental Health Disabilities.

Defendants incorrectly assert that Plaintiff has failed to adequately plead facts that show it has standing to assert claims on behalf of ITP detainees.

The Supreme Court has long recognized that associations (such as Plaintiff) that advocate for and represent the interests of their constituents have standing to sue on behalf of those constituents. *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343-45 (1977) (finding associational standing because "it would exalt form over substance to differentiate between the Washington Commission and a traditional trade association representing the individual growers and dealers who collectively form its constituency."). Under *Hunt*, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id*. at 343. A non-membership organization can also assert associational standing when it possesses the "indicia of membership." *Id*. at 344.

7

Following this precedent, this Court recently found that DRNC has associational standing to sue on behalf of North Carolinians with disabilities. *Timothy B. v Kinsley*, No. 1:22-CV-1046, 2024 WL 1350071, at *11 (M.D.N.C. Mar. 29, 2024) ("Given DRNC's statutory mandates, and the ability of DRNC's constituents to influence its priorities and activities, this court finds that DRNC may sue on behalf of its constituents as a traditional membership organization may"). In doing so, the Court joined federal courts in North Carolina that have routinely held that DRNC has standing to sue on behalf of North Carolinians with disabilities because: DRNC vigorously pursues its statutory mandate as the federally-designated P&A for individuals with mental health disabilities in North Carolina and uses its resources to identify, investigate, and prosecute legal wrongs suffered by its constituents (such as the constitutional deprivations pleaded here); DRNC's constituents influence its priorities and activities; and, because DRNC possesses the indicia of a traditional membership organization. *See, e.g., Wilson v. Thomas*, 43 F. Supp. 3d 628, 632 (E.D.N.C. 2014) (holding that DRNC had associational standing because it "is a protection and advocacy organization whose characteristics are similar to the [organization] which the Supreme Court found to have associational standing in *Hunt*); *Disability Rts. N. Carolina v. N. Carolina State Bd. of Elections*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *2 (E.D.N.C.

July 11, 2022) (holding that "DRNC possesses the indicia of membership with individuals in and outside of congregate settings who would be able to sue on their own behalf" and that "plaintiff has satisfied the *Hunt* test and has associational standing on behalf of all of its members"); *see also Bone v. Univ. of N. Carolina Health Care Sys.*, 678 F. Supp. 3d 660, 702-03 (M.D.N.C. 2023); *Disability Rights N.C. v. Sprouse,* WDNC No. 1:17-cv-197, 2018 WL 3785465, (W.D.N.C. Aug. 9, 2018); *Disability Rights N.C. v. Frye Regional Medical Center,* WDNC 5:13-cv-102, 2014 WL 5810458 (W.D.N.C. Nov. 7, 2014); *Disability Rights N.C. v. Moses H Cone Mem. Hosp.,* MDNC 1:11-cv-812, 2013 WL 179034 (M.D.N.C. Jan. 17, 2013).

Defendants make no effort to distinguish these cases. Indeed, they ignore them altogether.[2] Instead, Defendants cite inapposite, out-of-circuit cases to argue that "Plaintiff cannot satisfy the first or third requirements of the *Hunt* test," Mot. 6-7, while conceding that Plaintiff sufficiently pleaded facts that satisfy the second *Hunt* factor (*i.e.*, that DRNC seeks to protect interests that are germane to its purpose.). *Id*. 6-10.

In the cases cited by Defendants, the assertion of associational standing failed because the plaintiff non-member organizations did not show indicia of

---

[2] Although Defendants reference *Timothy B.*, Mot. at 7, they fail to address the holding of the case. *See* Mot. at 7 .

9

membership. The Fifth Circuit declined to extend associational standing where it found that the organization's constituents were "unable to participate in and guide the organization's efforts." *Assoc. for Retarded Citizens of Dallas v. Dallas Cty. Mental Heath & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994). Similarly, the lack of standing in *Mo. Prot. & Advocacy Servs. v. Carnahan* was premised on the court's conclusion that there was no constituent involvement in governance of the organization. 499 F.3d 803, 810 (8th Cir. 2007). Here, Plaintiff has amply alleged the requisite participation of its constituents in organizational governance. Compl. (ECF No. 1) ¶¶ 20-24.

By contrast, as Defendants concede in a footnote, two circuit courts have found P&As to have associational standing based on the *Hunt* factors. *See, e.g., Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111-12 (9th Cir. 2003) ("Like the Commission in *Hunt* . . . OAC serves a specialized segment of Oregon's community: the disabled in general, including the mentally ill and, more specifically, incapacitated criminal defendants. Those groups are the primary beneficiaries of OAC's activities, 'including the prosecution of this kind of litigation'") (quoting *Hunt*, 432 U.S. at 344); *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) ("Much like members of a traditional association, the constituents of the Advocacy Center possess the means to influence the priorities and activities the Advocacy Center undertakes").

10

Turning to the first *Hunt* factor, Defendants contend that "Plaintiff does not allege that it is a traditional membership group with participating members who enjoy a close relationship to the organization," and that "Plaintiff does not allege that the disabled individuals it purports to serve, criminal defendants, have direct relationships with DRNC or a role in its operations." Mot. 9. The *Hunt* test does not require a "direct" or "close" relationship between the association and a specific individual; it requires that at least one individual constituent would have standing to sue in their own right and that the organization advocates on behalf of its constituents' interests. *Hunt,* 432 U.S. at 343. As Plaintiff pleaded, DRNC is federally mandated and empowered to conduct monitoring and investigations in facilities where people with disabilities live and receive services and pursue legal remedies on behalf of North Carolinians with disabilities." Compl. (ECF No. 1) ¶ 21. Further, "[m]ore than half of DRNC's board of directors and advisory council members are individuals with disabilities or are family members, guardians, or advocates for people with disabilities [and] DRNC conducts annual surveys of the disability community to determine the specific areas of advocacy on which the organization will focus." *Id*. ¶ 22. DRNC also pleads that "[m]embers of the disability community have the right to file grievances if they disagree with actions taken by DRNC or if they are wrongly

11

denied services by DRNC." *Id*. And the Complaint specifically pleads the factual basis for several illustrative constituents — namely, Adam Anderson, Barbara Brown, Carl Cline, Devin Davis, Eliza Evans, and Devonte Watson — who have standing in their own right to sue NCDHHS for the injuries caused by NCDHHS' failure to provide timely capacity assessments and treatment. *Id*. ¶¶ 86-98. Comparable allegations have established DRNC's standing in numerous prior cases. *See supra* 9-10. Plaintiff has thus surpassed its burden of "mak[ing] specific allegations establishing that at least one identified member ha[s] suffered or would suffer harm." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (citation and alteration omitted).

These same allegations show that Plaintiff has adequately pleaded that DRNC's governance structure ensures that its constituents can influence the priorities and activities DRNC undertakes on behalf of ITP detainees. This shows DRNC's indicia of membership sufficient to support associational standing. *See Hunt,* 432 U.S. at 343 (holding that a non-membership organization can also assert associational standing when it possesses the "indicia of membership"); *Bone*, 678 F. Supp. 3d at 702-03; *Disability Rts. N.C. v. N.C. State Bd. of Elections*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *2 (E.D.N.C. July 11, 2022); *Wilson*, 43 F. Supp. 3d at 632.

12

With regard to the third prong of *Hunt,* Defendants argue that Plaintiff has not adequately pleaded facts showing "that neither the claims asserted nor the relief requested requires participation of individual association members" because "[b]oth the detainees' alleged claims and any potential relief require the participation of, and individualized proof of, how [] multiple contributing factors affected each individual." Mot. 10. Defendants fail to acknowledge that the third prong of the *Hunt* test is a prudential, rather than jurisdictional, consideration, *see Timothy B.*, 2024 WL 1350071, at *11, and this court has held that Congress abrogated this requirement as applied to DRNC because of the broad authority granted by the P&A statutes to litigate on behalf of constituents with disabilities. *Id.* at *12.

Even if the third *Hunt* prong was applicable, Plaintiff has met the standard. Although individual constituents are identified in this lawsuit, the relief requested does not include individualized remedies; their participation is not indispensable to DRNC achieving the declaratory and injunctive relief it seeks here. *See Wilson*, 43 F. Supp. 3d at 632 (finding DRNC had associational standing because the "declaratory and injunctive relief" sought would "benefit all eligible constituents of Disability Rights" and thus "clearly" did "not require the participation of any individuals"). Here, Plaintiff seeks declaratory and injunctive relief that would broadly benefit DRNC constituents who, because

13

of their mental health disabilities, require ITP assessment or restoration services. *See Warth v. Seldin*, 422 U.S. 490, 515-16 (1975) (holding that pursuing declaratory, injunctive, or some other form of prospective relief that benefits all injured members supports a finding of associational standing); *see also Disability Rights N.C. v. N.C. State Bd. of Elections*, 2022 WL 2678884, at *2 ("All voters with disabilities in North Carolina are constituents of DRNC" for purposes of voting litigation.).

The mere fact that evidence regarding the experiences of particular constituents of DRNC may be used to illustrate Defendants' constitutional and statutory violations does not defeat associational standing. *See, e.g., Allen v. City of Graham*, Nos. 1:20-CV-997, 2021 WL 2223772, at *5-6 (M.D.N.C. June 2, 2021) (holding that "the litigation will require evidence and testimony from a representative sample of organization members . . . [and] [m]any courts have found that limited participation by individual members does not defeat associational standing") (citation omitted).

In sum, DRNC has established its standing to bring this suit.

## II. There Are No Unnamed Indispensable Parties.

Defendants assert that "DHHS and its Secretary – the only defendants here – are neither the sole cause of the current ITP wait times, nor the state actors with unilateral authority to solve these issues on their own." As such, they

argue that judgment against them would only "afford incomplete relief" and that other, unnamed stakeholders are indispensable parties. Mot. 10-11.

While Defendants claim generally that court personnel and jails are responsible for delays, they fail to identify any particular "indispensable parties" specifically. In failing to do so, they have not met the procedural requirements to invoke Rule 12(b)(7) and their motion should be denied. *See, e.g., Fisher v. Blue Cross*, 879 F. Supp. 2d 581, 594 (N.D. Tex. 2012) (holding Rule 19(a) requirement not met where plaintiffs identified categories of entities but had not identified what specific entities it contended were necessary.).

Even if Defendants had more specifically identified the parties they claim are indispensable, their argument fails as a matter of fact and as a matter of law.

Defendants fundamentally misconstrue the Complaint and the relief Plaintiff seeks. As explained above, Plaintiff is suing Defendants because they have failed to operate state facilities and oversee other services for the assessment and treatment of persons accused of crimes who have mental health disabilities or other cognitive disabilities that may affect their mental capacity. Compl. (ECF No. 1) ¶¶ 26-28; N.C. Gen. Stat. § 143B-137.1. Plaintiff's allegations focus on the wait times caused by NCDHHS's inaction Compl. (ECF

15

No. 1) ¶¶ 2, 6-8, 10, 54-74. Accordingly, Defendants can provide relief which would redress the delays identified in Plaintiff's Complaint.

Tellingly, Defendants acknowledge that they are empowered and capable of resolving this situation by asserting that they already are taking action to reduce wait times. Mot. 4. Most importantly, NCDHHS is obligated by statute to provide mental health services to ITP individuals, and the relevant statutes do not identify other agencies tasked with this responsibility. Compl. (ECF No. 1) ¶¶ 10, 26-28, 55. Plaintiff sufficiently alleged that NCDHHS has failed to abide by their constitutional and statutory obligations to ensure that ITP detainees are afforded due process. And Defendants do not cite a single case where a court dismissed an action against a state agency under Rule 19 because there were other parties that contributed to a plaintiff's harm. For these reasons alone, this Court should reject Defendants' Rule 19 argument.

A plaintiff is the master of the allegations in the complaint and may choose how to frame its claims and whom to name as defendants. *Cf. Lincoln Prop. Co. v. Roche*, 546 U.S. 81, 91 (2005) ("[i]n general, the plaintiff is the master of the complaint and has the option of naming only those parties the plaintiff chooses to sue, subject only to the rules of joinder [of] necessary parties." (citations omitted); *Jacobs Vehicle Sys., Inc. v. Yang,* No.

1:12CV00181, 2013 WL 4833058, at *6 n.4 (M.D.N.C. Sept. 10, 2013) (recognizing that a plaintiff need not sue all potential defendants: "Although [the plaintiff] may not be able to obtain entirely satisfactory relief by suing only [the defendant] and not third parties, that is a risk it may choose to take.")

Moreover, the time to add parties under the Federal Rules has not passed. Should Defendants identify an actually indispensable party (as required by the Federal Rules of Civil Procedure) or should discovery reveal a fact-based reason to add additional parties, Plaintiff will do so. Defendants are likewise empowered by the Rules to seek to implead additional parties. But, at the motion to dismiss stage, the Court accepts the pleadings as true and asks whether a claim has been alleged and whether relief can be obtained. Here both are well-pled.

## III. *Younger* Abstention Does Not Apply Because the Complaint is Unrelated to the Merits of Pending State Criminal Actions.

Defendants inaccurately assert that the case should be dismissed under *Younger* abstention. Mot. 14. As a threshold matter, *Younger* abstention does not apply because Plaintiff does not seek to enjoin any pending criminal action against any DRNC constituent or ITP detainee. Rather, Plaintiff seeks to

17

ensure that Defendants provide timely assessments and treatment to ITP detainees.

*Younger* abstention applies only where an injunction would interfere with the prosecution of an ongoing criminal proceeding. *Younger v. Harris*, 401 U.S. 37, 49-54 (1971); *see generally Colorado River Water Cons. Dist. v. U.S.*, 424 U.S. 800, 816 (1976) (explaining that *Younger* "abstention is appropriate when, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining state criminal proceedings.").

Unlike in *Younger*, Plaintiff does not challenge or seek to enjoin any aspect of any pending criminal proceeding against any constituent. Instead, Plaintiff challenges Defendants' failure to provide services for DRNC constituents while they await their day in court. Neither Plaintiff nor individual ITP detainees could seek the systemic relief sought in this action through any pending criminal proceedings, because neither it nor Defendants are parties to those proceedings. Cases challenging pre-trial detention do not implicate the particular comity interests at issue in *Younger*. *See, e.g., Walker v. City of Calhoun*, 901 F.3d 1245, 1254 (11th Cir. 2018) (affirming declination of *Younger* abstention in a class action challenging a bail system because bail determinations were pretrial procedural determinations and would not

18

interfere with ongoing prosecutions); *see also Telco Communications Inc. v. Carbaugh*, 885 F.2d 1225, 1228 (4th Cir. 1989) ("district court did not err in declining to abstain where state proceedings were in a preliminary stage and where the state had imposed a prior restraint upon protected speech."). And because Plaintiff's suit pursues relief against NCDHHS and does not implicate the administration of the state judicial system, *Younger* abstention is plainly inappropriate. *See Jonathan R. by Dixon v. Justice*, 41 F.4th 316, 331 (4th Cir. 2022) (rejecting *Younger* abstention in case challenging state department of health and human services' administration of the child welfare system because "this lawsuit does not challenge [state court] authority—it does not challenge any state-court order at all. It asks instead to enjoin *the Department's* actions." (emphasis in original)). For this reason, this suit does not present the types of comity concerns that were addressed by *Younger* and its progeny.

Moreover, *Younger* abstention is "exceptional," and "federal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not 'refus[e] to decide a case in deference to the States.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (citation omitted). "Abstention doctrines constitute 'extraordinary and narrow exception[s]' to a federal court's duty to exercise the jurisdiction

19

conferred on it." *Martin v. Stewart*, 499 F.3d 360, 363 (4th Cir. 2007) (quoting *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996)).

Defendants do not cite a single case where *Younger* abstention precluded relief on behalf of ITP individuals subject to pretrial detention who awaited mental health assessment and restoration services. Indeed, to the contrary, in *Glendening as Next Friend of G.W. v. Howard*, No. 22-CV-04032-TC-ADM, 2023 WL 8715814 (D. Kan. Dec. 18, 2023), relied upon by Defendants for many of their other dismissal arguments, the district court held that *Younger* did not bar claims challenging the plaintiffs' prolonged detention in county jails while awaiting admission to the state hospital. 2023 WL 8715814 at *4; *see also Dixon*, 41 F.4th at 329 ("[C]ourts should go on to determine if federal involvement will in fact put comity at risk, but if the case does not, courts need go no further, they can properly entertain their federal-question jurisdiction without worrying about stepping on state toes.").

Defendants cite *Verbal v. Krueger*, No. 1:09CV990, 2010 WL 276644, at *6 (M.D.N.C. Jan. 15, 2010) to contend *Younger* abstention should apply. Mot. 17. But that case is easily distinguishable: *Verbal* concerned a collateral attack by the criminal defendants' mother on the constitutional merits of the *actual* (on-going) criminal prosecution, such that granting relief would necessarily have required enjoining the prosecution. *Id.* The court dismissed that claim

20

because it failed to plausibly allege a cause of action, not because *Younger* abstention applied. *Id*. While the court discussed in dicta whether *Younger* would have applied had the court not dismissed on plausibility grounds, the *Younger* analysis was not part of the court's holding. *Id*.

For all these reasons, *Younger* has no application here.

## IV. The Complaint States Claims Upon Which Relief Can be Granted.

Plaintiff has adequately pleaded substantive due process violations, procedural due process violations, and violations of the American with Disabilities Act and Rehabilitation Act, and the Court should deny Defendants' motion to dismiss Counts 1 through 4.

### a. Count 1 Plausibly Alleges a Substantive Due Process Violation Arising from NCDHHS' Inaction.

As plead in the Complaint, ITP detainees routinely sit in jail for months or more awaiting assessments and treatment that NCDHHS is required to provide. Compl. (ECF No. 1) ¶¶ 8-10. It has long been the law that a criminal defendant who is suspected of being incapable to proceed to trial can be detained only for a "reasonable period of time necessary" to determine whether their capacity may be restored in the foreseeable future and that "continued commitment [of individuals detained] must be justified by progress toward" restoration. *Jackson v. Indiana*, 406 U.S. 715, 738-39 (1972). Thus, an ITP

21

individual may be detained only to promote restoration of their capacity or to promptly initiate civil commitment proceedings. *Id.*

As pleaded, NCDHHS is statutorily "charged with operating state facilities and overseeing other services for the assessment and treatment of persons accused of crimes who have mental health disabilities or other cognitive disabilities that may affect their mental capacity (for example, a traumatic brain injury)." Compl. (ECF No. 1) ¶ 27. Further, "NCDHHS is responsible for administering and overseeing services necessary to determine an individual's capacity to proceed, to assess criteria for involuntary commitment, and to provide treatment aimed at restoring capacity." *Id.* Thus, under North Carolina law, NCDHHS alone is responsible for delivering services to people with mental health disabilities who have been charged with crimes and who await capacity assessments or restoration services. *Id.*

Notwithstanding this clear statutory mandate, Defendants aver that "multiple factors outside DHHS's control and authority have contributed to the wait times." Mot. 18-19.

These arguments go well beyond the allegations pleaded in the Complaint and rely on a proffer of evidence that goes to the merits of this action. Consideration of a factual proffer on a Rule 12(b)(6) motion is improper. *Kolon Indus. Inc.*, 637 F.3d at 440, 448-49 (holding that a court cannot go

22

beyond the complaint in its entirety without "convert[ing] the motion into one for summary judgment," an action from which courts should refrain "where the parties have not had an opportunity for reasonable discovery. Additionally, statements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion." (citations omitted)).

Defendants' argument that current wait times have resulted from economic factors outside their control misreads the Complaint and fails as a matter of law.

First, Plaintiff's Complaint details why the supply-and-demand issues and involvement of other parties does not absolve NCDHHS from direct responsibility for constitutional and statutory violations. Plaintiff specifically pleads that because ITP detainees are subjected to prolonged detention because of NCDHHS' acts and omissions, including reducing bed capacity and failing to address increasing wait times. Compl. (ECF No. 1) ¶¶1-2, 6-11, 52-74. This case specifically pleads that a subset of pretrial detainees — who are suspected of having or have been adjudicated to have mental health disabilities and require assessment or treatment (or both) — suffer additional and prolonged detention because of their mental health disability, in violation of the constitution, ADA and RA.

23

Second, Defendants cite unpersuasive and unhelpful law in support of their argument. Defendants extensively discuss *Glendening v. Howard*, 2023 WL 8715814 (D. Kan. Dec. 18, 2023), appeal filed Jan. 16, 2024.[3] That case did not address a motion to dismiss, but involved a motion for preliminary injunction, which requires a different standard and analysis. *Id.* And, in contrast with *Glendening*, Plaintiff pleads that NCDHHS bears sole responsibility for the ITP wait times identified in the Complaint and those delays directly harm Plaintiff's constituents. Courts have routinely held that similar allegations of prolonged pretrial wait times for ITP individuals stated due process claims against the state agencies responsible for delays in the competency assessment and treatment process. *See Disability L. Ctr. v. Utah*, 180 F. Supp. 3d 998, 1004 (D. Utah 2016) (denying motion to dismiss due process claims brought by pretrial detainees awaiting competency restoration services where "it is not uncommon for these individuals to remain incarcerated in county jails for six months or more"); *Advoc. Ctr. for Elderly &*

---

[3] Defendants also cite *Simmons v. Baltimore City Police Dep't*, No. 21-CV-00969-LKG, 2023 WL 8452448, at *17 (D. Md. Dec. 6, 2023), which analyzed causation where police officers pursued a suspect who ran a red light and killed a bystander. *Id.* at *17. That fact pattern does not help the Court here analyze ITP wait times under *Jackson*, which was not even part of the court's opinion in *Simmons*. *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012), the only other causation case cited by Defendants, is similarly inapposite and does not analyze *Jackson*.

24

*Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 620-23 (E.D. La. 2010) (waits of six to nine months for restoration treatment likely violated the due process clause); *Terry ex. rel. Terry v. Hill*, 232 F. Supp. 2d 934, 938, 944 (E.D. Ark. 2002) (wait times of eight months for evaluation and over six months for restoration treatment violated the due process clause). *Cf. United States v. Reeves*, 690 F. Supp. 3d 531, 535 (W.D.N.C. 2023) (noting in a criminal prosecution that pre-hospitalization detention of nine months "simply cannot be squared with" Jackson).

Third, North Carolina law charges NCDHHS with the *sole* responsibility for operating state facilities and overseeing other services for the assessment and treatment of persons accused of crimes who have mental health disabilities or other cognitive disabilities that may affect their mental capacity. Compl. (ECF No. 1) ¶ 27. As explained above, NCDHHS alone is responsible for the assessment and restoration of people with mental health disabilities who have been charged with crimes. The Complaint plausibly alleges the myriad of NCDHHS failures that have led to unconstitutional wait times for ITP detainees. For these reasons, the Court should deny Defendants' motion to dismiss Count 1.

25

### b. Count 2 Pleads a Deprivation of ITP Detainees' Procedural Due Process Rights.

Defendants argue that "[o]ther than the single, conclusory allegation that DHHS's administration and operation of the ITP system has violated these detainees' rights to procedural due process . . . Plaintiff has failed to plead or prove any deprivation . . . without due process of law." Mot. 20 (internal quotations omitted). This is a gross misreading of the Complaint. As pleaded, ITP detainees have a liberty interest in freedom from incarceration absent conviction of a crime and in receiving assessments and treatment that could enable them to participate in their defense and allow their criminal cases to expeditiously proceed to resolution, whether by plea bargains, trial, dismissal, or involuntary commitment. Compl. (ECF No. 1) ¶ 117. Because NCDHHS has failed to provide prompt evaluations and restoration services — and because trial proceedings cannot occur while evaluation or restoration is pending — ITP detainees are denied reasonably expedient resolution of their criminal cases. *Id.*; *see* N.C. Gen. Stat. Ann. § 15A-1001, 1002. Moreover, ITP individuals who are detained for long periods of time without appropriate mental health care or restoration services will often decompensate or otherwise exacerbate their mental health disabilities, increasing their risk of harm and making capacity restoration more difficult. *Id.* ¶¶ 75-85; *see Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1106-07 (9th Cir. 2003).

26

The Complaint plausibly alleges that Defendants have violated ITP detainees' procedural due process rights because NCDHHS bears responsibility for assessing and providing restoration treatment to ITP individuals — without which they have no meaningful opportunity to participate in their own defense. *See*, *e.g.*, *Mink*, at 1119 n.10 (affirming that "[p]ersons unfit to proceed and held in county jails for more than a brief period suffer delays in receiving restorative treatment, which delays their return to competency, prolonging their criminal cases and making it difficult for their attorneys to learn from their clients about the crime or crimes charged, to identify witnesses, and to enter into plea negotiations."); *Dusky v. United States*, 362 U.S. 402 (1960). For these reasons, the Court should deny Defendants' motion to dismiss Count 2.

### c. Plaintiff's Americans with Disabilities Act and the Rehabilitation Act Claims Adequately Plead Causation.

As pleaded in the Complaint, ITP detainees qualify as individuals with disabilities as defined under the Americans with Disabilities Act and Rehabilitation Act because they "have, or are regarded as having," mental health disabilities severe enough that their capacity to stand trial has been called into question, or they have already been deemed incapable to proceed to trial. *See* 42 U.S.C. § 12102; Compl. (ECF No. 1) ¶¶ 123, 134. Defendants argue that "[d]etainees are not waiting because they have disabilities (or suspected

capacity issues)" and thus "the Complaint fails to allege that detainees have been excluded from participation in, or denied the benefits of, a public service, program, or activity, or was otherwise discriminated against, <u>by reason of a disability</u>."  Mot. 23 (emphasis in original).

ITP detainees are being detained for so long because they have — or are regarded as having — mental health disabilities that require assessment and treatment prior to standing trial. Compl. (ECF No. 1) ¶¶ 5-8, 51, 99-119. Access to these services is being impaired in violation of the ADA and RA, which "impose[] an affirmative obligation . . . to enable disabled persons to receive services or participate in programs or activities." *Constantine v. Rectors & Visitors of George Mason Univ*, 411 F.3d 474, 488 (4th Cir. 2005) (citation omitted). State agencies are required to ensure such access by using proper methods of administering such programs or activities or making "reasonable modifications to rules, policies, or practices." *See Constantine,* 411 F.3d at 488 (interpreting Title II of the ADA); *Pierce v. District of Columbia,* 128 F. Supp. 3d 250, 266 (D.D.C. 2015) ("the express prohibitions against disability-based discrimination in Section 504 and Title II include *an affirmative obligation* to make benefits, services, and programs accessible to disabled people" (emphasis in original)).  Defendants also violate the statutes' prohibitions on unnecessary confinement of disabled individuals by causing the extended detention of ITP

28

detainees. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600-01 (1999) (unjustified segregation of individuals with mental health disabilities constitutes discrimination).

As alleged in the Complaint, NCDHHS is the sole agency responsible for providing the assessment and treatment to these individuals. Compl. (ECF No. 1) ¶¶ 27, 109. NCDHHS' methods of administering ITP assessment and restoration services result in unnecessary detention in county jails instead of the prompt placement of ITP individuals in community-based programs or state psychiatric hospitals where they may receive appropriate treatment. *Id.* ¶¶ 8, 24, 75, 103-113. NCDHHS' failures to assess ITP individuals' long-term needs and ensure the availability of mental health professionals to conduct capacity assessments and appropriate restoration treatment are omissions which violate the ADA and RA. *Olmstead*, 527 U.S. at 600 ; *State Office of Prot. & Advocacy for Persons with Disabilities v. Connecticut*, 706 F. Supp. 2d 266, 277-78 (D. Conn. 2010) (allegations that a state agency failed to adequately assess and identify plaintiff's needs was sufficient to state plausible claims under the ADA and RA). For these reasons, the Court should deny Defendants' motion to dismiss Counts 3 and 4.

29

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss.

Respectfully submitted this the 19th day of July, 2024.

/s/ *Michele Delgado*
Michele Delgado
N.C. Bar No. 50661
Kristi L. Graunke
N.C. Bar No. 51216
Ivy A. Johnson
N.C. Bar No. 52228
Amika M. Singh
N.C. Bar No. 61111
**ACLU OF NORTH CAROLINA
LEGAL FOUNDATION**
P.O. Box 28004
Raleigh, NC 27611-8004
Tel. (Delgado): (919) 256-5891
Tel. (Graunke): (919) 354-5066
Tel. (Johnson): (919) 532-3681
Tel. (Singh): (919) 885-0051
mdelgado@acluofnc.org
kgraunke@acluofnc.org
ijohnson@acluofnc.org
asingh@acluofnc.org

Susan H. Pollitt
N.C. Bar No. 12648
Lisa Grafstein
N.C. Bar No. 22076
Luke Woollard
N.C. Bar No. 48179

**Disability Rights NC**
801 Corporate Center Drive
Suite 118
Raleigh, North Carolina 27607
Tel.: (919) 856-2195
Fax: (919) 856-2244
susan.pollitt@disabilityrightsnc.org
lisa.grafstein@disabilityrightsnc.org
luke.woollard@disabilityrightsnc.org

John A. Freedman*
Michael L. Walden*
Colleen Couture*
**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue N.W.
Washington, DC 20001
Tel.: (202) 942-5316
john.freedman@arnoldporter.com
mike.walden@arnoldporter.com
colleen.couture@arnoldporter.com

Andrew C. Johnson*
**Arnold & Porter Kaye Scholer LLP**
Three Embarcadero Center
10th Floor
San Francisco, CA 94111
Tel.: (415) 471-3321
Andrew.johnson@arnoldporter.com

*Special appearances

*Counsel for Plaintiff*

31

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to Civ. L.R. 7.3(d), I hereby certify that this brief is less than 6,250 words, as calculated by the word processing software used to prepare this brief.

<u>/s/ Michele Delgado</u>
Attorney for Plaintiff

32

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel and parties of record who have registered on the CM/ECF system. Electronically submitted this the 19th day of July, 2024.

<u>/s/ Michele Delgado</u>
Attorney for Plaintiff

33