# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| DISABILITY RIGHTS NORTH CAROLINA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:24CV335 |
| THE NORTH CAROLINA DEPARTMENT OF HEALTH AND AND HUMAN SERVICES and KODY KINSLEY, in his official capacity as Secretary of the North Carolina Department of Health and Human Services, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the Court on a Motion for Preliminary Injunction and Request for Oral Argument by Plaintiff Disability Rights North Carolina (hereinafter "DRNC") pursuant to Federal Rule of Civil Procedure 65(a). (Docket Entry 15.) Also before the Court is a Motion to Dismiss by Defendants, the North Carolina Department of Health and Human Services (sometimes referred to as "the Department") and Kodi Kinsley, in his official capacity as Secretary of the North Carolina Department of Health and Human Services (collectively, "NCDHHS") pursuant to Rules 12(b)(1), 12(b)(6), and 12(b)(7) of the Federal Rules of Civil Procedure. (Docket Entry 22.) After response and reply briefs were filed to said motions (*see* Docket Entries 20, 24, 25, 27), the Court held a hearing on the matter on March 25, 2025. (Minute Entry dated 3/25/2025; *see also* Docket Entry 32.) For the following reasons, the

undersigned recommends that DRNC's motion be denied, and NCDHHS's motion be granted in part and denied in part.

## I.  BACKGROUND[1]

In April 2024, DRNC commenced this action alleging that NCDHHS is responsible for, but has failed to provide timely and adequate capacity assessments and restoration services to pretrial detainees who are suspected of, or adjudicated to be, incapable to proceed to trial ("ITP")[2] due to mental health disabilities or cognitive disabilities, in violation of the Fourteenth Amendment's Due Process Clause, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.* ("RA").  (*See generally*, Compl., Docket Entry 1.)

### A. <u>The Parties</u>

DRNC is a private and independent nonprofit that has been federally designated and authorized as the Protection and Advocacy ("P&A") system for the State of North Carolina, tasked with protecting and advocating for the rights of individuals with disabilities.  (*Id.* ¶¶ 20-21.)  DRNC alleges that "[m]ore than half of [its] board of directors and advisory council members are individuals with disabilities or are family members, guardians, or advocates for people with disabilities."  (*Id.* ¶ 22.)  Pointing to several of its constituents, DRNC alleges examples of how NCDHHS's failure to provide timely assessment and restoration services impacts ITP detainees.  (*Id.* ¶¶ 23, 86-96.)  Thus, "DRNC sues on behalf of ITP detainees in

---

[1] The allegations in the Background section are as alleged in the Complaint.

[2] Similar to DRNC, this opinion collectively refers to pretrial detainees who are suspected of, or adjudicated to be, incapable to proceed to trial as "ITP detainees".

2

North Carolina who are detained in county jails for extended periods of time while they await ITP or involuntary commitment examinations and/or treatment at a state psychiatric hospital or other appropriate integrated settings." (*Id.* ¶ 24.)

The Department is statutorily obligated "to provide the necessary management, policy development, and establishment and enforcement of standards for the provision of services in the fields of public and mental health and rehabilitation[,]" and is "charged with operating state facilities and overseeing other services for the assessment and treatment of persons accused of crimes who have mental health disabilities or other cognitive disabilities that may affect their mental capacity." (*Id.* ¶¶ 26, 27 (citing N.C. Gen. Stat. § 143B-137.1)). Specifically, DRNC alleges that the Department "is responsible for administering and overseeing services necessary to determine an individual's capacity to proceed, to assess criteria for involuntary commitment, and to provide treatment aimed at restoring capacity." (*Id.* ¶ 27.) As the Secretary of the Department, Defendant Kody Kinsley is an overseer and "is responsible for all management functions of [the Department] and its subdivisions." (*Id.* ¶¶ 30, 31.)

## B. North Carolina's ITP Statutes

DRNC also sets forth the relevant statutory provisions governing ITP proceedings under North Carolina law. (*See id.* ¶¶ 35-40.) Under North Carolina law, "[n]o person may be tried, convicted, sentenced, or punished for a crime when by reason of mental illness or defect he is unable to understand the nature and object of the proceedings against him, to comprehend his own situation in reference to the proceedings, or to assist in his defense in a rational or reasonable manner." N.C. Gen. Stat. § 15A-1001(a). During criminal proceedings, "the prosecutor, the defendant, the defense counsel, or the court" may raise at any time the

3

question of a defendant's capacity to proceed, *see* N.C. Gen. Stat. § 15A-1002(a), and a hearing must follow. N.C. Gen. Stat. § 15A-1002(a)(b)(1). Medical experts, including local forensic evaluators, may be used to evaluate a defendant and prepare written reports to help determine capacity. N.C. Gen. Stat. § 15A-1002(b)(1a). In those instances where the court orders a capacity assessment, the capacity hearing cannot be held until after the medical assessment. N.C. Gen. Stat. § 15A-1002(b)(1). Moreover, for persons charged with a felony, the criminal court may also order a defendant to a state facility for the mentally ill for "observation and treatment" for a period not to exceed 60 days for a determination of his or her capacity to proceed. N.C. Gen. Stat. § 15A-1002(b)(2).

Upon an ITP finding under North Carolina law, the court must next determine whether there are "reasonable grounds to believe the defendant meets the criteria for involuntary commitment under Part 7 of Article 5 of Chapter 122C." N.C. Gen. Stat. § 15A-1003(a). Specifically, DRNC alleges that

> The following criteria for involuntary commitment ("IVC") are evaluated by a mental health professional authorized by NCDHHS to conduct IVC examinations:
>
> a. (for inpatient commitment) the person is mentally ill and is a danger to themselves or others, N.C. Gen. Stat. § 122C-268(j); or,
>
> b. (for outpatient commitment) the person is mentally ill and needs treatment to prevent deterioration that would result in dangerousness, N.C. Gen. Stat. § 122C.261(b).

(Compl. ¶ 41.) Therefore, for persons determined by an examiner to meet the criteria for inpatient IVC, they may be temporarily detained in a 24-hour facility designated by NCDHHS.

4

N.C. Gen. Stat. § 122C-263(d)(2).[3]  A civil district court then proceeds with a commitment hearing to determine whether a person will be involuntarily committed.  N.C. Gen. Stat. § 122C-268(a).

DRNC alleges that "[i]n practice, the ITP and IVC processes are intertwined, reflecting [North Carolina's] legislative intent to comply with the limits on non-therapeutic detention announced in *Jackson v. Indiana* [406 U.S. 715 (1972)]."  (Compl. ¶ 43.)  Thus, in summary DRNC alleges that

> [A]fter finding a defendant ITP, a criminal court judge must determine whether there are reasonable grounds to believe the defendant meets the criteria for involuntary commitment. If that judge finds reasonable grounds, they must initiate the IVC process by entering a custody order that requires the ITP defendant to undergo an IVC examination. From this point on, IVC proceedings are governed by the civil involuntary commitment statutes[.]

> Under the civil IVC process, the ITP defendant must be examined by a mental health professional to determine if they meet the IVC criteria and should be involuntarily committed. A civil district court, separate from the criminal court, then reviews the medical professional's examination results and other relevant evidence at a district court hearing.  If the district court finds that an ITP defendant meets the standard for involuntary commitment, the defendant is committed to state-designated mental health facility.

(*Id.* ¶¶ 45-46 (citations omitted).)

DRNC further alleges that, upon information and belief, restoration services are available for ITP detainees who are committed at a state psychiatric hospital for IVC

---

[3] Under state law, 24-hour facilities "may be designated by the Secretary as facilities for the custody and treatment of involuntary clients" and "[d]esignation of these facilities shall be made in accordance with rules of the Secretary that assure the protection of the client and the general public." N.C. Gen. Stat. § 122C-252.

proceedings. (*Id.* ¶ 47.) After receiving those services, an ITP detainee's capacity status is reevaluated, and their criminal case continues if they have been restored. (*Id.* ¶ 48.) If an individual's capacity is not restored, DRNC alleges that "the state [may] reinitiate criminal proceedings against an individual who later regains capacity." (*Id.* ¶ 50 (citing N.C. Gen. Stat. §§ 15A-1004(a), (e)).) However, "[i]f an ITP detainee does not meet the involuntary commitment standard, and there is not a substantial probability of capacity restoration in the foreseeable future, the ITP detainee must be released under *Jackson*." (Compl. ¶ 49.)

## C. **Allegations of Delay in Court-Ordered Capacity Assessments and Restoration Services, and the Resulting Harm**

DRNC alleges that "ITP detainees often languish in jail for prolonged periods of time during the ITP process." (*Id.* ¶ 52.) Specifically, the initial capacity assessments are conducted either by local forensic evaluators through four Local Management Entities/Managed Care Organizations ("LME/MCOs")[4] or Central Regional Hospital ("Central Regional"), the latter limited to assessments for individuals charged with felonies. (*Id.* ¶¶ 54, 56-57.) NCDHHS is responsible for the oversight of LME/MCOs. (*Id.* ¶ 55.) From January 2022 to the filing of the Complaint, "ITP detainees waited an average of 68 days from the day the LME/MCO or Central Regional received the order for their capacity assessment until the LME/MCO (or Central Regional) issued its capacity assessment report." (*Id.* ¶ 58.) The wait time for individuals charged with felonies averaged 127 days. (*Id.* ¶ 59.) DRNC also alleges that further delay sometimes occurs because of an additional capacity assessment after the local capacity

---

[4] There were four LME/MCOs at the time the Complaint was filed. (Compl. ¶ 56.)

6

assessment is "deemed inadequate by the criminal court" which NCDHHS has failed to hold the responsible parties accountable. (*Id.* ¶¶ 60-61.)

DRNC also points to the delays in awaiting restoration services. There are three state psychiatric hospitals (Central Regional, Broughton Hospital, and Cherry Hospital), with Central Regional "the only one to operate a forensic services unit dedicated to the examination and treatment of people who are facing criminal charges." (*Id.* ¶ 62.) In that regard, from 2016 to 2023, the number of state psychiatric beds in North Carolina has substantially decreased, and those designated for forensic service beds have been limited, all while wait times for capacity assessments and restoration services have increased. (*Id.* ¶¶ 63-65.) Moreover, Central Regional's forensic unit has recently operated at reduced capacity with "staffing shortages." (*Id.* ¶¶ 66-67.) In addition, forensic service beds were reduced during the Covid-19 pandemic and have not been fully restored to the available 120 beds. (*Id.* ¶ 68.) Thus, the capacity of the forensic unit during the filing of the Complaint was "between 75 and 78 beds." (*Id.*) As a result, DRNC alleges that "[f]rom 2022 to the present, the average wait time from a court order for restoration services to placement at any of the state's three psychiatric hospitals is 145 days — almost five months[,] and "[m]ore recently, from January 2024 to February 2024, the wait time was 197 days — over 6.5 months." (*Id.* ¶ 70.)

The Complaint further alleges that delays occur for ITP detainees awaiting transfer to a state psychiatric hospital for IVC examinations. (*Id.* ¶ 71.) Many ITP detainees are wait-listed for placement at a 24-hour facility for IVC examinations and during the waiting period, they spend significant time in local jails that "are not equipped to provide the intensive mental health care they need." (*Id.* ¶ 72.) Upon completion of the IVC examination, IVC proceedings

7

are then triggered by the superior court clerk's receipt of the findings from the state-provided IVC examination. (*Id.* ¶ 73 (citing N.C. Gen. Stat. §§ 122C-264(b)-(d)).) DRNC therefore alleges that a "due process limbo" exists because many ITP detainees' "criminal case[s are] paused while they are processed through the civil commitment proceedings, but their legal representation in the IVC proceedings does not begin until the IVC examination is complete and an IVC hearing is scheduled." (*Id.* ¶ 74.)

According to DRNC, the delays in capacity and restoration services for ITP detainees result in significant harm by placing burdens on overcrowded local jails and its administrators who lack resources or otherwise use inappropriate measures to care for ITP detainees, and causes exacerbation of mental health conditions of ITP detainees which often hinder efforts at capacity restoration. (*Id.* ¶¶ 75-82.) As specific examples, DRNC points to individuals[5] impacted by NCDHHS's alleged conduct:

> a) Adam Anderson: 46-year-old man diagnosed with schizophrenia and bipolar type schizoaffective disorder, and having experienced a traumatic brain injury; arrested in June 2021 for a felony probation violation; subsequently ordered two capacity assessments, (completed on October 1, 2021 and December 21, 2021); court found ITP on February 10, 2022 and ordered to be admitted to Cherry State Hospital for IVC examinations and restoration services, which admission did not take place until November 15, 2022. "From the time of his initial arrest to his admission to Cherry, Mr. Anderson spent 17 months in . . . Jail, often in acute psychiatric distress, before he received appropriate treatment. . . . Mr. Anderson experienced unstable moods, paranoia, and combative behavior and was eventually shackled due to aggressive behavior. He was frequently placed in solitary

---

[5] The names of said individuals are referenced as "pseudonyms."

8

confinement because of behaviors resulting from his mental distress."

b) Barbara Brown: 34-year-old woman diagnosed with bipolar disorder, schizophrenia, and post-traumatic stress disorder; arrested in March 2023 based on a failure to appear warrant and later charged with malicious conduct by a prisoner; subsequently ordered a capacity assessment (submitted to the court over three months later on November 15, 2023); court found ITP on January 22, 2024 and ordered her to be committed, which admission took place on January 26, 2024, at Central Regional. "While in jail, Ms. Brown repeatedly committed acts of self-harm that consisted of pulling her hair, slapping herself, punching herself, and giving herself a black eye. She was placed in solitary confinement for six months."  During that time, "Ms. Brown's father advocated on her behalf. Upon information and belief, this advocacy significantly benefited Ms. Brown as she went through the ITP process."

c) Carl Cline: 26-year-old man born without lower arms and cancer survivor; diagnosed with bipolar affective disorder, manic with psychotic features, schizophrenia, and schizoaffective disorder; arrested in March 2020 for felony stalking; received intensive mental health treatment at Central Prison for approximately three months before being released to his family; entered a deferred prosecution agreement and placed on probation; re-arrested in January 2022 for a probation violation; subsequently ordered a capacity assessment (report produced on April 11, 2022); court found ITP on April 28, 2022 and ordered him to be admitted to Broughton State Hospital for restoration services; Broughton refused acceptance and wait-listed Mr. Cline due to lack of available beds; Mr. Cline remained in jail for several months, with his counsel moving for review of his case and the court twice ordering Broughton to admit Mr. Cline or "appear and show cause"; 13 months after being in custody, and "more than 10 months after the order for treatment was entered," Mr. Cline was admitted to Broughton. "In total, Mr. Cline was in custody for 13 months. Approximately 12 of those months were the result of

9

waiting to be evaluated and admitted for services by Defendants. Mr. Cline experienced acute psychiatric harm[,] was placed in segregation[,] and was repeatedly on suicide watch while in jail."

d) Devin Davis: 21-year-old man diagnosed with schizophrenia and a cognitive disability; charged in January 2023 for felony assault on an emergency personnel; capacity assessment ordered on May 12, 2023 to be conducted by a local forensic evaluator; arrested on May 26, 2023 for Assault on a Female with mother alleged to be the victim; capacity assessment ordered on August 4, 2023 to be conducted by Central Regional (conducted over six months later on February 21, 2024). As of the date the Complaint was filed, "Mr. Davis remain[ed] in the custody of Iredell County jail [though at Central Prison], and his capacity evaluation ha[d] yet to be submitted to the court."

e) Eliza Evans: 34-year-old woman diagnosed with schizophrenia and schizoaffective disorder; arrested in October 2021 for possession of methamphetamines, and was subsequently charged with assault causing physical injury to a detention officer; subsequently ordered a capacity assessment (submitted on May 2, 2022); court found ITP on June 26, 2023 and ordered her to be involuntarily committed to Cherry State Hospital, which admission did not take place until April 1, 2024.

(*Id.* ¶¶ 87-96.) In addition, the Complaint mentions others held at the Cleveland County jail who have been subject to extended jail detention while awaiting services provided by NCDHHS. (*Id.* ¶¶ 97-98.)

**D. Claims/Relief Sought**

As a result of NCDHHS's alleged conduct, DRNC asserts claims alleging violations of the Due Process Clause of the Fourteenth Amendment (both substantive and procedural)[6],

---

[6] Counts 1 and 2 are solely against Defendant Kinsley.

Title II of the ADA, and Section 504 of the RA. (*Id.* ¶¶ 99-139.)[7] DRNC seeks declaratory and injunctive relief, reasonable attorneys' fees and costs, and any further relief as the Court finds just and proper. (*Id.* at 43-44.)[8] DRNC moves for a preliminary injunction pursuant to Rule 65(a) of the Federal Rules of Civil Procedure specifically seeking an order "requiring Defendants to provide ITP detainees with (1) capacity assessments within fourteen days of a judicial order directing such evaluation and (2) initiation of state-provided restoration treatment (whether inpatient or outpatient) within fourteen days of a judicial determination that a criminal defendant is incapable to proceed." (Docket Entry 15 at 2.) In turn, NCDHHS opposes the request (Docket Entry 20) and moves to dismiss this action under Rules 12(b)(1), (6) and (7) of the Federal Rules of Civil Procedure arguing that DRNC lacks standing, DRNC has failed to join indispensable parties, abstention principles under *Younger v. Harris*, 401 U.S. 37 (1971) apply, and that DRNC fails to state a claim upon which relief can be granted. (Docket Entry 22.) DRNC opposes NCDHHS's motion. (Docket Entry 25.) Both parties submitted replies to their respective motions. (Docket Entries 24, 27.) The Court held a hearing on the parties' motions on March 25, 2025. (Minute Entry dated 3/25/2025; *see also* Docket Entry 32.)

---

[7] The undersigned will discuss detailed allegations when addressing NCDHHS's Motion to Dismiss.

[8] Unless otherwise noted, all citations in this opinion to documents filed with the Court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

## II. DISCUSSION

### A. <u>NCDHHS's Motion to Dismiss</u>

#### 1. <u>Legal Standards</u>

A motion under Rule 12(b)(1) challenges the existence of subject matter jurisdiction, thus raising the question "whether [a plaintiff] has a right to be in the district court at all and whether the court has the power to hear and dispose of [his or her] claim." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012); *see also Cap. Associated Indus., Inc. v. Cooper*, 129 F. Supp. 3d 281, 299 (M.D.N.C. 2015) ("Subject matter jurisdiction is a threshold question that relates to the power of the court to hear a case and must be resolved before a court addresses the merits of a case." (citation omitted)). "Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (citation omitted). The court's subject matter jurisdiction is limited, therefore it "possess[es] only the jurisdiction authorized . . . by the United States Constitution and by federal statute." *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347 (4th Cir. 2009) (citation omitted). When subject-matter jurisdiction is challenged, the burden of proving jurisdiction is on the party asserting jurisdiction exists. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999); *see also Demetres v. East West Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015); *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010). When evaluating a Rule 12(b)(1) motion to dismiss, a court may consider evidence outside the pleadings and should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647 (citing *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A complaint that does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" must be dismissed. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Id.*; *see also Simmons v. United Mortg. and Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) ("On a Rule 12(b)(6) motion, a complaint must be dismissed if it does not allege enough facts to state a claim to relief that is plausible on its face.") (citations and quotations omitted). The "court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, … bare assertions devoid of further factual enhancement[,] … unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted). In other words, the standard requires a plaintiff to articulate facts, that, when accepted as true, demonstrate the plaintiff has stated a claim that makes it plausible he or she is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 557). For that reason, "[d]ismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Brown v. Target, Inc.*, No. CIV.A. ELH-14-00950, 2015 WL 2452617, at *9 (D. Md. May 20, 2015) (citations and quotations omitted).

Rule 12(b)(7) permits dismissal of an action for failure to join a party under Rule 19. *See* Fed. R. Civ. P. 12(b)(7). The party moving pursuant to Rule 12(b)(7) bears the burden of demonstrating that an absent party is both necessary and indispensable pursuant to Rule 19. *Am. Gen. Life & Accident Ins. Co. v. Wood*, 429 F.3d 83, 92 (4th Cir. 2005). "The inquiry contemplated by Rule 19 is a practical one" and generally within "the sound discretion of the trial court." *Coastal Modular Corp. v. Laminators, Inc.*, 635 F.2d 1102, 1108 (4th Cir. 1980). Moreover, "[t]hat determination must be made . . . in the context of the substance of each case, rather than by procedural formula." *Gunvor SA v. Kayablian*, 948 F.3d 214, 219 (4th Cir. 2020) (internal quotations and citation omitted). The Court must first determine whether there should be joinder of an absent party in accordance with the criteria set forth in Rule 19(a). *See McKiver v. Murphy-Brown, LLC*, 980 F.3d 937, 950 (4th Cir. 2020). "If the court determines that the party is 'necessary,' it must then determine whether the party is 'indispensable' to the action under Rule 19(b)." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of S.C., Inc.*, 210 F.3d 246, 249 (4th Cir. 2000); *see also* Fed. R. Civ. P. 19(b) ("If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed."). Dismissal of a case under Rule 19 is a "drastic remedy that should be employed only sparingly." *Home Buyers Warranty Corp. v. Hanna*, 750 F.3d 427, 433 (4th Cir. 2014) (cleaned up).

14

## 2. **Analysis**

### a. **DRNC has sufficiently alleged associational standing.**

NCDHHS argues that DRNC lacks associational standing because it fails to satisfy the first and third requirements under the test set forth in *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (commonly known as the "*Hunt* test"), and therefore cannot establish injury, causation nor redressability. (Docket Entry 23 at 6-10; *see also* Docket Entry 32 at 8-14.) As stated above, federal district courts exercise limited jurisdiction. *Jadhav*, 555 F.3d at 347. Article III of the United States Constitution outlines the federal court's jurisdictional limits, which implicates certain doctrines including standing and ripeness. *See* U.S. Const., art. III, § 2; *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 & n.5 (2014). For any case or controversy to be justiciable in federal court, a plaintiff must allege "such a personal stake in the outcome of the controversy as to warrant his invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005) (quoting *Planned Parenthood of S.C. v. Rose*, 361 F.3d 786, 789 (4th Cir. 2004)). Article III standing is "an integral component of the case or controversy requirement." *CGM, LLC v. BellSouth Telecomms., Inc.*, 664 F.3d 46, 52 (4th Cir. 2011) (quoting *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006)).

To establish Article III standing, a plaintiff must plausibly allege that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant[s], and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "[S]tanding is not dispensed in gross[,] rather, [a] plaintiff[ ] must demonstrate

15

standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citations omitted). Here, the undersigned construes NCDHHS' argument as a facial challenge to DRNC's standing. Therefore, "the facts alleged in the complaint are generally regarded as true and the plaintiff is entitled to the same protections available under a Rule 12(b)(6) motion." *Hatch v. DeMayo*, No. 1:16CV925, 2020 WL 5763543, at *3 (M.D.N.C. Sept. 28, 2020) (citing *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017)). *See also Timothy B. v. Kinsley*, No. 1:22-CV-1046, 2024 WL 1350071, at *5-13 (M.D.N.C. Mar. 29, 2024) (facial challenge to the plaintiffs' standing).

Relevant here, an organizational plaintiff may establish standing to sue on its own behalf, or it may have standing to bring suit on behalf of its members even if it has not itself suffered an injury. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To establish associational standing in a representative capacity, an association must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief sought requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. A non-membership organization may assert associational standing where it possesses the "indicia of membership." *Id.* at 344.

Here, DRNC satisfies the first prong of the *Hunt* test. Specifically, it alleges that as a P&A agency charged with protecting the rights of North Carolinians with disabilities, it is "empowered to conduct monitoring and investigations in facilities where people with disabilities live and receive services, and pursue legal remedies on behalf of North Carolinians

16

with disabilities." (Compl. ¶¶ 20-21.) Further, "[m]ore than half of DRNC's board of directors and advisory council members are individuals with disabilities or are family members, guardians, or advocates for people with disabilities [and] DRNC conducts annual surveys of the disability community to determine the specific areas of advocacy on which the organization will focus." (*Id.* ¶ 22.) DRNC also pleads that "[m]embers of the disability community have the right to file grievances if they disagree with actions taken by DRNC or if they are wrongly denied services by DRNC." (*Id.*) The Complaint also sets out NCDHHS's alleged unlawful conduct towards several of DRNC's constituents, *id.* ¶¶ 86-96, and DRNC brings this action on behalf of ITP detainees with mental health disabilities experiencing prolonged wait times for capacity assessments or restoration services. (*Id.* ¶¶ 3, 24.) Therefore, DRNC possesses "indicia of membership" with ITP detainees who would be able to sue on their own behalf, which satisfies the first prong of the *Hunt* test. *See Timothy B.*, 2024 WL 1350071, at *11 (holding that "constituents of DRNC or members of NC NAACP would otherwise have standing to sue in their own right, satisfying the first element of the *Hunt* test"); *Disability Rts. N.C. v. N.C. State Bd. of Elections*, No. 5:21-CV-361-BO, 2022 WL 2678884, at *2 (E.D.N.C. July 11, 2022) (finding "DRNC possesses the indicia of membership with individuals in and outside of congregate settings who would be able to sue on their own behalf, which satisfies the first prong of *Hunt*."); *see also Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (advocacy group's "constituents [ ] possess[ed] many indicia of membership—enough to satisfy the purposes that undergird the concept of associational standing: that the organization [was] sufficiently identified with and subject to the influence of those it [sought] to represent as to have a "personal stake in the outcome of the controversy"(internal quotations and

17

citation omitted)); *Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*, 630 F. Supp. 3d 1022, 1029 (S.D. Ind. 2022) (plaintiff advocacy group, "like the commission in *Hunt* and like the protection and advocacy systems considered in other courts' decisions, has sufficient 'indicia of membership' to fit it within the *Warth* framework for associational standing).

Next, the second *Hunt* factor is satisfied as there is no dispute that DRNC seeks to protect interests that are germane to its purpose. As to the third *Hunt* factor, the undersigned concludes "that Congress has abrogated the third *Hunt* requirement as it applies to DRNC in this context[.]" *Timothy B.*, 2024 WL 1350071, at *12; *see also Mink*, 322 F.3d at 1113 ("[I]n light of the role Congress assigned by statute to advocacy organizations such as [the plaintiff], Congress abrogated the third prong of the *Hunt* test."); *Tellis v. LeBlanc*, No. 18-CV-0541, 2019 WL 1474777, at *4 (W.D. La. Apr. 3, 2019) ("[P]ersuasive authority has consistently held that [P&A's statutory] provision abrogated the third prong of the *Hunt* test." (collecting cases)). In that regard, the third prong of the *Hunt* test is "prudential" in nature, and "best seen as focusing on these matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555, 557 (1996). Therefore, as another court explained, this prong "arguably should not apply to a P&A organization at all[.]" *Trivette v. Tennessee Dep't of Correction*, No. 3:20-CV-00276, 2020 WL 6685557, at *6 n.6 (M.D. Tenn. Nov. 12, 2020).

Even if the third prong of the *Hunt* test were not abrogated in this context, the undersigned nevertheless finds that DRNC has satisfied it. NCDHHS argues that DRNC

cannot satisfy the third *Hunt* prong because "[m]ultiple factors have contributed to ITP wait times, including that non-party state and county stakeholders play independent contributing roles in these issues." (Docket Entry 23 at 9.) NCDHHS further contends that DRNC's expert, Dr. Daniel Murrie, and NCDHHS's "experts agree that multiple systemic factors affect individual detainees and their respective wait times." (*Id.* at 9-10 (quoting Expert Declaration of Daniel Murrie, Phd. ¶ 21, Docket Entry 15-10 ("Murrie Decl."); citing Declaration of Robert Cochrane, Psy.D., ABPP ¶¶ 28-39, Docket Entry 20-1 ("Cochrane Decl.")).)[9] However, DRNC seeks declaratory and injunctive relief that would broadly benefit DRNC constituents who, because of their mental health disabilities, require timely capacity assessments or restoration services. (Compl. ¶¶ 23-24; *id.* at 43-44.) This type of relief, as opposed to money damages, generally satisfies the third prong of the *Hunt* test. *Timothy B*, 2024 WL 1350071, at *12; *see also Wilson v. Thomas*, 43 F. Supp. 3d 628, 632 (E.D.N.C. 2014) ("Disability Rights seeks the non-discriminatory administration of the driver licensing program to benefit all eligible constituents of Disability Rights and declaratory and injunctive relief furthering that goal. This is clearly relief that does not require the participation of any individuals."); *Retail Indus. Leaders Ass'v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007) (associational standing originally recognized for an "action [that] seeks a declaratory judgment and injunctive relief"). Furthermore, although individual constituents of DRNC are identified in the

---

[9] Dr. Murrie works "as a forensic-clinical psychologist, university faculty member, and national expert in forensic mental health services, with specific areas of expertise including competence evaluation and restoration treatment." (Murrie Decl. ¶ 1; *see also* Docket Entry 32 at 44.) He also "serve[s] as a federally appointed 'special master' overseeing reform of the competence system in Colorado." (Murrie Decl. ¶ 1; *see also* Docket Entry 32 at 84-89.) Dr. Cochrane is "the Statewide Director of Forensic Services at [the Department]." (Cochrane Decl. ¶ 2; *see also* Docket Entry 32 at 98.)

Complaint, and even if "litigation will require evidence and testimony from a representative sample of [DRNC's constituents][,]" this does not defeat associational standing. *Allen v. City*, No. 1:20-cv-998, 2021 WL 2223772, at *5 (M.D.N.C. June 2, 2021). Therefore, DRNC has met the third prong of the *Hunt* test.

NCDHHS's argument that DRNC lacks associational standing relies upon holdings from the Fifth and Eighth Circuit Courts of Appeals denying associational standing to P&A systems. *See* Docket Entry 23 at 7-9; *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994) (holding that association failed to satisfy the *Hunt* factors since the federally-funded advocacy group "[bore] no relationship to traditional membership groups because most of its 'clients'—handicapped and disabled people—[were] unable to participate in and guide the organization's efforts"); *Missouri Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 810 (8th Cir. 2007) (finding *Hunt* factors not satisfied and that "the lawsuit may not properly go forward without the participation of one or more individual wards with specific claims based upon a particular incapacity and a record reflecting the basis upon which [State] officials have denied the right to vote."). However, those cases are distinguishable because as stated above, DRNC's constituents have sufficient "indicia of membership" to invoke associational standing. Moreover, as United States District Court Judge William L. Osteen, Jr. wrote, "[d]istrict courts in North Carolina have held that DRNC may assert associational standing on behalf of its constituents." *Timothy B.*, 2024 WL 1350071, at *11 (collecting cases). In addition, other courts have also concluded that P&A systems meet associational standing. *See Mink*, 322 F.3d at 1113; *Disability Rts. Pennsylvania v. Pennsylvania Dep't of Hum. Servs.*, No. 1:19-CV-737, 2020

20

WL 1491186, at *8 n.6 (M.D. Pa. Mar. 27, 2020) (collecting cases); *Ind. Prot. & Advoc. Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 642 F. Supp. 2d 872, 877 (S.D. Ind. 2009) (collecting cases). In sum, DRNC has demonstrated associational standing to challenge the claims herein.

### b. DRNC has sufficiently alleged causation and redressability.

Affixed to their argument regarding associational standing, NCDHHS in conclusory fashion states "[f]or the same reasons, [DRNC] cannot establish causation and redressability" as "the Complaint alleges and Plaintiff's expert confirms that nationwide economic factors and external stakeholders, both outside of DHHS control, affect ITP wait times[.]" (Docket Entry 23 at 10.) The undersigned disagrees.

The causation element of standing requires "a causal connection between the injury and the conduct complained of[.]" *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013) (citation omitted). Thus, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* at 234-35 (citation omitted). "[A]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice to establish traceability." *Kadel v. Folwell*, 446 F. Supp. 3d 1, 10 (M.D.N.C. 2020); *see also Bennett v. Spear,* 520 U.S. 154, 171 (1997) (acknowledging that, at the pleading stage, the traceability burden is "relatively modest"). Redressability is satisfied "where there is a non-speculative likelihood that the injury would be redressed by a favorable judicial decision." *Cooksey*, 721 F.3d at 238 (internal quotations and citation omitted). A plaintiff "need not show that a favorable decision will relieve their every injury [but] only . . . that they personally would benefit in a tangible way from the court's intervention." *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018) (internal

quotations and citations omitted). In analyzing standing, the Supreme Court has held that causation and redressability "are often flip sides of the same coin[,]" and therefore, "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (internal quotations and citation omitted). "So the two key questions in most standing disputes are injury in fact and causation." *Id.* at 381.

Here, the Complaint alleges NCDHHS's statutory obligation and "failure to administer mental health assessments, services, and treatment in a timely fashion at state hospitals or other appropriate integrated community settings" which leads to unnecessarily prolonged and harmful imprisonment in county jails. (*See* Compl. ¶¶ 5, 8, 23, 24, 26-28.) At the pleading stage, DRNC has sufficiently alleged a nexus between the injuries of ITP detainees and NCDHHS's conduct, thus "render[ing DRNC's] allegations *plausible* on their face with respect to traceability." *Hutton v. Nat'l Bd. of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 623-24 (4th Cir. 2018) (emphasis added). Furthermore, an order enjoining NCDHHS from failing to provide timely access to capacity assessments, restoration services and IVC examinations, or an order requiring NCDHHS to develop a remedial plan to reduce wait times for said services would redress the injuries alleged as it would provide some "tangible" benefit to ITP detainees. *Deal*, 911 F.3d at 189. Therefore, NCDHHS's conclusory argument for dismissal on the issues of causation and redressability lack merit and the motion to dismiss for lack of standing should be denied.

### c. Rule 12(b)(7) dismissal is not warranted.

NCDHHS next argues that dismissal is required because DRNC has failed to join indispensable parties. (Docket Entry 23 at 10.) They contend, "DHHS and its Secretary – the only defendants here – are neither the sole cause of the current ITP wait times, nor the state actors with unilateral authority to solve these issues on their own." (*Id.* at 10-11.) NCDHHS does not specify individuals that should be added but rather contend that there are multiple non-party "stakeholders" (state courts, judges, clerks, jails, and jail officials) DRNC alleges plays contributing roles in the delay issues. (*Id.* at 12-13; *see also* Docket Entry 27 at 6.) For example, NCDHHS points to DRNC's allegations that county jails generally lack the resources to provide mental health (Compl. ¶ 76), that ITP detainees "remain in jail as they wait for judges to order capacity assessments" (*id.* ¶ 52), and the State criminal courts' control in scheduling hearings on capacity issues, (*see id.* ¶¶ 36, 73-74). NCDHHS further contends that DRNC's expert, Dr. Murrie, underscores these allegations by stating that "these challenges require[ ] a multifaceted approach that involves . . . improving coordination and collaboration across mental health and criminal legal systems" including legislation changes, "upstream" deflection, and "educating courts and attorneys about capacity" issues. (*See* Murrie Decl. ¶¶ 21, 23, 27.) Again, Dr. Cochrane with NCDHHS agrees that "actions, or lack thereof, taken by these external stakeholders substantially impact the entire system, including but not limited to the wait times for ITP evaluations and restoration services that DHHS is deemed to provide." (Cochrane Decl. ¶ 28.) NCDHHS also contends it has been working with such

23

stakeholders. (*See* Docket Entry 23 at 13 (citing Cochrane Decl. ¶¶ 40-49; Declaration of Carrie Brown, MD, MPH, DFAPA ¶¶ 19-28, Docket Entry 20-2 ("Brown Decl.")).[10]

Rule 19(a) determines which parties are necessary and states:

(a) Persons Required to Be Joined if Feasible.

(1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

(A) in that person's absence, the court cannot accord complete relief among existing parties; or

(B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

(i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1). Rule 19(b) then sets forth whether a party is indispensable. Fed. R. Civ. P. 19(b).

Here, NCDHHS has not specifically identified the parties they claim are indispensable nor does it otherwise demonstrate that this Court "cannot accord complete relief among existing parties." Fed. R. Civ. P. 19(a)(1)(A); *see also Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 518 (M.D.N.C. 2008) ("Complete relief is any relief that will effectively and completely adjudicate the dispute." (internal quotations and citation omitted)); *McKay v. Federspiel*, No. 14-

_____

[10] Dr. Brown is "the Chief Psychiatrist and Deputy Chief Medical Officer for [the Department]." (Brown Decl. ¶ 2.)

24

CV-10252, 2014 WL 1400091, at *8 (E.D. Mich. Apr. 10, 2014) ("The requirement under Rule 19(a)(1) that complete relief be available does not mean that every type of relief sought must be available, only that meaningful relief be available.") (citation omitted). As mentioned above, DRNC's suit is rooted in NCDHHS's alleged statutory obligation and "failure to administer mental health assessments, services, and treatment in a timely fashion at state hospitals or other appropriate integrated community settings" which leads to unnecessarily prolonged and harmful imprisonment in county jails. (*See* Compl. ¶¶ 5, 8, 23, 24, 26-28.) While NCDHHS argues that the stakeholders are necessary because the relief sought requires a collaborative effort, having contributing roles in the issues at hand does not deem an individual or entity a necessary party under Rule 19(a). *See Superior Performers, Inc. v. Ewing*, No. 1:14CV232, 2015 WL 790371, at *5 (M.D.N.C. Feb. 25, 2015) ("[W]hile the individuals may or may not have had extensive roles in the facts at issue, [this] do[es] not satisfy the requirements of finding [individuals] are necessary parties pursuant to Rule 19(a).")

Nor does NCDHHS explain whether nonjoinder may impede the non-party stakeholders' abilities to protect their claimed interests. *See* Fed. R. Civ. P. 19(a)(1)(B). NCDHHS does not explicitly argue that any of the non-party stakeholders claim an interest in this pending action. *See Am. Gen. Life & Accident Ins. Co.,* 429 at 93 (affirming district court's determination that the "[absent party] had not claimed an interest in the federal action, and therefore, joinder was not required under Rule 19(a)(2)"); *see also Soho Wilmington LLC v. Barnhill Contracting Co.*, No. 7:18-CV-79-D, 2019 WL 165708, at *4 (E.D.N.C. Jan. 10, 2019) (non-parties have not claimed an interest in lawsuit); *Barnhardt v. Scottsdale Ins. Co.,* Case No. 1:13CV637, 2014 WL 98803, at *3 (M.D.N.C. Jan. 9, 2014) (collecting cases) (same). Even if

25

NCDHHS's collaborative works with some stakeholders could be viewed as a claimed interest, (*see* Docket Entry 23 at 13 ("DHHS has been working with law enforcement, judges, the North Carolina Administrative Office of the Courts, and various District Attorneys' offices")), NCDHHS does not explain how they would be subject to substantial risk of multiple or inconsistent obligations. *See* Fed. R. Civ. P. 19(a)(1)(B)(ii). Instead, NCDHHS focuses on the contention that the relief sought from DRNC "cannot be accomplished by an injunction directed to [NC]DHHS alone." (Docket Entry 23 at 14.)

Essentially NCDHHS's contention is that DRNC's allegations bear joint accountability between NCDHHS and the non-party stakeholders for the prolonged wait times. (*Id.* at 12-14.) Even if this were true, dismissal of this matter is not warranted because even in circumstances involving joint tortfeasors and co-conspirators, all are not required to be named in one action. *See Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990) ("It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit."). To the extent DRNC "may not be able to obtain entirely satisfactory relief by suing only [NCDHHS] and not [the non-party stakeholders], that is a risk it may choose to take." *Jacobs Vehicle Sys., Inc. v. Yang*, No. 1:12CV00181, 2013 WL 4833058, at *6 n.4 (M.D.N.C. Sept. 10, 2013). Therefore, because NCDHHS has not met its burden that the nonparty stakeholders are necessary parties to this action pursuant to Rule 19(a), the Court need not determine whether such individuals are indispensable pursuant to Rule 19(b). *Ewing*, 2015 WL 790371, at *5. Accordingly, NCDHHS's request for dismissal under Rule 12(b)(7) should be denied.

#### d. The Court should not abstain under *Younger*.

NCDHHS next argues that dismissal is required because DRNC "purports to represent individuals currently detained in connection with ongoing state court criminal proceedings" and this Court should abstain under the *Younger* abstention doctrine. (Docket Entry 23 at 14-17.) "The *Younger* abstention doctrine is an exception to the general rule that federal courts must decide cases within their jurisdiction." *Dawkins v. Staley*, No. 1:22-CV-299, 2023 WL 1069745, at *3 (M.D.N.C. Jan. 27, 2023) (citing *Younger v. Harris*, 401 U.S. 37, (1971); *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 603-04 (1975)). The *Younger* abstention is warranted in circumstances when there is "(1) 'an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) . . . provide[s] an adequate opportunity to raise [federal] challenges.' " *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 81 (2013); *accord Nivens v. Gilchrist*, 444 F.3d 237, 241 (4th Cir. 2006). In situations "where [a] State criminal prosecution is pending, the comity concerns of [*Younger*] and its progeny require abstention where granting the requested relief would require adjudication of federal constitutional issues involved in the pending state action." *Traverso v. Penn,* 874 F.2d 209, 212 (4th Cir. 1989).

Here, abstention under *Younger* is not proper. Undoubtedly, DRNC's claims relate to pending state-court criminal proceedings. (*See e.g.*, Compl. ¶¶ 3, 8, 24, 52, 95.) However, "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Jacobs*, 571 U.S. at 72. Here, DRNC is not challenging any state-court orders but rather pursues relief against NCDHHS for its purported inaction in providing timely and adequate capacity assessments and restoration services. Therefore, DRNC's relief does not interfere with the State's judicial system. *See Jonathan R. by Dixon v. Just.*, 41 F.4th

316, 332 (4th Cir. 2022) ("*Younger*'s main concern has always been whether federal jurisdiction will 'unduly interfere' with pending state proceedings."). If anything, rather than interfering with the state court proceedings, "the result it seeks would expedite those proceedings." *Indiana Fam. & Soc. Servs. Admin.*, 630 F. Supp. 3d at 1030; *see also Glendening as Next Friend of G.W. v. Howard*, 707 F. Supp. 3d 1089, 1101 (D. Kan. 2023) ("An injunction would affect the state courts' orders only by causing state officials to more quickly comply with the state court orders in criminal cases."), *appeal dismissed*, No. 24-3005, 2024 WL 5330348 (10th Cir. Nov. 5, 2024); *Ward v. Young*, No. 1:16-CV-917-DAE, 2025 WL 879728, at *6 (W.D. Tex. Feb. 18, 2025) ("Plaintiffs' requested relief would, on average, allow their underlying criminal proceedings to resume within a fraction of the current time it takes most incompetency detainees to even be admitted to a mental health facility for competency restoration."). Accordingly, as this case does not involve an instance of "the prospect of undue interference with state proceedings[,]" *Jacobs*, 571 U.S. at 72, this Court should not abstain under the *Younger* abstention doctrine. Therefore, NCDHHS's motion to dismiss should be denied on this ground.

### e. Counts 3 and 4 of the Complaint should be dismissed for failure to state a claim.

Finally, NCDHHS seeks dismissal of the Complaint contending that it fails to state claims upon which relief can be granted. (Docket Entry 23 at 17-23; *see also* Docket Entry 32 at 16-17.) As explained below, the undersigned concludes that Counts 1 (substantive due process) and 2 (procedural due process) of the Complaint sufficiently state a claim for relief

but that Counts 3 (under the ADA) and 4 (under the RA) of the Complaint should be dismissed for failure to state a claim.

### Counts 1 and 2 – 14th Amendment Substantive and Procedural Due Process Claims

NCDHHS argues that DRNC's substantive due process claim fails to allege causation. (Docket Entry 23 at 17-19.) In addition, NCDHHS argues that DRNC's procedural due process claim "fails to allege a deprivation without due process of law" and "largely repackages" its substantive due process claim. (*Id.* at 20-21.) DRNC opposes both arguments. (Docket Entry 25 at 21-27.) For the following reasons, the undersigned concludes that DRNC has sufficiently alleged substantive and procedural due process claims.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty or property, without due process of law." U.S. Const. amend. XIV § 1. "The touchstone of due process is protection of the individual against arbitrary action of the government." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (internal quotations and citation omitted). Substantive due process proscribes the government's "exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id.* at 846. Thus, "the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Id.* at 847 (internal quotations and citations omitted). For a substantive due process claim to survive a motion to dismiss, the plaintiff must allege "(1) it has a liberty or property interest; (2) the state deprived it of this liberty or property interest; and (3) the state's action falls 'so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency.' " *Safety-Kleen, Inc. (Pinewood) v. Wyche*, 274 F.3d 846, 862

29

(4th Cir. 2001) (quoting *Sylvia Dev. Corp. v. Calvert County,* 48 F.3d 810, 827(4th Cir. 1995)). Ultimately, the Court must balance "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982).

Unlike substantive due process, procedural due process "protection of property is a safeguard of the security interests that a person has already acquired in specific benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576 (1972). It is a "guarantee of fair procedures, typically notice and an opportunity to be heard." *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008) (quotations and citation omitted). "To state a procedural due process violation, a plaintiff must (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law." *Prieto v. Clarke*, 780 F.3d 245, 248 (4th Cir. 2015). Overall, "[t]he fundamental requirement of [procedural] due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (internal quotations and citations omitted).

In *Jackson*, a criminal defendant was found incompetent to stand trial and committed to Indiana's state mental health institution "until ... sane." 406 U.S. at 719. The Supreme Court held that "indefinite commitment of a criminal defendant solely on account of his incompetency to stand trial does not square with the Fourteenth Amendment's guarantee of due process." *Id.* at 731. It explained that

> a person charged by a State with a criminal offense who is
> committed solely on account of his incapacity to proceed to trial
> cannot be held more than the reasonable period of time necessary
> to determine whether there is a substantial probability that he will
> attain that capacity in the foreseeable future.... Furthermore, even

30

> if it is determined that the defendant probably soon will be able
> to stand trial, his continued commitment must be justified by
> progress toward that goal.

*Id.* at 738. In reaching that conclusion, the court explained that "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Id.*

Here, DRNC alleges that "ITP detainees have a liberty interest in freedom from incarceration. . . ." and that "[p]rolonged confinement of an ITP detainee, during which the detainee is not receiving capacity assessments or treatment, does not bear a reasonable relation to any legitimate purpose of such confinement." (Compl. ¶¶ 102-03.) DRNC further alleges that "ITP detainees have a life and liberty interest in personal safety and receiving adequate mental health care while in government custody" and "[w]hile detained, ITP detainees also have a constitutional right to individualized treatment to provide a realistic opportunity for capacity restoration, mitigation of severe mental pain, improvement of their mental condition, and prevention of suicide and other forms of self-harm." (*Id.* ¶¶ 104-05.) DRNC also alleges that NCDHHS solely is responsible for the assessment and restoration of people with mental health disabilities who have been charged with crimes, that "[n]o legitimate state interest justifies the confinement of mentally ill individuals in county jails for months," and that "[t]he prolonged confinement also amounts to further punishment imposed without conviction in instances when an ITP detainee has been, or will be, incarcerated for longer than his or her maximum criminal exposure." (*Id.* ¶¶ 106, 109-110.)

Taking the facts as alleged in the Complaint as true, the undersigned concludes that DRNC has alleged a plausible substantive due process Fourteenth Amendment claim that

31

NCDHHS is violating the rights of ITP detainees to be free from incarceration by subjecting them to prolonged confinement in county jails while they await ITP or IVC examinations and/or treatment at a state psychiatric hospital or other appropriate integrated settings. The claim is grounded in a liberty interest in freedom from incarceration, reasonable conditions of safety and mental health care, and timely restorative treatment. "The Supreme Court has recognized that an individual has a liberty interest in being free from incarceration absent a criminal conviction." *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (citing *Baker v. McCollan*, 443 U.S. 137, 144 (1979)); *see also Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[A] detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."). It has further recognized "constitutionally protected interests in conditions of reasonable care and safety[.]" *Youngberg*, 457 U.S. at 324 (1982). Further, the Ninth Circuit has recognized that incapacity criminal defendants "also have a liberty interest in receiving restorative treatment." *Mink*, 322 F.3d at 1121. DRNC's substantive due process claim is also supported from the guidance in the Supreme Court's holding in *Jackson*. *See Jackson*, 406 U.S. at 738 ("[D]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.").[11]

---

[11] In *Youngberg*, the Supreme Court noted that *Jackson* is a procedural rather than substantive due process case. *See* 457 U.S. at 321 n.27 ("This case differs in critical respects from *Jackson*, a procedural due process case . . . ."). However, the Court in *Youngberg*, which was analyzing substantive due process, cited to *Jackson* when it held that the involuntarily-committed respondent enjoyed "constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests," and that "[s]uch conditions of confinement would comport fully with the purpose of respondent's commitment." *Id.* at 324. Therefore, as DRNC and others have often done, the undersigned relies upon the guidance in *Jackson* in the context of the substantive due process claim. (*See* Docket Entry 25 at 21-22 (citing to *Jackson* under substantive due process argument); *see also Disability L. Ctr. v. Utah*, 180 F. Supp. 3d 998, 1007-08 & n. 27 (D. Utah 2016) (acknowledging *Youngberg* and relying on *Jackson* to examine substantive due process claim); *Mink*, 322 F.3d 1101, 1121–22 (9th Cir. 2003) (drawing

Case 1:24-cv-00335-LCB-JLW    Document 33    Filed 06/12/25    Page 32 of 58

NCDHHS contends that DRNC fails to allege causation because the Complaint alleges "that the current wait times have resulted from nationwide supply-and-demand economic factors outside the control of DHHS." (Docket Entry 23 at 18.) NCDHHS also points to the holding in *Glendening* where the district of Kansas considered several external factors outside of the state agency's control which impacted the wait lists for admission to a state hospital for ITP competency evaluation and restoration. 707 F. Supp. 3d at 1107 ("[I]t is unclear at this point whether Plaintiffs can show that the staffing shortages are within [the state agency's] control or that the admission delays are due to its conduct."). NCDHHS's argument misses the mark in that DRNC's Complaint focuses on NCDHHS's alleged statutory obligation and failures that have led to prolonged delays for ITP detainees. (*See* Compl. ¶¶ 5, 8, 23, 24, 26-28.) Ultimately, as stated above, at the motion to dismiss stage, DRNC has adequately pled allegations which, taken as true, states a plausible substantive due process claim against NCDHHS. *See Nadendla v. WakeMed*, 24 F.4th 299, 305 (4th Cir. 2022) (internal quotations and citations omitted) (explaining that to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "[t]o contain sufficient factual matter to make a claim plausible, the factual content must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (internal quotations and citation omitted)); *Disability L.*

_____

support from *Jackson* in concluding that state mental hospital "violates the substantive due process rights of incapacitated criminal defendants when it refuses to admit them in a timely manner"); *Powell v. Maryland Dep't of Health*, 455 Md. 520, 547-50, 168 A.3d 857, 873-74 (2017) (applying *Jackson* due process principle to substantive due process claim); *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, 73 F. Supp. 3d 1311, 1314-18 (W.D. Wash. 2014) (same); *Jonathan R.*, 2023 WL 184960, at *7-8 (relying on *Jackson* due process principle to substantive due process claim in a foster care matter).)

*Ctr.*, 180 F. Supp. 3d at 1006 ("Plaintiffs have adequately pled a plausible claim that the State is violating the Fourteenth Amendment rights of incompetent defendants by unconstitutionally infringing on their liberty interest in being free from incarceration absent a criminal conviction."); *Cooper v. Kliebert*, No. 15-751-SDD-RLB, 2016 WL 3892445, at *5 (M.D. La. July 18, 2016) ("Plaintiffs have alleged that, as pretrial detainees who have been found incompetent to stand trial and who have not been convicted of any crimes, their substantive due process rights guaranteed by the Fourteenth Amendment have been violated by Defendants' policies, practices, and procedures.").

The undersigned also concludes that DRNC has alleged a plausible procedural due process claim against NCDHHS. Here, DRNC alleges that "ITP detainees possess a protected liberty interest in avoiding prolonged detention in local county jails. ITP detainees have liberty interests in assessments and treatment that could enable them to participate in defending against criminal charges and would enable their criminal cases to expeditiously proceed to resolution, whether by plea bargains, trial, dismissal, or involuntary commitment." (Compl. ¶ 117.) Further, NCDHHS's "inadequate administration and operation of the ITP system, has violated these detainees' rights to procedural due process under the Fourteenth Amendment." (*Id.* ¶ 118.) NCDHHS contends that this claim is the same as the substantive due process claim and that DRNC otherwise fails to "credibly allege any procedural due process deprivation." (Docket Entry 23 at 20-21.) However, at least for purposes of the Rule 12(b)(6) stage, these factual allegations are sufficient to state a plausible procedural due process claim. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

34

the misconduct alleged."); *Mink*, 322 F.3d at 1119 n.10 (violation of procedural due process rights where "[p]ersons unfit to proceed and held in county jails for more than a brief period suffer delays in receiving restorative treatment, which delays their return to competency, prolonging their criminal cases and making it difficult for their attorneys to learn from their clients about the crime or crimes charged, to identify witnesses, and to enter into plea negotiations. . . .."). Therefore, NCDHHS's motion to dismiss should be denied on this ground.

**Counts 3 and 4 – ADA and RA Claims**

NCDHHS finally argues that DRNC's ADA and RA claims fail to allege causation because "ITP waiting times are not a function of, or caused by, or motivated by, anyone's disability" and DRNC "has not alleged that the detainees' disabilities were a 'motivating factor' in [NC]DHHS's role in administering the State's ITP statutes, or that [NC]DHHS took actions 'solely by reason' of the detainees' disabilities (required under the RA)." (Docket Entry 23 at 21-23.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Moreover, the RA similarly states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . .." 29 U.S.C. § 794(a). The Fourth Circuit has explained:

35

"Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same." *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) (internal quotation marks omitted). To establish a violation of either statute, plaintiffs must prove "(1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of their disability." *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503 (4th Cir. 2016).

The ADA's Title II and the Rehabilitation Act "differ only with respect to the third element, causation." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012). "To succeed on a claim under the Rehabilitation Act, the plaintiff must establish he was excluded 'solely by reason of' his disability; the ADA requires only that the disability was 'a motivating cause' of the exclusion." *Id.* at 461-62 (quoting *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468-69 (4th Cir. 1999)).

*Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018).

Further, a district court within the Fourth Court Circuit explained:

Title II and § 504 do more than share similar language—they also impose similar requirements. *Halpern*, 669 F.3d at 461. One such requirement is the "integration mandate." Public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals." 28 C.F.R. § 35.130(d); *see also* 34 C.F.R. § 104.4(b)(2) (imposing a similar integration requirement) . . . . Public entities must also abide by the "reasonable modification" requirement. "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7)(i).

*Jonathan R.*, 2023 WL 184960, at *18. Moreover, "[p]ublic entities are forbidden from utilizing

standards, criteria, or methods of administration' that disparately impact the disabled, without

56

regard to whether such conduct has a rational basis." *Connor*, 2025 WL 1167846, at *5 (internal quotations and citation omitted). Thus, "public entities are prohibited by regulation from methods of administration that subject disabled individuals to discrimination on the basis of disability or have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." *Id.* (internal quotations and citation omitted). In addition, the Supreme Court has recognized that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999).

Here, DRNC alleges that ITP detainees qualify as individuals with disabilities as defined under the ADA and RA "because they have, or are regarded as having, mental health disabilities severe enough that their capacity to stand trial has been called into question, or they have already been deemed incapable to proceed to trial." (Compl. ¶¶ 123, 134.) Further, DRNC alleges that NCDHHS, to include its secretary, is a "public entit[y]," and receives "federal financial assistance." (*Id.* ¶¶ 122, 132.) The Complaint further alleges that: "Defendants have failed to administer their ITP-related services in the most integrated setting appropriate to the needs of ITP detainees;" "[e]xtended confinement of ITP individuals due to the lack of timely capacity assessment and restoration constitutes unlawful discrimination under the integration mandate of [both the ADA and RA];" "Defendants have utilized methods of administering its ITP services that result in discrimination against ITP detainees;" and "Defendants have failed to make reasonable modifications in policies, practices, or procedures which are necessary to avoid discrimination against ITP detainees." (*Id.* ¶¶ 124-27, 135-38.)

37

The undersigned concludes that DRNC has not stated a plausible claim for relief arising under either the ADA or RA. Specifically, as NCDHHS argues, DRNC has failed to allege that NCDHHS's failures in administering its ITP services or failures to make reasonable modifications in its policies or procedures associated with wait times were in any way caused by, or motivated by, a disability. DRNC argues that "[a]ccess to [competency and restoration] services is being impaired in violation of the ADA and RA, which 'impose[ ] an *affirmative obligation* . . . to enable disabled persons to receive services or participate in programs or activities.' " (Docket Entry 25 at 28 (quoting *Constantine v. Rectors & Visitors of George Mason Univ*, 411 F.3d 474, 488 (4th Cir. 2005) (emphasis added)).) Relying on *Olmstead* and pointing to several factual allegations (*see* Compl. ¶¶ 8, 24, 27, 75, 103-113), DRNC further contends that NCDHHS "violate[s] the statutes' prohibitions on unnecessary confinement of disabled individuals by causing the extended detention of ITP detainees" and "NCDHHS' failures to assess ITP individuals' long-term needs and ensure the availability of mental health professionals to conduct capacity assessments and appropriate restoration treatment are omissions which violate the ADA and RA." (Docket Entry 25 at 28-29.) However, a methods of administration claim cannot be based upon "an allegation of deficiencies in the level services provided." *Dyous v. Dep't of Mental Health & Addiction Servs.*, No. 3:22-CV-1518 (SVN), 2024 WL 1141856, at *19 (D. Conn. Mar. 15, 2024).

Moreover, DRNC neither sufficiently alleges nor argues how *Olmstead* is applicable here. In *Olmstead*, the Supreme was "confront[ed with] the question [of] whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions." 527 U.S. at 587. The response was "a qualified

38

yes[;]" that is, "[s]uch action is in order when the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Id.* Thus, in explaining that "Congress explicitly identified unjustified 'segregation' of persons with disabilities as a "for[m] of discrimination[,]" *id.* at 600, the Supreme Court rejected the State's argument that petitioners "encountered no discrimination *by reason of their disabilities* because they were not denied community placement *on account of those disabilities. Id.* at 598 (emphasis added and quotations omitted). *See also Alexander v. Choate*, 469 U.S. 287, 295 (1985) ("Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.").

However, in *Winters v. Arkansas Dep't of Health & Hum. Servs.*, 491 F.3d 933 (8th Cir. 2007), the Eighth Circuit rejected an attempt to invoke *Olmstead* and the "integration mandate" in the context of a pretrial detainee alleging delays in treatment. *See id.* at 936-37. The Court wrote:

> The district court rejected as inapplicable the plaintiff's argument based on [*Olmstead*] that Mr. Winters did not receive an appropriate placement under the ADA because jail is not the least restrictive placement for a person with a mental illness. The *Olmstead* case dealt with discrimination arising from isolating persons with mental illness in an institution when the state's own treatment professionals have determined that a community setting would be appropriate. The district court properly distinguished the situation at hand, noting that Mr. Winters was awaiting transfer to the State Hospital for a decision about his

> appropriate placement, . . . . No treatment professionals had yet
> had the opportunity to evaluate him or recommend a placement
> for him and consequently, the least restrictive placement standard
> did not come into play.
>
> . . .
>
> Mr. Winters was not denied admittance to the State Hospital on
> the basis of his disability, but for a lack of available space. While
> a policy of same-day or immediate admission into an appropriate
> mental health facility may be desirable in the best of all worlds, it
> is not mandated by the ADA, the Rehabilitation Act, or the
> Constitution, and it may not always be feasible given a state's
> limited resources. We agree with the district court's conclusion
> that Mr. Winters was not discriminated against on the basis of his
> disability.

*Id.* (internal citations omitted).

Here, similarly the undersigned finds that *Olmstead* is inapplicable. The Complaint alleges "[e]xtended confinement of ITP individuals due to the lack of timely capacity assessment and restoration constitutes unlawful discrimination under the integration mandate of Title II of the ADA." (Compl. ¶ 125.) However, there are no allegations that treatment professionals have recommended that the ITP detainees be placed in community-based settings. Rather, the allegations here are that the ITP detainees are languishing in jails for prolonged periods of times awaiting capacity assessments and restoration services. *Cf. Olmstead*, 527 U.S. at 593. Therefore, this matter does not implicate *Olmstead,* and DRNC does not otherwise allege that ITP detainees have been excluded from participation in, or denied the benefits of, a public service, program, or activity, or was otherwise discriminated against, by reason of a disability. *See Seth v. D.C.*, No. CV 18-1034 (BAH), 2018 WL 4682023, at *11-14 (D.D.C. Sept. 28, 2018) (finding the plaintiff had not alleged discrimination "by reason of

40

disability" and had not alleged an *Olmstead* claim where the plaintiff "does not oppose a transfer from institutional care to a less restrictive setting, but he has failed to offer sufficient indications that the defendants believe community placement is appropriate or that the placement can be reasonably accommodated" (internal quotations and citation omitted)); *M.S. v. Cnty. of Ventura*, No. CV1603084BRORAOX, 2016 WL 11506613, at *12 (C.D. Cal. Oct. 24, 2016) ("[The p]laintiffs do not allege that [the hospital's] "one in, one out" policy has anything to do with [the p]laintiffs' disability; rather, from the face of [the p]laintiffs' pleading, it appears that this alleged policy is due to a lack of space[,]" which "[the d]efendants cannot be held liable for discrimination under the ADA or the Rehabilitation Act because [the hospital] lacks space to accommodate [the p]laintiffs."); *Winters*, 491 F.3d at 937 (8th Cir. 2007) ("We agree with the district court's conclusion that [Mr. Winters] was not discriminated against on the basis of his disability."); *see also Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."). Accordingly, because DRNC fails to sufficiently to allege plausible claims under the ADA and RA, the Court should grant NCDHHS's motion to dismiss Counts 3 and 4.

## B. **DRNC's Motion for Preliminary Injunction**

### 1. **Legal Standard**

The undersigned now turns to DRNC's motion for preliminary injunction. (Docket Entry 15.)[12] A party seeking a preliminary injunction must establish all four of the following

---

[12] The undersigned notes that DRNC requests that the Court waive the Rule 65(c) security requirement, which NCDHHS does not request a bond. (*See* Docket Entry 16 at 28; Docket Entry

elements: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in the party's favor; and (4) an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *accord HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021). "[E]ach preliminary injunction factor [must] be satisfied as articulated." *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (internal quotations omitted). In that regard, "[a] plaintiff need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed at trial [and] [s]imilarly, a plaintiff must demonstrate more than just a 'possibility' of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017). Injunctive relief, such as the issuance of a preliminary injunction, is an extraordinary remedy that may be awarded only upon a clear showing that the plaintiff is entitled to such relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see also MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (a preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances" (citation and quotations omitted)). Because the undersigned concludes that DRNC's ADA and RA claims should be dismissed pursuant to NCDHHS's motion to dismiss, only DRNC's claims asserting violations of substantive and procedural due process are considered here.

---

20 at 22.) In light of the recommendation to deny the motion for preliminary injunction, the Court need not address this issue any further.

## 2. Analysis

### a. Likelihood of Success on the Merits

#### i. Substantive Due Process

The Court first examines the likelihood of success on the merits of DRNC's substantive due process claim. The undersigned concludes that DRNC has not demonstrated that it is likely to succeed on the merits of its substantive due process claim. To reiterate, DRNC's contention is that ITP detainees often languish in jail for prolonged periods awaiting capacity assessments and restoration services that NCDHHS is legally obligated to provide, which violates *Jackson's* mandate that pre-trial detention of ITP detainees be limited to "a reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future." 406 U.S. at 738. In support of its motion for preliminary injunctive relief, DRNC provided data and expert opinion related to the status of ITP detainees awaiting services (and most of which is akin to the allegations in the Complaint).

Specifically, in 2022 and 2023, around 3,800 detainees had capacity assessments, which "[a]round 20% of those assessed are ultimately found ITP." (*See* Docket Entry 16 at 6 (citing Docket Entry 24-1 at 2;[13] Docket Entry 15-4 at 18).) DRNC states that "[s]ince 2022, ITP

---

[13] DRNC originally filed a spreadsheet compiling average wait times for capacity assessments attached as Exhibit 1 to its motion for preliminary injunction. (*See* Docket Entry 15-1.) It also filed a declaration from one of its attorneys, Amika M. Singh, explaining the compilation of data. (*See* Declaration of Amika M. Singh, Docket Entry 15-2 ("Singh Decl.").) As part of its reply, DRNC subsequently filed "an updated version of [the spreadsheet at Docket Entry 24-1], which corrects a typographical error and clarifies the title of a chart" but otherwise avers that "[t]he information relied upon is unaltered" and "[a]ll data cited in Plaintiff's filings remain correct." (Docket Entry 24 at 2 n.1.) The undersigned notes that the "updated version" of the spreadsheet is substantially shorter in

43

detainees have waited an average of 68 days from the issuance of a court order for an initial capacity assessment." (Docket Entry 16 at 7.)[14] In particular, "[w]ait times for assessments by LME/MCOs average 24 days, and waits at Central Regional Hospital average 127 days." (*Id.*)[15] However, DRNC further argues that some detainees, including its constituents named in the Complaint, wait longer. (*Id.*; *see e.g*, Docket Entry 15-6 (Brown waiting three months for her assessment report to be completed); Docket Entry 15-7 at 2-6 (Cline waiting three months)). These delays are not unusual, DRNC contends, as "1,228 ITP detainees have waited for two months or more for completion of their initial assessment reports," with over half of those waiting three months or more, "and 400 [having] waited 120 days or more." (Docket Entry 16 at 8 (citing Docket Entry 15-1 at 2).)

Then as the process continues, there are delays for restoration and treatment services. NCDHHS "oversees three psychiatric hospitals that handle almost all restoration treatment and involuntary commitment examinations" and "[i]n December 2022, 273 people were waiting to be admitted at a state psychiatric hospital, 191 of whom were ITP detainees." (Docket Entry 16 at 8 (citing Docket Entry 15-8 at 4-6; Docket Entry 15-4 at 21)). DRNC states that reductions in bed space and treatment capacity at the three state psychiatric

---

length. (Compare Docket Entry 15-1 *and* 24-1.) However, given the purpose of the updated version, the explanation from counsel of the compilation of data, and DRNC's representation that the data relied upon remains unaltered, the undersigned will refer to the updated version in the recommendation herein.

[14] DRNC explains that "[t]hese wait times indicate the average duration between the day that the assessment facility receives the assessment order and the day that the assessment report is completed." (Docket Entry 16 at 7 n.2 (citing Docket Entry 24-1; Singh Decl.).)

[15] DRNC has attached NCDHHS's webpage listing of LME/MCOs. (*See* Docket Entry 15-5.)

hospitals have led to delays. (*See e.g.*, Docket Entry 15-9 (Anderson waiting nine months for admission to Cherry State Hospital); (Docket Entry 15-7 at 9-12 (Cline waiting nearly 10 months for admission to Broughton Hospital).) DRNC also states that one detainee, "Dillon Ledford ultimately waited 531 days in detention before being admitted to Broughton Hospital." (Docket Entry 16 at 8 (citing *Fractured*, Frontline, (March 5, 2024), https://www.pbs.org/wgbh/frontline/documentary/fractured/) (last visited June 9, 2025).) Again, DRNC contends that this is not rare because "[s]ince January 2022, ITP detainees have waited an average of 145 days for admission to a state psychiatric hospital after they are ordered for involuntary commitment." (*Id.* at 8-9 (citing Docket Entry 15-3 at 2).)

Plaintiff's expert, Dr. Murrie, attests as to the impact of prolonged jail stays without treatment and the significant harm to persons with serious mental illnesses. "Even outside of jails and prisons, individuals with [serious mental illnesses], . . . are at increased risk for suicide and early mortality." (Murrie Decl. ¶ 8.) Further, "[u]nder stressful environmental conditions and in the absence of appropriate treatment, individuals with [serious mental illnesses] are at risk of psychiatric decompensation." (*Id.*) Further, "[t]he jail environment poses many challenges to providing mental healthcare," which many factors are "likely to exacerbate pre-existing mental health symptoms for those with" serious mental illnesses. (*Id.* ¶ 9.) Dr. Murrie further explained that "[t]he chaotic and anti-therapeutic environment of the jail setting, paired with the lack of appropriate resources and obstacles to health care (e.g., security, segregation) cause many people with pre-existing [serious mental illnesses] to experience psychiatric decompensation, which results in re-emergence of symptoms such as psychotic disorganization, hallucinations . . . [or] suicide attempts." (*Id.* ¶ 11.) Other consequences

include greater risk of harm to themselves or others, and increased severity of psychological symptoms and decreased capacity for eventual restoration. (*Id.* ¶¶ 17-20.) Thus, timely assessment and treatment are "crucial to prevent harm" of these individuals in the jail settings. (*Id.* ¶ 12.) DRNC even made efforts to contact NCDHHS to discuss its concerns about wait times of ITP detainees prior to initiating this action. (*See* Docket Entry 15-11.)

In response to DRNC's claim, NCDHHS's essential argument is that there are many external factors outside of its control which has caused the wait list issues and points to Dr. Murrie's statement that "North Carolina is not alone in facing such challenges." (Murrie Decl. ¶ 3.) NCDHHS also points to increasing demands since the Covid-19 pandemic. (*See* Cochrane Decl. ¶¶ 20-21.) In addition, they argue that there are workforce challenges in North Carolina, as is nationally, although they "ha[ve] taken steps to hire and retain more staff including [instituting] hiring and retention bonuses, however, hiring salaries remain below market value." (Docket Entry 20 at 5 (citing Brown Decl. ¶¶ 7-12).) NCDHHS also points to external stakeholders and their involvement; for example, increased capacity evaluation and restoration referrals by the courts, county clerks' delay in notifying district attorneys when ITP detainees have been restored as required by N.C.G.S. § 15A-1007(a), and insufficient mental health services in the detention centers. (Cochrane Decl. ¶¶ 37.) Further, the state psychiatric hospitals are tasked with serving other populations. (*See id.* ¶ 11 ("In addition to serving the entire ITP population, the [state psychiatric hospitals] also are charged with serving patients adjudicated as Not Guilty By Reason of Insanity (N.C.G.S. § 15A-1321) while also serving patients with the most acute and high-level psychiatric needs in the civil population.").)

46

NCDHHS further contends that "[d]espite the limited control that DHHS has over the ITP system, DHHS is deeply committed to reducing ITP wait times." (Docket Entry 20 at 6.) At the time of its response brief, NCDHHS noted that "[c]urrently, the median wait time is 16 days for a detainee to receive an ITP assessment (down from 33 days in 2022. The median and median wait time for admission to two of the [state psychiatric hospitals] also is coming down, and number of individuals on the waiting list has been reduced from 213 in June 2023 to 148 today." (*Id.* at 2-3; *see also* Cochrane Decl. ¶¶ 22-26.)[16] The initiatives NCDHHS is pursuing include increased funding ($835 million dollars in funds appropriated in 2023 to address mental health needs in North Carolina), legislative changes, investments to diversion and deflection programs, and new programs and initiatives like the detention-based capacity restoration program ("DBCRP") in the Mecklenburg County Detention Center, and the community-based capacity restoration programs ("CBCRP") launched in Mecklenburg, Wake, and Cumberland counties. (Brown Decl. ¶¶ 19-26; Cochrane Decl. ¶¶ 46-47.) Some of the initiatives also coincide with solutions that Dr. Murrie propose would reduce wait times for ITP detainees. (*See e.g.*, Murrie Decl. ¶¶ 28, 33-35, 38.)

At the hearing on the parties' motions, both Dr. Murrie and Dr. Cochrane testified. (*See* Docket Entry 32 at 43-139.) Notably, Dr. Murrie discussed hiring efforts that could reduce wait times for initial capacity assessments. (*Id.* at 51-52.) Further, while acknowledging

---

[16] The parties dispute the appropriateness of calculating "average" or "mean" versus "median" wait times. (*See* Docket Entry 20 at 15 n.5; Docket Entry 24 at 3; Docket Entry 32 at 62-63; Cochrane Decl. ¶¶ 24-26.) However, for the purposes of addressing DRNC's preliminary injunction motion, the undersigned finds the distinction immaterial to the underlining issue of whether the wait times violate *Jackson* because even using DRNC's preferred "means" calculation, the undersigned concludes that DRNC has not demonstrated that there is a likelihood that a constitutional violation has occurred.

47

that resolution of wait times "require[ ] a multifaceted approached," (*id.* at 53), he discussed solutions that a state mental health agency could do, such as a "continuum of care" approach to restorative services which incorporates community-based and jail-based restorative services. (*Id.* at 53-54.) Dr. Murrie also stated that a state mental health agency could "better steward the beds they do have" by transitioning folks into the community. (*Id.* at 54-55.) With an "average wait of 173 days" for restoration treatment, and a "waitlist of 157 people" (the former a slight increase from the time of the filing of Dr. Murrie's declaration and the latter a decrease), Dr. Murrie still finds the solutions beneficial. (*Id.* at 61-62.) Further, he commends the steps that NCDHHS has already taken towards reducing wait times, stating that "these are good steps[,] . . . many of [which] fit with best practices." (*Id.* at 63; *see also id.* at 77-80.) However, to "substantially reduce" North Carolina's numbers, Dr. Murrie believes that NCDHHS would need to "increase and expand these [steps] greatly." (*Id.* at 95.)

Dr. Cochrane reiterated NCDHHS's overarching argument that delays in wait times are outside the Department's control. Notably, he stated that there are delays in court-ordered evaluations being submitted to the appropriate NCDHHS officials, delays in receipt of necessary records, and delays in sheriff transports. (*Id.* at 103-05.) As to the 33% increase in court-ordered evaluations, Dr. Cochrane stated that there was nearly "an increase of 400 cases" from 2023 to 2024 alone, with 60% of those needing restoration services. (*Id.* at 107-08.) As to the initiatives to reduce efforts, Dr. Cochrane also noted that a second DBCRP launched in February 2025 in Pitt County, although both totaled bed space is only 35 beds (25 in Mecklenburg County Detention Center and 10 in Pitt County). (*Id.* at 115, 138.) Unfortunately, there have only been 16 participants in the CBCRPs which Dr. Cochrane

48

attributes the low participation to the State's statutory language surrounding ITP detainees. (*See id.* at 117-119 ("[J]udges don't feel comfortable ordering people into [community-based] programs because it's not explicit in statute that they can't do it.").) Dr. Cochrane further stated that the Department commenced a "quality improvement program" which includes reviewing reports and providing feedback to local evaluators. (*Id.* at 125.) Dr. Cochrane believes that an immediate order requiring admission of ITP detainees (roughly 150 individuals) within 14 days would be "catastrophic for [the] hospitals," "[d]angerous to other patients, dangerous to staff." (*Id.* at 127-28.") He fears that "staff would leave" and the Department "would be decertified." (*Id.* at 128.)

Here, the undersigned concludes that DRNC has not shown that it is likely to succeed on the merits of its substantive due process claim. DRNC believes NCDHHS's conduct of failing to provide timely and adequate capacity assessments and restoration services to ITP detainees violates *Jackson*. At the outset, *Jackson* "does not establish a bright line as to what length of confinement categorically violates the Due Process Clause." *Glendening*, 707 F. Supp. 3d at 1106; *see also Ind. Fam. & Soc. Servs. Admin.*, 630 F. Supp. 3d at 1031 ("*Jackson* decided, in effect, that competency restoration services cannot go on indefinitely. No one here argues they do."). The court did, however, decline "to prescribe arbitrary time limits" in connection to the reasonable duration of pretrial commitment. *See Jackson*, 406 U.S. at 738. With that in mind, it is not evident that the delays in this matter clearly violate *Jackson*'s prohibition on indefinite commitment. *See id.* Nor is the Court persuaded that the ITP wait times lack "some reasonable relation to the purpose for which the [ITP detainees are] committed." *Id.*, at 738;

49

*see also Youngberg*, 457 U.S. at 320 (the Court must balance "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty").

NCDHHS neither disputes nor argues that delays in capacity assessments and restoration services exists for ITP detainees in North Carolina. (*See* Docket Entry 32 at 149 (acknowledging "there is an ITP . . . wait time issue in our state")). As explained above, from 2022 to the filing of the Complaint, pretrial detainees suspected of being ITP spent an average 68 days in county jails awaiting initial ITP capacity assessments used to determine their capacity to proceed. Once found ITP, pretrial detainees spent on average 145 days in jail to be admitted to a state psychiatric hospital for IVC examination and capacity restoration treatment.[17] Further, based on the hearing testimony and record as a whole, the number of ITP detainees on the wait list for capacity restoration treatment appear to have generally declined since June 2023, however the average wait time in restoration services does not appear to have dramatically changed and may be headed in the wrong direction (*See* Docket Entry 32 at 59-62, 111, 141 (average wait time in early 2025 at 173 days, average wait list of 149-157 people); Cochrane Decl. ¶ 22). As the Court previously noted, DRNC is seeking remedy against NCDHHS for their statutory obligations to provide timely and adequate services to ITP detainees. Considering the circumstances, the evidence demonstrates that there may be external factors contributing to the wait times and thereby interfering or perhaps hindering NCDHHS's statutory obligations. The issue and magnitude of wait time challenges in North Carolina, particularly restoration services, has not been a historical problem but a more recent

---

[17] Again, for the purposes of resolving this motion the undersigned uses the "average" or "mean" calculation method as provided by DRNC.

Case 1:24-cv-00335-LCB-JLW     Document 33     Filed 06/12/25     Page 50 of 58

evolution since the Covid-19 pandemic.[18]  As stated above, the demand for capacity assessments and restoration services has increased.  (Cochrane Decl. ¶¶ 20-21; Docket Entry 32 at 110.)  Moreover, NCDHHS continues to face the rippled effects of the Covid-19 pandemic with staffing shortages which has impacted bed capacity for restoration services. (Brown Decl. ¶¶ 7-10.)  NCDHHS is making efforts to address staffing shortages along with other steps to reduce wait times, which is in part dependent on State legislative appropriations. (*Id.* ¶¶ 12-13, 27-28.)  Furthermore, NCDHHS has begun DBCRPs, CBCRPs and other initiatives to reduce the wait times, many of which DRNC's own expert commends.  (*See e.g*, Cochrane Decl. ¶¶ 46-47; Docket Entry 32 at 77-80.)  While DRNC believes the steps being taken are too slow or otherwise insufficient, "that appears to be a policy difference, not one grounded in the Constitution."  *Glendening*, 707 F. Supp. 3d at 1107.

DRNC points to several cases following *Jackson*, where courts have found violation of due process rights (or likely to be violated) related to prolonged waiting periods for assessment or restoration treatment services.  (*See e.g.*, *United States v. Donnelly*, 41 F.4th 1102, 1106 (9th Cir. 2022) (holding that an eight-month pre-hospitalization period violated due process); *Mink*, 322 F.3d at 1106, 1121-1123 (affirming injunction requiring detainees to be admitted to state hospital within seven days of judicial finding of incapacitation; assessing wait times of one to five months); *United States v. McCarthy*, 703 F. Supp. 3d 1377, 1380-81 (M.D. Fla. 2023) (pre-

---

[18] (*See* Docket Entry 32 at 149 (ITP wait time issue "of recent vintage since Covid" in North Carolina); at 146 ("prior to 2020, there were much short[er] waits[,] [v]irtually no waits for ITP services");  *see also* Brown Decl. ¶ 7 ("Prior to the Covid-19 pandemic, there was no waitlist to be admitted to a State Psychiatric Hospital for restoration services at Central Regional Hospital or Cherry Hospital. Since 2016, there has been a waitlist at the third SPH, Broughton Hospital; however, the average wait time pre-pandemic was on the order of one to two weeks.").)

hospitalization detention of five months deemed due process violation); *United States v. Reeves*, 690 F. Supp. 3d 531, 535-36 (W.D.N.C. 2023) (nine-month pre-hospitalization delay "simply cannot be squared with" *Jackson*); *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-1178-MJP, 2016 WL 4418180 (W.D. Wash. Aug. 19, 2016) (mandating 14-day limit to detention of individuals awaiting a competency evaluation admission and seven-day limit to detention awaiting hospitalization for restoration services); *United States v. Smith*, 764 F. Supp. 2d 541, 545 (W.D.N.Y. 2011) (after 10 weeks, absent posing a danger to the community, "defendant's continued commitment violates his right to due process"); *Advoc. Ctr. for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 620-21 (E.D. La. 2010) (finding waits of six to nine months for restoration treatment likely violated detainees' due process rights); *Terry ex. rel. Terry v. Hill*, 232 F. Supp. 2d 934, 938, 941-45 (E.D. Ark. 2002) (wait times of eight months for inpatient evaluation and over six months for restoration treatment violated the due process clause).)

Most notably, DRNC points to the Ninth Circuit's holding in *Mink* where that court was unable to discern "a legitimate state interest in keeping mentally incapacitated criminal defendants locked up in county jails for weeks or months." 322 F.3d at 1121. Some of the factual findings in that case included that "[n]one of the jails in which these persons are held is able to provide treatment designed to restore a person found unfit to proceed to competency. People found unfit to proceed are often overtly psychotic and require special housing or segregation. They are unpredictable and disruptive . . . . If they refuse to take medications, they often decompensate rapidly. They often are confined in their cells for 22 to 23 hours a day because of their behavior." *Id.* at 1106-07. The court explained that the state

mental hospital's "refusal to accept [incapacitated] defendants not only contravenes the legislature's statutory mandate that OSH provide them with restorative treatment, [but] it also undermine[d] the state's fundamental interest in bringing the accused to trial." *Id.* at 1121.

Despite *Mink* which predates the Covid-19 pandemic, the undersigned finds instructive the circumstances and holding in *Glendening*. That court assessed average wait times of 264-336 days for admission to a state hospital for capacity restoration, which the court characterized as both "substantial" and "suboptimal." *Glendening,* 707 F. Supp. 3d at 1107. Considering an increased demand for services, staffing shortages impacting bed availability, and the Covid-19 pandemic, the court explained that it was "unclear" and at the preliminary injunction stage "whether [the p]laintiffs c[ould] show that the staffing shortages [were] within [the state agency's] control or that the admission delays [were] due to its conduct. To the contrary, [the state agency] and the State ha[d] taken steps to reduce wait times for receiving required competency services." *Id.* Thus, in denying the motion for preliminary injunction, it held that the plaintiffs had not established that the delay was "not reasonably related" to the State's asserted interests "in evaluating and restoring the competency of each detainee so that he or she may be tried[,]" and "providing adequate care at [the hospital] to accomplish that purpose, which obliges detainees to wait in line until services are available." *Id.* at 1109. It further explained that "[d]etainees must wait for inpatient services because numerous pressures outside of [the state agency's] direct control have simultaneously increased demand for treatment and created staffing shortages." *Id.*

Similarly here and as discussed above, DRNC has not persuaded the Court that the delays here implicate a due process violation. NCDHHS has a continued interest in its

53

statutory obligations of administering capacity assessments and restoration services to carry on the criminal proceedings of pretrial detainees, but such obligations appear to be subject to some external factors contributing to the wait times. However, the record reflects that NCDHHS is making efforts through multiple initiatives to reduce the prolonged wait times. Thus, the evidence thus far tends to show that "the detentions are 'reasonably related' to the purpose of providing competency restoration services: there are more defendants found to need services than there are services available—some defendants must wait." *Ind. Fam. & Soc. Servs. Admin.*, 630 F. Supp. 3d at 1032. Moreover, "*Jackson* dis-courages courts from interceding to impose arbitrary limits[,] and [a]t this stage, granting [DRNC's 14-day injunction] request would mean imposing an arbitrary limit." *Glendening*, 707 F. Supp. 3d at 1110. Indeed, DRNC has not clearly explained nor demonstrated how the requested 14-day deadline for compliance is an appropriate remedy here.[19] For these reasons, the undersigned concludes that DRNC has not clearly shown that it is likely to succeed on the merits of its substantive due process claim.

## ii. Procedural Due Process

The undersigned also concludes that DRNC has not clearly shown that it is likely to succeed on the merits of its procedural due process claim. Here, DRNC argues that "[b]ecause NCDHHS has failed to provide timely evaluations and restoration services — and because trial proceedings cannot occur while evaluation or restoration is pending — ITP detainees are

---

[19] Interestingly, DRNC's suggested 14-day time limit as an appropriate remedy for compliance does not seem to be supported with certainty from its own expert. When asked about a "reasonable amount of time for a patient with a serious mental illness to go without receiving treatment," Dr. Murrie, responded that "months and months are always too long" for most detainees but it would "vary by person." (Docket Entry 32 at 58-59.)

denied reasonably expedient resolution of their criminal cases." (Docket Entry 16 at 21.) Further, it contends that "ITP detainees' fundamental liberty interests . . . are significantly impaired when they are held for months awaiting assessment or treatment" and that "the state's only possible legitimate interests in detaining ITP defendants — attempting restoration to bring defendants to trial or pursuing involuntary commitment — are undermined by prolonged detention." (*Id.* at 21-22.) However, DRNC's alleged due process violations appear predicated on the same core allegations that NCDHHS's current unconstitutional policies and practices of inadequate administration of the ITP system is allegedly the cause of unconstitutional wait times for capacity assessment and restoration services for ITP detainees. (*See* Compl. ¶¶ 99-119.)

In that regard, it seems that DRNC seeks substantive safeguards for the "liberty interest in not being incarcerated without being convicted of a crime," (*see* Docket Entry 16 at 21), not a denial of adequate procedural protections. Indeed, "the entire point of procedural due process claims is to require a fair process, regardless of the substantive result of that process." *Glendening*, 707 F. Supp. 3d at 1111.[20] Again, that process generally centers on notice and opportunity to be heard. *Mathews*, 424 U.S. at 333 ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." (internal quotations and citation omitted); *see also Salazar v. City of Albuquerque*, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011) (no procedural due process claim where the plaintiff's "contention

---

[20] While DRNC relies on *Mink's* finding of unchallenged "procedural due process violations [that] further support[ed] the district court's injunction," 322 F.3d at 1119 n.10, *Glendening* essentially rejected this argument. 707 F. Supp. 3d at 1110-12 & n.9 (plaintiffs' "procedural due process claim . . . largely repackages their substantive due process claim").

[ ] furthers none of the goals due-process protections seek to further"). It is not clear that DRNC's claim seeks such opportunities. Rather, they appear to "attack[ ] the substantive outcome, not the procedures that produced the outcome." *Glendening*, 707 F. Supp. 3d at 1111. Therefore, similar to *Glendening,* DRNC's "request is unlikely to succeed because it confuses this framework. They seek only to avoid untimely competency evaluation and restoration treatment that flows from the state criminal procedures." (*Id.* at 1111-12.) Thus, it is not clear that this action is "about a lack of procedure, [but] about the result regardless of the procedures employed." (*Id.* at 1112.) For these reasons, DRNC has failed to demonstrate a likelihood of success on the merits as to this claim.

### b.  Remaining Preliminary Injunction Factors

The undersigned also concludes that the remaining factors also weigh against preliminary injunctive relief. DRNC has failed to clearly show that ITP detainees are likely to suffer irreparable harm in the absence of the preliminary relief requested, particularly given the unlikelihood of success on the merits as to any constitutional violation.[21] *See WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (in the context of constitutional violations, "a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits"); *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) ("Without [plaintiff's] alleged constitutional injury, [he] has failed to show that he will suffer irreparable harm."); *Cap. Associated Indus.*, 129 F. Supp. 3d at 297 ("Because [the plaintiff] has

---

[21] Irreparable harm requires that the harm "be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (cleaned up).

failed to clearly show that it would likely prevail on the merits, . . . the Court must also conclude that the same holds true for [the plaintiff] argument that it would likely suffer irreparable harm.").

Moreover, DRNC has not demonstrated that the balance of equities weighs in its favor, or that an injunction would serve the public interest.[22] Dr. Cochrane explained the "catastrophic" effects the requested relief would have on both ITP detainees and staff, which raises serious logistical and safety concerns for not only those groups, but others who NCDHHS serves in the state psychiatric hospitals. (*See* Docket Entry 32 at 127-29; *see also* Brown Decl. ¶¶ 29-33)). Dr. Brown has also expressed those concerns beyond speculation, stating that "[i]n the past, overcrowding at the [state psychiatric hospitals] ha[ve] led to serious patient and staff injury, resulting in Immediate Jeopardy status from the Joint Commission." (Brown Decl. ¶ 32.) While DRNC alleges injury here, "because [they] do not suffer an obvious injury, their interest does not clearly outweigh" NCDHH's. *Glendening*, 707 F. Supp. 3d at 1115. Moreover, the undersigned recognizes that the Fourth Circuit has held in the context of a preliminary injunction that "upholding constitutional rights surely serves the public interest." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002); *see also Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("[I]t is well-established that the public interest favors protecting constitutional rights."). However, given NCDHHS's efforts in progress to reduce wait times, DRNC essentially "request[s] federal court intervention where none may be necessary." *Glendening*, 707 F. Supp. 3d at 1116.

---

[22] These two factors are often merged when the government is the opposing party. *See Kipke v. Moore*, 695 F. Supp. 3d 638, 662-63 (D. Md. 2023); *Miranda*, 34 F.4th at 365; *Nken v. Holder*, 556 U.S. 418, 435 (2009).

For these reasons, DRNC's motion for preliminary injunction should be denied. However, the conclusion here does not suggest that DRNC's substantive and procedural due process claims will necessarily fail. Rather, the undersigned concludes that DRNC has failed to clearly establish the limited circumstances necessary to entitle it to the extraordinary remedy at the preliminary injunction stage. In that regard, DRNC "is not required to prove [its] case in full at a preliminary injunction hearing," and "the findings of fact and conclusions of law made by a court" at the preliminary injunction stage "are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citations omitted).

## III.    CONCLUSION

For the reasons stated herein, IT IS HEREBY RECOMMENDED that NCDHHS's Motion to Dismiss (Docket Entry 22) be GRANTED IN PART AND DENIED IN PART in that DRNC's counts three and four of the Complaint under Title II of the ADA and the Rehabilitation Act be DISMISSED WITHOUT PREJUDICE, and DRNC's counts one and two of the Complaint for violations of substantive and procedural due process under the Fourteenth Amendment survive.

IT IS FURTHER RECOMMENDED that DRNC's Motion for Preliminary Injunction and Request for Oral Argument (Docket Entry 15) be DENIED.

/s/  Joe L. Webster

United States Magistrate Judge

June 12, 2025
Durham, North Carolina