## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| DISABILITY RIGHTS NORTH CAROLINA,<br><br>*Plaintiff,*<br><br>v.<br><br>THE NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES and DEVDUTTA SANGVAI, in his official capacity as Secretary of the North Carolina Department of Health and Human Services,<br><br>*Defendants.* | **PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM OPINION AND RECOMMENDATION**<br><br>Case No. 1:24-cv-335<br><br>Oral Argument Requested |

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 72(b), Plaintiff Disability Rights North Carolina ("DRNC") respectfully submits these objections to Magistrate Judge Webster's Memorandum Opinion and Recommendation ("O&R") (DE 33). DRNC objects to the portions of the O&R recommending that Defendants' (North Carolina Department of Health and Human Services and Dr. Devdutta Sangvai – collectively "NCDHHS") Motion to Dismiss (DE 22) be granted in part as to counts three and four, which state violations of Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("RA"). DRNC also objects to the recommendation that its Motion for

Preliminary Injunction (DE 15) be denied. While the Magistrate correctly determined that counts one and two of DRNC's Complaint states a claim, he misapplied the law when analyzing counts three and four, as well as DRNC's Motion for Preliminary Injunction. DRNC respectfully requests that this Court deny NCDHHS's Motion to Dismiss in full and issue a preliminary injunction to prevent ongoing violations.

This case concerns the prolonged pre-trial detention of individuals with mental or cognitive disabilities in North Carolina jails. People charged with crimes, but presumed innocent, who are determined or believed to be incapable to proceed to trial ("ITP"), are often detained in county jails for excessive periods of time awaiting court-ordered assessment and treatment. DRNC, the federally mandated protection and advocacy organization for people with disabilities in North Carolina, asserts that NCDHHS is violating ITP detainees' rights under the Due Process Clause, the ADA, and the RA. NCDHHS is responsible under state law for providing capacity assessments and restoration services to ITP detainees, but is chronically delayed in doing so, causing detainees to languish in jails without receiving appropriate mental health services, such that individuals wait months (1) for an initial capacity assessment; and (2) for capacity restoration services. Prolonged wait times result in irreparable harm to ITP detainees confined in jails, including

2

psychiatric decompensation, the inability to contribute meaningfully to their criminal defense, and purposeless human suffering.

## OBJECTIONS

1.     The Magistrate erroneously denied DRNC's Motion for Preliminary Injunction when he concluded that DRNC did not show a likelihood of success on its due process claims.

2.     The Magistrate erroneously concluded that the remaining factors weigh against DRNC's request for preliminary injunctive relief.

3.     The Magistrate erroneously concluded that counts three and four of the Complaint — claims under the ADA and RA — should be dismissed for failure to state a claim for relief. Because the Magistrate erroneously dismissed DRNC's ADA and RA claims, the recommended summary denial of DRNC's Motion for Preliminary Injunction for statutory violations was contrary to law.

## STANDARDS OF REVIEW

A district judge reviews objected-to portions of a recommendation on a dispositive motion *de novo*, and "may accept, reject, or modify the recommended disposition." Fed. R. Civ. P. 72(b)(3). For non-dispositive motions, the district judge reviews the magistrate's decision to determine whether it is clearly erroneous or contrary to law. *See* Fed. R. Civ. P. 72(a).

In reviewing a motion to dismiss under Rule 12(b)(6), the court "must accept as true all of the factual allegations contained in the complaint" and

3

"draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).

To obtain a preliminary injunction, a party must show: (1) likely success on the merits; (2) likely irreparable harm without relief; (3) the balance of hardships favors them; and (4) the injunction serves the public interest. *HIAS, Inc. v. Trump*, 985 F.3d 309, 318 (4th Cir. 2021). Plaintiff "need not establish a certainty of success," just "a clear showing that they are likely to succeed at trial." *Roe v. U.S. Dep't of Defense*, 947 F.3d 207, 219 (4th Cir. 2020).

## LAW AND ARGUMENT

**I. The Magistrate acted contrary to law in denying DRNC's motion for preliminary injunction.**

**a. The Magistrate misinterpreted *Jackson v. Indiana* and its progeny and misapplied it to DRNC's substantive due process claim.**

Evidence and testimony presented at the preliminary injunction hearing established that:

(i)   When this case commenced, ITP detainees' average wait time for an initial assessment was 68 days, DE 151 at 1; DE 15-2, and their average wait time for admission to state hospitals for restoration services or IVC assessments was 145 days, with some waiting far longer, DE 15-3;

4

(ii)     Average wait times for restoration services have *increased* from 145 days to 174 days, DE 20-1 ¶ 24; and

(iii)    NCDHHS' expert Dr. Robert Cochrane, Director of Forensic Science, agreed that decompensation from these delays is a "big problem." DE 32 at 107:4–5.

ITP detainees "have a liberty interest in receiving restorative treatment" while they are detained, *Oregon Advocacy Center v. Mink*, 322 F.3d 1101, 1121 (9th Cir. 2003), and under longstanding Supreme Court precedent, "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).

The Magistrate erred in three critical respects in evaluating this record and applying the substantive due process case law.

1.     The Magistrate fundamentally misconstrued *Jackson* as discouraging court-established limits on detention. DE 33 at 49. In *Jackson*, the Supreme Court held that pretrial detention of a criminal defendant whose capacity to stand trial is questioned must be reasonably related to the state's interest in the defendant regaining competency. 406 U.S. at 738. Once confinement becomes excessive, the state's asserted interest in competency restoration trial no longer justifies depriving liberty. *Id*. While the *Jackson* court declined to announce a broadly applicable specific detention limit due to

5

"a lack of evidence in [the] record," *id.*, *Jackson* never stated that courts lack authority to set reasonable limits, and numerous courts have set such limits. Despite the parties' agreement that many ITP detainees are subject to six or more months of detention awaiting assessments and restoration services (*see* DE 32 at 103:23, 128:9, 137:5–6; DE 20-1 ¶¶ 24–25, DE 15-10 ¶ 4(a)), the Magistrate erred in determining that these delays do not violate *Jackson*'s prohibition on prolonged pre-trial confinement of people with mental health disabilities. DE 33 at 49. His conclusion that the wait times are reasonably related to restoration contradicts the weight of authority interpreting *Jackson*.[1]

---

[1] *See, e.g.*, *United States v. Donnelly*, 41 F.4th 1102, 1106 (9th Cir. 2022) (six-month detention awaiting inpatient restoration treatment is impermissible); *United States v. Wayda*, 966 F.3d 294, 309 (4th Cir. 2020) (affirming district court dismissal of a civil commitment proceeding where the government detained the defendant for six months after he was deemed incompetent to proceed before initiating commitment proceedings); *Mink*, 322 F.3d at 1121–1123 (affirming injunction requiring detainees to be admitted to state hospital within seven days of a court finding of incapacity to proceed; deeming wait times of one to five months impermissible); *United States v. Reeves*, 690 F. Supp. 3d 531, 535 (W.D.N.C. 2023) (prehospitalization detention of nine months "simply cannot be squared with" *Jackson*); *United States v. McCarthy*, 703 F. Supp. 3d 1377, 1381 (M.D. Fla. 2023) (pre-hospitalization detention of five months violates due process); *Trueblood v. Washington State Dep't of Soc. & Health Servs.*, No. C14-1178-MJP, 2016 WL 4418180, at *7, *17 (W.D. Wash. Aug. 19, 2016) (mandating fourteen-day limit to detention of individuals awaiting a competency evaluation admission and seven-day limit to detention awaiting hospitalization for restoration services); *Disability Law Center v. Utah*, 180 F. Supp. 3d 998, 1004–5 (D. Utah 2016) (denying motion to dismiss due process claims brought by pretrial detainees awaiting competency

6

Rather than address this persuasive authority, the Magistrate relied on a single outlier district court decision, *Glendening as Next Friend of G.W. v. Howard*, 707 F. Supp. 3d 1089 (D. Kan. 2023); DE 33 at 49. *Glendening* misreads *Jackson* and has not been followed by any other court.[2]

Relatedly, the Magistrate characterized DRNC's fourteen-day request as arbitrary. DE at 54. The Magistrate failed to consider that North Carolina law requires transfer for involuntary commitment examinations "[w]ithout unnecessary delay" and hearings to determine IVC status within 10 to 15 days. N.C. Gen. Stat. §§ 122C-263(a), 122C-267(a). The Magistrate also failed to consider that courts have ordered or upheld similar limits. *See Mink*, 322 F.3d

---

restoration services where "it is not uncommon for these individuals to remain incarcerated in county jails for six months or more"); *United States v. Smith*, 764 F. Supp. 2d 541, 545 (W.D.N.Y. 2011) (defendant's due process rights were likely violated by ten-week pre-hospitalization detention in jail); *Advocacy Center for Elderly & Disabled v. Louisiana Dep't of Health & Hosps.*, 731 F. Supp. 2d 603, 620-621 (E.D. La. 2010) (finding waits of six to nine months for restoration treatment likely violated the Due Process Clause); *Terry ex. rel. Terry v. Hill*, 232 F. Supp. 2d 934, 944 (E.D. Ark. 2002) (wait times of eight months for evaluation and over six months for restoration treatment violated the due process clause).

[2] *Glendening*'s reasoning is inconsistent with *Jackson* and the weight of authority on prolonged detention of ITP individuals. The plaintiff in *Glendening* appealed, but ultimately reached a settlement with Kansas prior to resolution of the appeal. Consistent with that settlement, Kansas began construction on a new state psychiatric hospital. *See* Stip. of Dismissal: *Glendening as Next Friend of G.W. v. Howard* at 1, Nov. 5, 2024, ECF No. 119; Kansas Dep't for Aging and Disability Servs., "South Regional Central Mental Health Hospital," available at https://www.kdads.ks.gov/state-hospitals/south-central-regional-mental-health-hospital (last visited July 2, 2025).

7

at 1121–23 (seven-day limit); *Trueblood*, 2016 WL 4418180 at *48 (147-day limit for initial assessment and 7-day limit for hospital transfer); and *Advoc. Ctr. for Elderly & Disabled*, 731 F. Supp. 2d at 627 (21-day limit). And to the extent that the Magistrate believed DRNC's proposed fourteen-day limit unreasonable, he erred by refusing to consider what an alternative limit might be. *See* DE 24 at 13; DE 32 at 66:2–3, 67:2–7, 92:4–12, 146:11–17.

2.    The Magistrate erred in treating NCDHHS' invocation of "external factors" such as staffing shortages, increased demand, COVID-19 and the involvement of other actors in the ITP process as valid defenses. DE 33 at 54. These challenges, real as they may be, are not unique to North Carolina and cannot justify ongoing constitutional violations.

Here again, the Magistrate exclusively relied on the *Glendening* decision. DE at 53. But the Magistrate failed to consider that *Glendening* conflicts with the weight of cases involving ITP detainees, in which courts have repeatedly rejected the idea that such "external factors" negate state agencies' responsibility for constitutional violations. For example, in *Mink*, the Ninth Circuit confronted the same excuses from the state agency charged with providing competency assessments and restoration services. 322 F.3d at 1121. It held that "[l]ack of funds, staff or facilities" do not excuse a state's duty to fulfill its statutorily designated role in ensuring timely admission and treatment of ITP detainees. *Id*. Similarly, in *Advoc. Ctr. for Elderly & Disabled*,

the court rejected the state's claim that it could not be held responsible for

delays in ITP assessment and restoration services arising from third parties'

missing paperwork. 731 F. Supp. 2d at 620.[3]

Moreover, treating "external factors" as a defense is inconsistent with:

- NCDHHS' exclusive statutory duty to provide the assessment and

    restoration services that ITP detainees are awaiting. *See* N.C. Gen.

    Stat. §§ 143B-10(e), 143B-137.1; N.C. Gen. Stat. §§ 15A-1002–

    1003. Neither the constitution nor North Carolina statutes allow

---

[3] *See also Donnelly*, 41 F.4th at 1104 (due process violation found despite "significant backlog" and "lack of available bed space"); *Fields v. Corizon Health, Inc.*, 490 F. App'x 174, 185 (11th Cir. 2012) ("Lack of funds for facilities cannot justify an unconstitutional lack of competent medical care or treatment") (citations omitted); *Smith v. Sullivan*, 611 F.2d 1039, 1044 (5th Cir. 1980) ("inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement"); *Mickens v. Winston*, 462 F. Supp. 910, 913 (E.D. Va. 1978), aff'd, 609 F.2d 508 (4th Cir. 1979) ("Those responsible for the allocation of funds must allocate an amount sufficient to assure that no inmate's constitutional rights are violated."); *United States v. Terrell Cnty., Ga*, 457 F. Supp. 2d 1359, 1367 (M.D. Ga. 2006) ("Lack of funds is not a defense to or legal justification for unconstitutional conditions") (citations omitted); *Terry*, 232 F. Supp. 2d at 944 ("limited resources cannot be considered an excuse for not maintaining the institution according to at least minimum constitutional standards") (citations omitted); *Reeves*, 690 F. Supp. 3d at 536 (due process violation found despite "the shortage of qualified forensic psychologists to staff the psychiatric referral centers, the increased number of competency restoration orders issued by courts, as well as bed space limitations at the psychiatric referral centers"); *McCarthy*, 703 F. Supp. 3d at 1380 ("The Government offers no solutions—only excuses" such as "lack of available bed space"); *Trueblood*, No. C14-1178-MJP, 2016 WL 4418180, at *5 (insufficient bed space does not excuse constitutional violations).

9

NCDHHS to abdicate this duty by blaming staffing shortages, court delays, or increased demand.

- NCDHHS' own evidence shows it is capable of taking affirmative steps to reduce these wait times. DE 32 at 101:14–19; 102:14; 113:13–124:2.

- NCDHHS' testimony that it could reduce ITP wait times by discharging patients who no longer require inpatient care but remain in state hospitals due to inadequate discharge planning. DE 32 at 133:25–136:5 (Dr. Cochrane's acknowledgment that 33 percent of state hospital patients were ready for discharge and noted the need for "places in the community to safely discharge them").

- The Magistrate's acknowledgment in recommending denial of NCDHHS' motion to dismiss that "external factors" do not constitute a defense. *See* DE 33 at 33 ("NCDHHS's argument misses the mark in that DRNC's Complaint focuses on NCDHHS's alleged statutory obligation and failures that have led to prolonged delays for ITP detainees.")

The Magistrate also failed to consider DRNC's experts' testimony that a key strategy to reduce delays is to "better steward the beds they do have" by

10

transitioning patients to community settings, and freeing up beds for those who need them most directly reduces wait times. DE 32 at 54:16–55:10.

And the Magistrate failed to consider that courts applying *Jackson* have repeatedly found that months-long delays violate due process, even when caused by external factors, limited resources or high demand.

As DRNC's expert Dr. Daniel Murrie testified, all state mental health systems faced post-pandemic strain, yet North Carolina's vacancy rate for restoration beds is significantly higher than the national average, approximately 30 percent compared to 15 percent nationally. DE 32 at 65:9–13. States facing similar challenges have been able to reduce wait times. In Colorado, where the COVID-19 pandemic had a severe impact, waitlists were cut in half through proactive measures. DE 32 at 93:6–12. In Virginia, Dr. Murrie testified that ITP detainees cannot be detained longer than 10 days before admission to restoration services, and "they reliably do that." DE 32 at 57:3–5.

3.     The Magistrate similarly treated NCDHHS' efforts to address wait times through pilot programs as a defense, and dismissed DRNC's objections as "policy difference[s]." DE 33 at 51. But, as set forth above, wait times in North Carolina frequently equal or exceed times that multiple other courts deem unconstitutional. Even where state authorities are well-meaning, constitutional violations cannot be excused by effort alone. *See, e.g., Freeman*

11

*v. Pitts*, 503 U.S. 467, 499 (1992) (effort was not enough without "a comprehensive plan to remedy ongoing violations"). The Due Process Clause demands outcomes that protect liberty, not good intentions or slow progress.

Despite NCDHHS's existing efforts, ITP individuals are languishing for months in jail without receiving treatment. NCDHHS' own data confirms delays are worsening, DE 20-1 ¶ 24, with wait times increasing from 145 days to 174 days. DE 32 at 61:5–6, 62:6–8, 128:9. The evidence presented at the hearing confirmed that NCDHHS's pilot programs remain too limited to address the ongoing harm. DE 20-1 ¶¶ 46–47. In particular, Dr. Cochrane admitted that the three community-based restoration programs have treated only 16 patients to date, DE 32 at 139:1; Mecklenburg County's detention-based restoration program has only 25 beds; Pitt County just 10. DE 32 at 138:17–20. Such limited capacity does not meaningfully address this issue affecting hundreds across the state. When asked whether the "potential ramp-up planning" had "crystallized yet," Dr. Cochrane confirmed it had not: "Well, it's sort of in the future." DE 32 at 117:9–14.

Rather than indicating progress, the undisputed data demonstrates that constitutional violations will persist unless this Court intervenes. DE 33 at 51.

12

### b. DRNC is likely to succeed on its procedural due process claim.

The Due Process Clause protects ITP detainees from prolonged detention in jails because such detention prejudices their ability to access procedures for expediently resolving their criminal cases. ITP detainees have a liberty interest in freedom from incarceration absent criminal conviction, *Mink*, 322 F.3d at 1121. The detainee's interest in curtailing pre-trial incarceration and the state's interest in bringing ITP detainees to trial are both undermined because ITP detainees decompensate when held in jail for extended periods. DE 15-10 ¶¶ 15, 20. *See, e.g., Disability Law Center*, 180 F. Supp. 3d at 1011 (denying motion to dismiss where plaintiffs alleged that the state "is undermining [the goal of bringing ITP detainees to trial] by holding incompetent defendants in jail for months without providing them adequate treatment"); *Trueblood*, 73 F. Supp. 3d at 1316 (W.D. Wash. 2014) ("There is, however, no legitimate independent interest in delays within the system because delays undermine the state's 'primary governmental interest' of bringing the accused to trial.").

The Magistrate misconstrued DRNC's procedural due process claim as a request for substantive safeguards, concluding that DRNC objects to the outcome of delays, not the fairness of the procedures. DE 33 at 55–56. But DRNC challenges the denial of timely evaluations and restoration services

13

necessary for ITP detainees to access the procedures the Constitution guarantees. Procedural due process protects more than notice and a hearing; it ensures a meaningful opportunity to participate in the process affecting one's liberty. *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); *see also Tennessee v. Lane*, 541 U.S. 509, 523 (2004) (due process requires states to afford people a meaningful opportunity to be heard "by removing obstacles to their full participation in judicial proceedings"). To meaningfully participate, criminal defendants must be competent to understand the proceedings and assist in their defense to stand trial. *Dusky v. United States*, 362 U.S. 402, 402 (1960).

ITP detainees in North Carolina often wait months without evaluation or treatment. During this time, they cannot meaningfully confer with counsel, negotiate plea deals, or present a defense. With extreme delays, prejudice to the ability to present a defense is inevitable: witnesses or evidence disappear, memories erode, etc. These delays extend incarceration without trial and deny meaningful access to the legal process—the practical, effective ability to use the legal system to protect one's rights or challenge one's detention. *See Lewis v. Casey*, 518 U.S. 343, 346 (1996).

For ITP pretrial detainees, that meaningful access means being restored so that they can understand the charges, communicate with counsel, and participate in their defense. N.C. Gen. Stat. § 15A-1001(a). Cost and convenience alone cannot justify a state's failure to provide individuals with a

meaningful right of access to the courts. *Lane*, 541 U.S. at 512; *Mink*, 322 F.3d at 1119 n.10; *Disability Law Center*, 180 F. Supp. 3d at 1011 (rejecting argument that procedural protections are satisfied while treatment is indefinitely delayed); *Trueblood*, 73 F. Supp. 3d at 1316 (delays undermined the state's interest in timely adjudication).

This is not, as the Magistrate asserted, DE 33 at 55, a disguised substantive challenge. It is a procedural claim. As the Magistrate recognized earlier in recommending denial of NCDHHS's motion to dismiss this claim, DRNC alleged a valid procedural due process claim distinct from its substantive due process claim. DE 33 at 34–35 (citing *Mink*, 322 F.3d at 1119 n.10 (recognizing a procedural due process violation where "[p]ersons unfit to proceed and held in county jails for more than a brief period suffer delays in receiving restorative treatment, which delays their return to competency, prolonging their criminal cases and making it difficult for their attorneys to learn from their clients about the crime or crimes charged, to identify witnesses, and to enter into plea negotiations. . . .").

While procedures exist for the purpose of protecting criminal defendants' rights, NCDHHS has effectively denied ITP detainees access to these procedures. Without timely evaluation and treatment, there is no participation.

15

### c. The Magistrate erroneously dismissed DRNC's ADA and RA claims and failed to analyze the likelihood of success on the merits.

The Magistrate erred in recommending dismissal of DRNC's ADA and RA claims due to a purported failure to plead discriminatory motive or that disability was a "motivating factor." DE 33 at 35–38.

### i. The Magistrate misread the statutory requirement to plead discrimination "by reason of" disability as requiring animus.

"[A] plaintiff need not show discriminatory animus" — *i.e.*, purposeful discrimination — to state a claim under Title II of the ADA or § 504 of the Rehabilitation Act. *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 373 (D. Md. 2011) (citing *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 830 n.9 (4th Cir. 1994)). *See also Smith v. N. Carolina Dep't of Safety,* 2019 WL 3798457, at *3 (M.D.N.C. Aug. 13, 2019) (same). "ADA Title II and RA Section 504 claims may be pursued on a theory of disparate impact." *Connor v. Maryland Dep't of Health*, 2025 WL 1167846, at *5 (D. Md. Apr. 22, 2025); *see also A Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008) (recognizing three categories of ADA claims: "(1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations.")

Here, the Magistrate failed to recognize that the ADA and RA allow claims not only for intentional discrimination, but also for disparate impact on

16

protected individuals. Instead, he erroneously required DRNC to show that the alleged failures were "motivated by" disability. DE 33 at 38.

Only a causal link need be pled between a disability and an exclusion from participation, denial of benefits, or deprivation of such an opportunity. *See, e.g.*, *Lamberson v. Pennsylvania*, 561 F. App'x 201, 207 (3d Cir. 2014) ("a plaintiff may succeed under the ADA "so long as disability had a determinative effect on the outcome, and thus was the but for cause of the adverse action") (citation modified); *La Union del Pueblo Entero v. Abbott*, 770 F. Supp. 3d 974, 1043 (W.D. Tex. 2025) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 291 (2d Cir. 2003) (clarifying the causal link is established "even if there are other contributory causes"). This link can be either a purpose or an *effect* of the complained conduct. 28 C.F.R. § 35.130(b)(3)(i), (ii) (emphasis added); *see also Timothy B. v. Kinsley*, No. 1:22-CV-1046, 2024 WL 1350071, at *2 (M.D.N.C. Mar. 29, 2024). The Complaint here focused on the *effect* of the complained conduct, which has discriminatory results. *See, e.g.*, DE 1 ¶¶ 86–98.

The Magistrate's failure to recognize that DRNC's claims do not require motivation or intent was a clear error fundamentally infecting his assessment of each legal theory of statutory violation.

### ii. The Magistrate failed to consider DRNC's three distinct theories of violation.

DRNC pled its ADA and RA claims on three separate theories: (1) failure to make reasonable modifications (DE 1 ¶¶ 127, 138) (under 28 C.F.R. § 35.130(b)(7)(i); 28 C.F.R. § 41.51(b)); (2) employment of methods of administration that have the effect of defeating or impairing accomplishment of objectives of the program (DE 1 ¶¶ 126, 137) (under 28 C.F.R. §§ 35.130(b)(3), 41.51(b)(3)); and (3) failure to administer programs in the most integrated setting appropriate (DE 1 ¶¶ 124, 135) (under 28 C.F.R. §§ 35.130(d), 41.51(d)). Pleading any of these theories is sufficient to establish an ADA and an RA violation. *See, e.g., Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 503–05 (4th Cir. 2016); *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.*, 673 F.3d 333, 336 & n.1 (4th Cir. 2012); *A Helping Hand*, 515 F.3d at 362.

The Magistrate failed to examine DRNC's "reasonable modification" theory and misstated the relevant legal theories when considering the "methods of administration" and "integration" claims.

### 1. The Magistrate did not address DRNC's claim based on a "reasonable modification" theory.

ADA and RA impose affirmative duties on public entities to make reasonable modifications when necessary to prevent discrimination based on disability. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 488 (4th Cir. 2005); *Pierce v. District of Columbia*, 128 F. Supp. 3d

18

250, 266 (D.D.C. 2015). Failure to make reasonable modifications is a distinct ground for ADA and RA claims. *A Helping Hand*, 515 F.3d at 362; *Knowles v. Lewis*, 2014 WL 1117966, at *11 (E.D.N.C. Mar. 20, 2014). Inquiry of claims on the "reasonable modification" theory is fact-intensive "and will vary according to the circumstances." *Seremeth,* 673 F.3d at 340.

Here, DRNC pled NCDHHS' failure to modify policies, practices, and procedures necessary to avoid discrimination. *See, e.g.*, DE 1 ¶¶ 8, 10–13, 86–98, 127, 138. The Magistrate failed to address this theory, other than to say that "DRNC has failed to allege" they were "motivated by a disability." DE 33 at 38. Because this claim was properly pled, it was error to dismiss the ADA and RA claims.

### 2. The Magistrate's analysis of DRNC's "methods of administration" claim relied exclusively on *Dyous*, which is inapposite.

DRNC's "methods of administration" claim alleges that NCDHHS' poor oversight of the system is the problem, including a failure to hold Local Management Entities/Managed Care Organizations ("LME/MCOs") accountable for their contractual obligation to provide for adequate community-based services, which keeps beds at the psychiatric hospitals filled with people who are ready for discharge. *See, e.g.*, DE 1 ¶¶ 10, 55. DRNC alleges that NCDHHS' management of the system has led to lengthy delays and environments in which ITP detainees languish in jails and decompensate

19

— not merely that NCDHHS needs to add more beds. *See, e.g.*, DE 1 ¶¶ 52–74. *See, e.g., Connor*, 2025 WL 1167846, at *7 (plausible to allege disparate impact where allegations "are asserted against Defendants for their own deficient performance of their oversight and enforcement functions").

The Magistrate's analysis of "methods of administration" mistakenly and exclusively relied on a case alleging "service gaps" seeking to have more resources provided. DE 33 at 38 (citing *Dyous v. Dep't of Mental Health & Addiction Servs.*, No. 3:22-CV-1518 (SVN), 2024 WL 1141856, at *19 (D. Conn. Mar. 15, 2024)). This misconstrued DRNC's claim, which is not based on alleged deficiencies in "level of services provided" and does not demand "more" services, but rather the *effective* and *timely* administration of services already required by law. Properly construed, DRNC's complaint alleged violations of the ADA and RA claims and should not have been dismissed.

### 3. The Magistrate's analysis of the "integration mandate" contains factual and analytical mistakes.

The Magistrate misconstrued DRNC's "integration mandate" allegations in two critical ways. First, he mistakenly concluded that "there are no allegations that treatment professionals have recommended that the ITP detainees be placed in community-based settings." DE 33 at 40. This fundamentally misconstrues the Complaint, which was filed in part on behalf of people who have been determined by a medical professional to be ITP and

20

need to be in treatment but are left in jails for extended periods of time rather than less restrictive environments where they should be placed (inpatient or outpatient treatment). *See e.g.*, DE 1 ¶ 53 (quoting NCDHHS's Dr. Cochrane, stating that ITP patients are "not getting the treatment that they need . . . the jails. . . just don't have the resources. . . . they're not hospitals, they're not clinics"). *See also id.* at ¶¶ 65–74 (ITP detainees awaiting restoration treatment following assessment by a medical professional). DRNC alleges that professionals have recommended that those individuals should be in less restrictive settings than a county jail; this is a proper *Olmstead* claim. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999).

Second, DRNC alleges (and NCDHHS agrees) that ITP detainees can and should be served in less restrictive environments than jails. DE 20-1 ¶ 32. Both parties thus rely on experts (and did so at the preliminary injunction hearing) to opine whether the existing system is unnecessarily segregating ITP detainees, and whether less restrictive settings are more appropriate places to access ITP services. DE 32 at 53:20–54:2, 114:7–14. At the hearing, both experts agreed that most ITP detainees would be better served by a system that provides them more timely access to services in a less restrictive environment. DE 32 at 48:18–23; 49:23–50:6, 55:11–24, 132:8–133:5.

This case is distinguishable from *Winters* (cited in DE 33 at 39–40), where a pre-trial detainee died of peritonitis in jail while "awaiting transfer to

the State Hospital for a decision about his appropriate placement." *Winters v. Arkansas Dep't of Health & Hum. Servs.*, 491 F.3d 933, 936–37 (8th Cir. 2007). Here, NCDHHS is solely in control of providing the needed assessments and admits that ITP detainees should be receiving those assessments and subsequent services in a less restrictive environment. DE 1 ¶ 27; DE 20-1 ¶ 32. Requiring that mental health professionals recommend less restrictive environments for each individual ITP detainee would be both unnecessary and illogical where NCDHHS admits that a less restrictive setting is not just appropriate, but better, and where NCDHHS' failure to provide such services is a core aspect of its constitutional and statutory violations.

The undisputed need for ITP assessment and services in less restrictive settings is more than sufficient to establish the viability of the "most integrated" environment claim.

### iii. The Magistrate failed to assess the likelihood of success on the ADA and RA claims

Because the Magistrate recommended dismissal of DRNC's ADA and RA claims, he declined to consider DRNC's motion for preliminary injunction based on the methods of administration theory. DE 33 at 42. DRNC is likely to succeed on this claim, because, as discussed *supra* at 22, the evidence shows NCDHHS's methods of administering assessments and services defeat or substantially impair the benefits of those programs for ITP detainees.

22

### d. The Magistrate Erred in Finding No Irreparable Harm

ITP detainees will suffer irreparable harm without a preliminary injunction limiting the time spent in jail awaiting assessments, treatment, or IVC proceedings. A violation of this constitutionally protected interest results in irreparable harm, as "the loss of constitutional freedoms unquestionably constitutes irreparable injury." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (citing *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). Additionally, as established by DRNC's expert, ITP detainees suffer severe consequences from their prolonged detention: prolonged mental pain and suffering (including increased risk of decompensation and isolation), increased severity of psychological symptoms, greater risk of harm to themselves or others, and diminished capacity for eventual restoration. DE 15-10 ¶¶ 11, 18–20; DE 32 at 47:11–48:23, 50:1–51:6. Untreated psychosis may result in permanent cognitive damage. *Id.* at 52:18–53:4. NCDHHS does not dispute that ITP detainees often decompensate in jail, suffer treatment gaps, and return to jail without care. DE 20-1 ¶¶ 34, 37.

"[S]uicide and diminished well-being ... are irreparable harms." *Iglesias v. Federal Bureau of Prisons,* 598 F. Supp. 3d 689 (S.D. Ill. 2022) (citing *Whitaker By Whitaker v. Kenosha Unified School*. District. No.1 Bd. of Educ., 858 F3d 1034, 1045-46 (7th Cir. 2017)). When "continued incarceration… is

23

likely to cause irreparable harm to [the defendant's] health, [and] ability to meaningfully assist in the defense of his criminal charges," injunctive relief is appropriate. *Brooks v. Avotte*, No. CIV. 07-CV-411-JD, 2008 WL 818804, at *10 (D.N.H. Jan. 18, 2008).

Ongoing suffering and likely decompensation also constitute irreparable harm. *Buffkin v. Hooks*, No. 1:18CV502, 2018 WL 6271855, at *13 (M.D.N.C. Nov. 30, 2018), *report and recommendation adopted in part, rejected in non-relevant part*, No. 1:18CV502, 2019 WL 1282785 (M.D.N.C. Mar. 20, 2019); *see also*, *Abu-Jamal v. Wetzel*, No. 3:16-CV-2000, 2017 WL 34700, at *20 (M.D. Pa. Jan. 3, 2017) ("The realities of civil litigation make it likely that waiting for resolution at trial will prolong Plaintiff[s'] suffering for a significant period of time and result in an overall deterioration of his health."); *Advoc. Ctr. for Elderly & Disabled*, 731 F. Supp. 2d at 625 (continued incarceration of incompetent detainees risked worsening mental conditions).

Beyond psychological harm, ITP detainees face serious legal disadvantages. Delays in treatment stall their criminal cases, often for months or more than a year. In that time, witnesses may move, die, or forget key details. While this can happen in any long case, the harm here is exacerbated by NCDHHS' conduct. *See*, *e.g., Doe v. McAleenan*, 415 F. Supp. 3d 971, 979 (S.D. Cal. 2019) (obstacles to participation in one's trial or "high stakes" proceedings can amount to an irreparable harm); *see also Franco-Gonzales v. Holder*, 767

24

F. Supp. 2d 1034, 1046 (C.D. Cal. 2010) (ITP detainees are "likely to be irreparably harmed if they are unable to meaningfully participate" in their proceedings). The Magistrate clearly erred in determining that DRNC failed to show that ITP detainees face irreparable harm. DE 33 at 56.

### e. The Magistrate failed to properly weigh the equities and public interest

The Magistrate concluded that DRNC did not show that the balance of equities favors relief or that an injunction serves the public interest. DE 33 at 57. This contradicts the record and binding precedent.

Lack of resources is not a legitimate state interest that justifies denial of a preliminary injunction. The cost of providing adequate resources does not outweigh the constitutional rights of ITP detainees. "[L]ack of funding cannot justify the continued detention of defendants who have not been convicted of any crime, who are not awaiting trial, and who are receiving next to no mental-health services." *Advoc. Ctr. for Elderly & Disabled*, 731 F. Supp. 2d at 624; *see also Terry*, 232 F. Supp. 2d at 944 ("[L]imited resources cannot be considered an excuse for not maintaining the institution according to at least minimum constitutional standards.") (citing *Finney v. Mabry*, 534 F. Supp. 1026, 1041 (E.D. Ark. 1982). The Magistrate pointed to Dr. Cochrane's warning that a fourteen-day time limit would have catastrophic effects. DE 33 at 57. Such an assertion does not obviate the need for some limit. NCDHHS offers no

25

alternative plan or timeline, and despite DRNC's urging in briefing and at the hearing, the Magistrate did not consider any alternative timelines or ask NCDHHS to propose a workable timeline. *See* DE 24 at 13; DE 32 at 66:2–3, 67:2–7, 92:4–12, 146:11–17. Nor was it necessary for the Court to impose limits effective immediately. As Dr. Murrie testified, other states under court supervision have reduced wait times through phased compliance. DE 32 at 66:14–67:11; *see also Trueblood*, 2016 WL 4268933 at *6.

The Magistrate also relied on safety concerns for hospital staff, citing overcrowding and staffing pressures. But NCDHHS's failure to adequately address the ITP crisis simply means that jail staff and other jail detainees are forced to bear these risks. DE 16 at 8 n.6. As Durwin Briscoe, Chief Deputy of the Cleveland County Sheriff's Office, said, "Jails are not designed to give the proper care for mentally ill inmates." *Id*. Dr. Cochrane agrees that "adequate mental health care is not provided in the jails." DE 32 at 132:23. Dr. Murrie explained that without treatment, ITP detainees' symptoms become more severe and "can lead to more disciplinary charges if they're acting erratically in front of staff or officers." DE 32 at 47:23–24.

The balance of the equities does not favor NCDHHS. NCDHHS concedes that ITP detainees decompensate in jail and often receive no treatment. DE 20-1 ¶ 34. This harm is severe and well documented. NCDHHS's burdens do not outweigh the public interest in court oversight and reasonable limits on

26

ITP detention. If immediate compliance is not feasible, this Court can order phased relief, as others have done.

Protecting constitutional rights is always in the public interest. *Leaders of a Beautiful Struggle*, 2 F.4th at 346. So is restoring competency so criminal cases can proceed. *Advoc. Ctr. for Elderly & Disabled*, 731 F. Supp. 2d at 626. Detaining people for months without treatment delays justice, worsens health, and undermines the state's prosecutorial interests. *Mink*, 322 F.3d at 1121. Public interest favors transferring ITP detainees to appropriate facilities and removing a significant burden from the sheriffs operating jails across the state.

The equities and public interest support the entry of a preliminary injunction.

## **CONCLUSION**

DRNC respectfully asks this Court to overrule the Magistrate's O&R in part; deny NCDHHS' Motion to Dismiss counts three and four; grant DRNC's Motion for Preliminary Injunction; and order NCDHHS to provide ITP detainees with (1) capacity assessments within fourteen days of a court order and (2) restoration treatment, inpatient or outpatient, within fourteen days of a judicial finding of incapacity. Alternatively, if the Court does not find that fourteen-day limits are an appropriate remedy, DRNC respectfully requests that the Court order alternative or phased timelines for assessments and transfers.

27

Respectfully submitted this the 3rd day of July, 2025.

/s/ Michele Delgado
Michele Delgado
N.C. Bar No. 50661
Kristi L. Graunke
N.C. Bar No. 51216
Ivy A. Johnson
N.C. Bar No. 52228
Amika M. Singh
N.C. Bar No. 61111
**ACLU OF NORTH CAROLINA
LEGAL FOUNDATION**
P.O. Box 28004
Raleigh, NC 27611-8004
Tel. (Delgado): (919) 256-5891
Tel. (Graunke): (919) 354-5066
Tel. (Johnson): (919) 532-3681
Tel. (Singh): (919) 885-0051
mdelgado@acluofnc.org
kgraunke@acluofnc.org
ijohnson@acluofnc.org
asingh@acluofnc.org

Susan H. Pollitt
N.C. Bar No. 12648
Lisa Grafstein
N.C. Bar No. 22076
Luke Woollard
N.C. Bar No. 48179
**Disability Rights NC**
801 Corporate Center Drive
Suite 118
Raleigh, North Carolina 27607
Tel.: (919) 856-2195
Fax: (919) 856-2244
susan.pollitt@disabilityrightsnc.org
lisa.grafstein@disabilityrightsnc.org
luke.woollard@disabilityrightsnc.org

John A. Freedman*
Michael L. Walden*
Colleen Couture*
Anora Y. Wang*

**Arnold & Porter Kaye Scholer LLP**
601 Massachusetts Avenue N.W.
Washington, DC 20001
Tel.: (202) 942-5316
john.freedman@arnoldporter.com
mike.walden@arnoldporter.com
colleen.couture@arnoldporter.com
anora.wang@arnoldporter.com

*Special appearances

*Counsel for Plaintiff*

29

## <u>CERTIFICATE OF WORD COUNT</u>

Pursuant to L.Cv.R. 72.4 7.3(d12), I hereby certify that these objections are less than 6,250 words or 20 pages in the manner specified in LR 7.3(d), as calculated by the word processing software used to prepare this filing.

<u>*/s/ Michele Delgado*</u>
Michele Delgado

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed the foregoing PLAINTIFF'S OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM OPINION AND RECOMMENDATION with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel and parties of record who have registered on the CM/ECF system. Electronically submitted this the 3rd day of July, 2025.

/s/ Michele Delgado
Michele Delgado

*Attorney for Plaintiff*

31