IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DISABILITY RIGHTS NORTH          )
CAROLINA,                        )
                                 )
          Plaintiff,             )
                                 )
     v.                          )
                                 )          1:24-cv-335
THE NORTH CAROLINA DEPARTMENT    )
OF HEALTH AND HUMAN SERVICES,    )
and KODY KINSLEY, in his         )
official capacity as Secretary   )
of the North Carolina Department )
of Health and Humans Services,   )
                                 )
          Defendants.            )

## ORDER

This matter is before this court for review of the Memorandum Opinion and Recommendation ("Recommendation") filed on June 12, 2025, by the United States Magistrate Judge in accordance with 28 U.S.C. § 636(b). (Doc. 33.) The Magistrate Judge recommends denying Plaintiff's motion for preliminary injunction and request for oral argument, (Doc. 15), and granting in part and denying in part Defendants' motion to dismiss, (Doc. 22). The Recommendation was served on the parties in this action on June 12, 2025. (Doc. 34.) Plaintiff and Defendants timely filed objections, (Docs. 36, 37). Plaintiff responded in opposition to Defendants' objections, (Doc. 38), and Defendants responded to Plaintiff's objections, (Doc. 39).

This court is also aware that Plaintiff recently filed a motion for leave to amend its complaint, (Doc. 41), and that motion remains under advisement with this court.

This court is required to "make a de novo determination of those portions of the [Magistrate Judge's] report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). This court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the [M]agistrate [J]udge. . . . [O]r recommit the matter to the [M]agistrate [J]udge with instructions." Id.

This court has appropriately reviewed the portions of the Recommendation to which the objections were made and has made a de novo determination which is largely in accord with the Magistrate Judge's Recommendation. This court adopts the Recommendation as supplemented herein or as modified as further explained below.

## I. DRNC'S CONSTITUENCY

One of Defendants' assignments of error focuses on the Recommendation's lack of an explicit analysis and conclusion regarding who is the constituency of Plaintiff Disability Rights North Carolina ("DRNC"). (See Doc. 36 at 9 & n.2.) The Recommendation does not explicitly analyze whether DRNC's complaint plausibly alleges the scope or category of individuals

- 2 -

that makes up DRNC's constituency. However, this analysis exists implicitly in the Recommendation's description of DRNC as a "P&A agency charged with protecting the rights of <u>North Carolinians with disabilities</u>," (Doc. 33 at 16 (emphasis added)), and its conclusion that DRNC's complaint sufficiently "alleged unlawful conduct towards several of DRNC's constituents, and DRNC brings this action on behalf of ITP[1] <u>detainees with mental health disabilities</u> experiencing prolonged wait times," (<u>id.</u> at 17 (emphasis added). Such language makes clear the Recommendation's conclusion that (a) DRNC's constituency consists of "North Carolinians with disabilities," of which "ITP detainees with mental disabilities" is a subset, and (b) that DRNC plausibly alleged so in its complaint. (<u>See</u> <u>id.</u>; <u>see also</u> Doc. 1 ¶¶ 2, 4, 20–21, 130 (alleging DRNC protects, advocates for, represents, provides services to "North Carolinians with disabilities").)

In <u>Disability Rights North Carolina v. North Carolina State Board of Elections</u>, the court held that "voters with disabilities in North Carolina are constituents of DRNC." No. 21-CV-361, 2022 WL 2678884, at *2 (E.D.N.C. July 11, 2022). Though Defendants criticize that case for "not appear[ing] to

---

[1] As used herein, as well as by the Recommendation, DRNC, and Defendants, "ITP" is shorthand for "incapacity to proceed" or "incapable to proceed to trial." (<u>See</u> Doc. 1 ¶¶ 5, 33–40 (citing N.C. Gen. Stat. §§ 15A-1001, -1002, -1003); Doc. 36 at 2; Doc. 37 at 2.)

- 3 -

undertake a detailed analysis under the first prong of Hunt,"
(Doc. 36 at 9), they make no argument why "North Carolinians
with disabilities" does not plausibly constitute DRNC's
constituency, (see id.). Therefore, Defendants' objection does
not raise error that necessitates a different conclusion or
outcome on this issue.

## II.   STANDARD OF CAUSATION FOR ADA/RA CLAIMS

DRNC contends that the Recommendation erred by applying a
too stringent standard of causation not required of all claims
under the Title II of the Americans with Disabilities Act
("ADA") and Section 504 of the Rehabilitation Act ("RA"). (See
Doc. 37 at 16–17.) Specifically, DRNC asserts that the
Recommendation "erroneously required DRNC to show that the
alleged failures were 'motivated by' disability," (id. at 17
(quoting Doc. 33 at 38)), which is the causation standard for
intentional discrimination (or "disparate treatment"), when the
ADA and RA also allow for disparate impact claims that require
"[o]nly a causal link . . . between a disability and an
exclusion from participation, denial of benefits, or deprivation
of such an opportunity," (id.). Further, DRNC argues that it
alleged three distinct theories, none of which were predicated
on intentional discrimination. (See id. 17–18.)

- 4 -

To some degree, DRNC mischaracterizes the Recommendation by asserting that it required only "motivated by" causation. The Recommendation concluded that DRNC failed to show that ITP wait times "were in any way caused by, or motivated by, a disability." (Doc. 33 at 38. (emphasis added)) The use of the word "or" signifies that the Recommendation considered both "motivated by" and other applicable forms of causation (i.e., "in any way caused by"). (See id.) However, the Recommendation's express analysis of causation is brief. Though it mentions, by way of a quotation, the availability of "disparate impact" ADA/RA claims, (see id. at 36 (quoting Connor v. Md. Dep't of Health, No. Civ. 24-1423, 2025 WL 1167846, at *5 (D. Md. Apr. 22, 2025)), it fails to explicitly analyze disparate impact with respect to DRNC's claims, (see id. at 38). Thus, there is merit to the question, raised by DRNC's objection, of whether the Recommendation sufficiently considered disparate impact, even if it did not expressly limit its conclusion to "motivated by" causation.

"Claims under the ADA's Title II and the Rehabilitation Act can be combined for analytical purposes because the analysis is substantially the same." Seremeth v. Bd. of Cty. Comm'rs Frederick Cty., 673 F.3d 333, 336 n.1 (4th Cir. 2012) (cleaned up). "To seek recovery for violation of either the ADA or the

- 5 -

RA, a plaintiff 'must allege that (1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) she was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of her disability.'" Cartagena v. Lovell, 103 F.4th 171, 184 (4th Cir. 2024) (quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005)).

That causation must be established for an ADA or RA claim is expressed in the statutory language of those acts. "Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." A.J.T. ex rel. A.T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279, 605 U.S. 335, 356 (2025) (Sotomayor, J., concurring) (quoting 42 U.S.C. § 12132). The RA also uses the same operative phrase "by reason of," with the addition of the modifier "solely." Id.; 29 U.S.C. § 794(a). The phrase "by reason of" requires "a causal link between the individual's disability and her 'exclu[sion] from' participating in or receiving the benefit of a covered service, program, or activity." A.J.T., 605 U.S. at 356–57.

- 6 -

With respect to the third prong of a disability discrimination claim, the Fourth Circuit has explained that "[t]he ADA permits plaintiffs to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact and (3) failure to make reasonable accommodations." Richardson v. Clarke, 52 F.4th 614, 619 (4th Cir. 2022); Adams v. Montgomery Coll. (Rockville), 834 F. Supp. 2d 386, 393 (2011). Regardless of which ground a plaintiff brings an ADA claim under, the plaintiff must establish causation. See Tsombanidis v. West Haven Fire Dept., 352 F.3d 565, 575 (2d Cir. 2003) (holding that an ADA disparate impact claim requires showing a "causal connection"); Weinreich v. Los Angeles Cnty. Metrop. Transp. Auth., 114 F.3d 976, 979 (9th Cir. 1997) ("[R]easonable modifications may be required when a state imposes a requirement that prevents qualified disabled people from having 'meaningful access' to a benefit because of their disability." (emphasis in original)). However, each of these three distinct theories require a distinct standard of causation.[2]

---

[2] DRNC does not assert a claim of intentional discrimination/disparate treatment. (See Doc. 37 at 18.)

## A.    <u>Disparate Impact</u>

The Fourth Circuit expressly recognized the availability of a disparate impact theory under Title II of the ADA in <u>A Helping Hand, LLC v. Baltimore County</u>. <u>See</u> 515 F.3d 356, 362 (4th Cir. 2008) ("[C]ourts have construed Title II of the ADA to allow a plaintiff to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations."). In doing so, the court relied upon a Second Circuit case, <u>Tsombanidis v. West Haven Fire Department</u>, which analyzed an ADA claim based upon a disparate impact theory of discrimination. <u>See</u> <u>id.</u> at 362; <u>Tsombanidis</u>, 352 F.3d at 574-75. There, the Second Circuit articulated what is necessary to make out a prima facie ADA claim under a disparate impact theory of discrimination: "the plaintiff must show: '(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices.'" 352 F.3d at 576-77 (emphasis omitted) (quoting <u>Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown</u>, 294 F.3d 35, 52-53 (2d Cir. 2002)). While a plaintiff need not show that the challenged practice was based on discriminatory intent or motivation to make out a disparate impact theory, he

- 8 -

must still show causation — that is, the practice "actually or predictably results in discrimination" or that "a causal connection between the facially neutral policy and the alleged discriminatory effect" exists. Id. at 575 (cleaned up); see also Zayre-Brown v. N.C. Dep't of Pub. Safety, No. 22-cv-191, 2024 WL 410243, at *7 (W.D.N.C. Feb. 2, 2024) ("To state a disparate impact claim, Plaintiff must (i) identify the challenged practice or policy, (ii) demonstrate that the practice or policy had an adverse impact on the plaintiff with a disability, and (iii) demonstrate a causal relationship between the identified practice and the disparate impact." (cleaned up)).

Of the three distinct theories of ADA/RA discrimination on which DRNC bases its claims, (Doc. 37 at 18; Doc. 1 at ¶¶ 124–27, 135–38), one can plausibly be construed as a disparate impact claim: that Defendant North Carolina Department of Health and Human Services ("NCDHHS") "utilized methods of administering ITP services that result in discrimination against ITP detainees" because those methods "defeat or substantially impair benefits of the capacity assessment and restoration programs controlled by NCDHHS," (Doc. 1 at ¶¶ 126, 137). See Connor, 2024 WL 1167846, at *5 (classifying "methods of administration" ADA claims as disparate impact claims). DRNC characterizes this claim as "alleg[ing] that NCDHHS' management of the system has

- 9 -

led to lengthy delay and environments in which ITP detainees languish in jails and decompensate." (Doc. 37 at 19.) More specifically, DRNC alleges in its Complaint that, "since 2022, ITP detainees wait more than two months for their report to be completed after their assessment is ordered. . . . [And] they spend nearly another five months in jail awaiting placement in state psychiatric hospitals for IVC examination and capacity restoration services." (Doc. 1 at ¶ 52.) DRNC further alleges that this prolonged "detention of ITP detainees in jail frequently exacerbates their mental health disability," which "increase[es] their risk of harm and mak[es] capacity restoration more difficult." (Id. at ¶¶ 75–79.) Such effects, DRNC asserts, run counter to the purposes of the ITP system "to determine an individual's capacity to proceeds, to assess criteria for involuntary commitment, and to provide treatment aimed at restoring capacity." (Id. ¶¶ 27, 121b, 126, 133b, 137.)

The Recommendation's analysis of this claim is brief and somewhat enmeshed with its analyses of DRNC's other ADA/RA theories. (See Doc. 33 at 38.) Beyond the conclusion that "DRNC has failed to allege that NCDHHS's failures in administering its ITP services . . . were in any way caused by, or motivated by, a disability," (id.), the Recommendation limits its analysis to one sentence: "[A] methods of administration claim cannot be

based upon 'an allegation of deficiencies in the level of services provided.'" (Id. (quoting Dyous v. Dep't of Mental Health & Addiction Servs., No. 22-CV-1518, 2024 WL 1141856, at *19 (D. Conn. Mar. 15, 2024).) DRNC contends that the Recommendation erred on this point because it misconstrues DRNC's claim as "alleg[ing] deficiencies in 'level of services provided'" or "demanding 'more' services," when it actually demands "the effective and timely administration of services already required by law." (Doc. 37 at 20.) In making this argument, DRNC seeks to distinguish its claims from those in Dyous, the case from which the Recommendation derived its dispositive proposition. (See id. (characterizing Dyous as "a case alleging 'service gaps' seeking to have more resources provided").)

Although the Recommendation's analysis on this point is scant, and the quoted language from Dyous can be legitimately criticized as too broadly stated, sound logic underlies Dyous' pronouncement. That is, when a service or program is provided to a person because of that person's disability, then disability becomes a permanent "but for" cause with respect to anything that occurs to the person within the context of that program or service. This is where the question of proximate cause kicks in. But disentangling causation becomes difficult with respect to a

- 11 -

disparate impact claim alleging deficiencies in the level or quality of the program or service, and nearly impossible when the program or service is provided only to persons with disabilities.

To establish a disparate impact claim under the ADA, a plaintiff must sufficiently plead a disparity. "[T]he essence of the [disparate impact] claim is that a single policy, rule, or custom has different effects upon protected and unprotected classes. Indeed, it is the disparity between a single policy's different effects on different groups which forms the basis of the cause of action." Pathways Psychosocial v. Town of Leonardtown, Md., 133 F. Supp. 2d 772, 788 (D. Md. 2001) (quoting Bryant Woods Inn, Inc. v. Howard Cnty., Md., 911 F. Supp 918, at 939 (D. Md. 1996)). Thus, to make out a disparate impact claim under the ADA, a plaintiff must "show that the policy or practice that is facially neutral has a more harsh effect on the protected class" than on an unprotected class. M.S. ex rel. H.S. v. Fairfax Cnty. Pub. Sch. Bd., No. 24-cv-622, 2025 WL 665543, at *5 (E.D. Va. Feb. 28, 2025) (quoting Thompson v. Va. Dep't of Game & Inland Fisheries, No. 06CV00065, 2007 WL 984225, at *3 (W.D. Va. Mar. 30, 2007)). This requires a plaintiff to allege a quantitative or qualitative "comparison

between two groups — those affected and those unaffected by the facially neutral policy." Tsombanidis, 352 F.3d at 575-78.

A plaintiff cannot allege such a comparison — that is, cannot establish a disparity — with respect to the administration of a program or service that is only provided to persons in the protected class. "[W]here only one group or class of persons is affected by a particular decision, there is no disparity in treatment between groups and no 'disparate impact.'" Pathways Psychosocial, 133 F. Supp. 2d at 788 (quoting Bryant Woods Inn, Inc., 911 F. Supp at 939). This situation arises where the government's provision of a program or service to individuals is predicated on those individuals having a disability; in that case, the methods of administration of that program or service affect only persons with disabilities because no other classes of person are provided that program or service.

North Carolina's ITP system is exactly such a program. According to DRNC's complaint, ITP evaluations and subsequent treatment are provided only to criminal defendants who have, or are perceived to have, a mental health disability. (See Doc. 1 ¶¶ 36-51 (describing the ITP system); id. ¶ 123 ("ITP detainees qualify as individuals with disabilities as defined under [the ADA,] 42 U.S.C. § 12131[,] because they have, or are regarded as having, mental health disabilities[.]"); id. at ¶ 134 ("ITP

detainees qualify as individuals with disabilities as defined under Section 504 [of the RA] because they have or are regarded as having mental health disabilities[.]").) Further, DRNC does not directly challenge the practice of ITP designation nor the ITP system itself; rather, DRNC challenges "NCDHHS' poor oversight of the system" and "NCDHHS' management of the system." (Doc. 37 at 19; see Doc. 1 at ¶¶ 126, 137.) Thus, DRNC does not and cannot sufficiently allege the comparison necessary to establish a disparity; it cannot show that NCDHHS' practices in managing the ITP system "has a more harsh effect" on persons with disabilities than those without because no persons without disabilities qualify for ITP services in the first place.

DRNC fails to sufficiently allege the necessary "causal connection" — that is, a disparity — to make out a disparate impact claim. See Pathways Psychosocial, 133 F. Supp. 2d at 788; see also Tsombanidis, 352 F.3d at 575-78 (holding that "[s]ince no quantitative or qualitative comparison was proven, plaintiffs did not establish a disparate impact claim" under the ADA). In other words, even accepting, arguendo, that NCDHHS' administration of the ITP system causes unreasonable harm to persons with disabilities, the disparate impact claim is not the appropriate vehicle for redressing that harm.

- 14 -

## B.    <u>Failure to Reasonably Accommodate</u>

Failure to make a reasonable accommodation is distinct from disparate impact. <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 276–77 (2d Cir. 2003) ("[A] claim of discrimination based on a failure reasonably to accommodate is distinct from a claim of discrimination based on disparate impact."); <u>see also</u> <u>Wis. Comm'y Servs., Inc. v. Milwaukee</u>, 465 F.3d 737, 753 (7th Cir. 2006) ("[T]he duty to accommodate is an independent basis of liability under the ADA."). To make out a failure to accommodate claim under the ADA, a plaintiff "must propose a reasonable modification to the challenged program that will allow them the meaningful access they seek. A modification is reasonable if it is reasonable on its face or used ordinarily or in the run of cases and will not cause undue hardship." <u>Richardson</u>, 52 F.4th at 619 (cleaned up) (quoting <u>Nat'l Fed'n of the Blind v. Lamone</u>, 813 F.3d 494, 507 (4th Cir. 2016)). It is the plaintiff's burden to plausibly allege (1) a modification that would allow meaningful access and (2) the reasonableness thereof. <u>Halpern v. Wake Forest Univ. Health Scis.</u>, 669 F.3d 454, 464–65 (4th Cir. 2012).

> Although determination of the reasonableness of a proposed modification is often fact-specific, a court may grant summary judgment in favor of a defendant if the plaintiff fails to present evidence from which a jury may infer that the accommodation is "reasonable on its face, i.e., ordinarily or in the run of cases," or

- 15 -

> if the defendant establishes as a matter of law that the proposed modification will cause "undue hardship in the particular circumstances."

Halpern, 669 F.3d at 465 (quoting U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002)); see also Richardson, 52 F.4th at 621 (holding that plaintiff's claim failed because he offered no evidence to create a genuine issue of material fact on the issue of reasonableness); Boone v. Bd. of Govs. Of Univ. of N.C., 858 F. App'x 622, 623 (4th Cir. 2021) (mem.) (plaintiff's ADA/RA claim failed because she "did not demonstrate that her suggested accommodations were reasonable"); Nat'l Fed'n of the Blind v. Lamone, 438 F. Supp. 3d 510, 528 (D. Md. 2020) ("Plaintiffs must . . . plausibly allege that their proposed policy modification is reasonable.").

DRNC's complaint asserts two claims that can plausibly be construed as alleging that NCDHHS failed to make a reasonable accommodation. First, DRNC alleges that NCDHHS "failed to make reasonable modifications in policies, practices or procedures which are necessary to avoid discrimination against ITP detainees." (Doc. 1 ¶¶ 127, 138.) Second, DRNC alleges that NCDHHS "failed to administer their ITP-related services in the

- 16 -

most integrated setting appropriate to the needs of ITP detainees."[3] (Doc. 1 ¶¶ 124-25, 135-36.)

### 1. DRNC's First Failure to Accommodate Claim

The Recommendation did not specifically address the first of these two claims beyond concluding that "DRNC has failed to allege that NCDHHS's . . . failures to make reasonable

_____

[3] This type of claim is often referred to as an "Olmstead claim" after the Supreme Court's plurality opinion holding that under the ADA and its implementing regulations, "[u]njustified isolation . . . is properly regarded as discrimination based on disability," Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 597 (1999). It is also sometimes described, as DRNC does in its briefs, (see, e.g., Doc. 37 at 20), as an "integration mandate" claim based on courts' subsequently reading of Olmstead as establishing that the ADA and its implementing regulations create an "integration mandate." See, e.g., Fischer v. Okla. Health Care. Auth., 335 F.3d 1175, 1180-81 (10th Cir. 2003). Despite these descriptors, and some courts' treatment of this type of claim as distinct, an Olmstead claim is a variety of failure to reasonably modify claim. See Olmstead, 527 U.S. at 596-97, 603-04; Brown v. District of Columbia, 928 F.3d 1070, 1094 (D.C. Cir. 2019) (Wilkins, J., concurring) ("Olmstead is but one gloss of the ADA's failure-to-accommodate claim."); Parent/Pro. Advoc. Leaguy v. Springfield, Mass., 934 F.3d 13, 26 (1st Cir. 2019) ("Olmstead claims concern whether the defendant public entity provides 'treatment,' accommodations, and placements." (emphasis added)); C.P.X. ex rel S.P.X. v. Garcia, 450 F. Supp. 3d 854, 917-19 (S.D. Iowa 2020) (describing how a plaintiff invoking Olmstead as the basis for claim must show "the placement [in a less restrictive setting] can be reasonably accommodated" (quoting Olmstead, 527 U.S. at 587)). But see L.E. ex rel. Cavorley v. Superintendent of Cobb Cnty. Sch. Dist., 55 F.4th 1296, 1303 (11th Cir. 2022) ("An Olmstead isolation claim is separate and distinct from a disparate treatment or failure to accommodate theory."). In other words, integrative treatment or the least restrictive setting is best viewed as a specific form of accommodation or modification in the prison or detention context. See id.

- 17 -

modifications in its policies or procedures associated with wait times were in any way caused by, or motivated by, a disability." (Doc. 33 at 38.) DRNC's objection picks up on the Recommendation's brief treatment of this claim, arguing that the Recommendation erred because it "failed to address this theory, other than to say that 'DRNC has failed to allege' they were 'motivated by a disability.'" (Doc. 37 at 18 (quoting Doc. 33 at 38.) Setting aside its selective quotation of the Recommendation, DRNC's criticism has merit. The Recommendation does not articulate the distinct requirements of a <u>prima facie</u> failure to reasonably accommodate claim, nor does it expressly analyze whether DRNC's pleadings satisfy those requirements. (<u>See</u> Doc. 33 at 35–41.) Further, the Recommendation appears to collapse together analyses of both reasonable accommodation claims. (<u>See</u> Doc. 33 at 38–41.)

Nevertheless, this court agrees with the Recommendation that that DRNC's first failure to reasonably accommodate claim fails for lack of sufficiently alleged causation. Reading DRNC's complaint in the light most favorable to it, as required here, DRNC appears to allege that decreasing ITP wait times is the accommodation that NCDHHS has failed to make. (<u>See</u> Doc. 1 ¶¶ 8, 10–13, 86–96 (focusing on NCDHHS' failure to make ITP services more timely); <u>see also</u> Doc. 37 at 19 (citing to paragraphs 8,

10-13, 86-97 of the Complaint as examples of DRNC alleging "NCDHHS' failure to modify policies, practices, and procedures necessary to avoid discrimination").) This court does not find that that making ITP services more timely alone constitutes a proposed modification — it is more of a <u>result</u> than a modification — but even if it did, DRNC does not sufficiently allege how doing so is reasonable. <u>See</u> <u>Richardson</u>, 52 F.5th at 621 (holding that plaintiff must show how its proposed modification is reasonable); <u>Halpern</u>, 669 F.3d at 464; <u>Lamone</u>, 438 F. Supp. 3d at 528-29.

### 2. <u>DRNC's Second Failure to Accommodate Claim</u>

The Recommendation construed DRNC's claim here as alleging that "ITP detainees are languishing in jails for prolonged periods of time awaiting capacity assessments and restoration services." (Doc. 33 at 40.) The Recommendation determined that this claim does not implicate <u>Olmstead</u> because it includes "no allegations that treatment professionals have recommended that the ITP detainees be place in community-based settings." (<u>Id.</u>) The Recommendation arrives at this conclusion by reading <u>Olmstead</u> alongside an Eighth Circuit case, <u>Winters v. Arkansas Department of Health and Human Services</u>, 491 F.3d 933 (8th Cir. 2007). (<u>See</u> <u>id.</u> ¶¶ 38-40.) In <u>Olmstead</u>, the Supreme Court held that the ADA "may require placement of persons with mental

- 19 -

disabilities in community settings rather than in institutions," when a state's "treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." 527 U.S. at 587. In Winters, confronted with a claim that a criminal detainee with a mental disability "did not receive an appropriate placement under the ADA because jail is not the least restrictive placement," the Eighth Circuit held that "the least restrictive placement standard did not come into play" — Olmstead was not applicable — because "[n]o treatment professionals had yet had the opportunity to evaluate [the detainee] or recommend a placement for him." 491 F.3d at 936–37.

DRNC objects to the Recommendation's analysis on this point for two reasons. First, DRNC contends that, contrary to the Recommendation's conclusion, DRNC alleged ITP detainees are "people who have been determined by a medical professional to be ITP and need to be in treatment but are left in jails for extended periods of time rather than less restrictive environments where they should be placed (inpatient or outpatient treatment)." (Doc. 37 at 20–21 (citing Doc. 1 ¶¶ 53,

- 20 -

65-74).) Thus, DRNC argues its claim implicates Olmstead because it alleges "professionals have recommended that those individuals should be in less restrictive settings than a county jail." (Id.) Second, DRNC seeks to distinguish Winters by arguing that, unlike there, NCDHHS is the entity "solely in control of providing the needed assessment" and that "[r]equiring that mental health professionals recommend less restrictive environments for each individual ITP detainee would be both unnecessary and illogical where NCDHHS admits that a less restrictive setting is not just appropriate, but better," which DRNC contends NDCHHS does. (Id. 21-22.)

DRNC's objection on this point has merit. DRNC brings its claims on behalf of both ITP detainees who are awaiting assessment and those who have been assessed and await treatment. (See Doc. 1 ¶¶ 6-11, 52, 54-74.) Thus, at least with respect to ITP detainees who have received assessment and are deemed to require further treatment, DRNC appears to plausibly allege that NCDHHS' medical professionals have deemed that treatment outside of the context of jail is necessary. It is debatable whether this necessarily means treatment in a less restrictive setting — that is, whether a state psychiatric hospital constitutes a less restrictive setting than jail, or whether other treatment

settings like community-treatment are considered at this stage of the ITP process.

In Olmstead, the Court described how a state must be afforded "leeway" so that it can "maintain a range of facilities and . . . administer services with an even hand." 527 U.S. at 605. Illustrating what such "leeway" means, the Court explained:

> If, for example, the State were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met. In such circumstances, a court would have no warrant effectively to order displacement of persons at the top of the community-based treatment waiting list by individuals lower down who commenced civil actions.

Id. at 605-06 (emphasis added). Here, DRNC's allegations appear to raise the question of whether the North Carolina's ITP system "waiting list" moves at a reasonable pace. That is, when a criminal defendant is designated as ITP and, therefore, requires assessment and subsequent treatment, whether the amount of time that criminal defendant must wait to receive these services is reasonable. Reasonableness is a fact-intensive and context-dependent question; there is no Fourth Circuit decision that clearly suggests what is reasonable in this context. Therefore, this claim presents issues which would benefit from further

- 22 -

factual development and dismissal at the 12(b)(6) stage is not appropriate.

Though DRNC's second failure to accommodate claim will survive Defendant's motion to dismiss, this court agrees with the Magistrate Judge's recommendation to deny Plaintiff's motion for preliminary injunction, and this court does not find that this claim's survival warrants a different outcome. A preliminary injunction is "an extraordinary remedy never awarded as of right," Winter, 555 U.S. 7, 24 (2008), and the Supreme Court has warned that courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction," id. (quoting Weinberger v. Romero-Carcelo, 456 U.S. 305, 312 (1982)). This court cannot find that DRNC has established that, at this stage, "an injunction is in the public interest." See id. at 20, 24-26. DRNC's requested preliminary injunction implicates and could have an adverse impact on, among other things, North Carolina's health system, particularly psychiatric hospitals and emergency departments, and its justice and public safety systems. (See Doc. 39 at 16-17; Doc. 33 at 57.) Additionally, given the complexities of, and the many actors involved in, the ITP system, this court does not fine that, at this stage, the record before it supplies sufficient information to appropriately craft an injunctive order, if it

- 23 -

wanted to. Furthermore, this court also cannot find that Plaintiff has established that it "is likely to succeed on the merits" of its surviving failure to accommodate claim. See Winter, 555 U.S. at 20.

**IT IS THEREFORE ORDERED** that the Magistrate Judge's Recommendation, (Doc. 33), is **ADOPTED AS MODIFIED HEREIN.**

**IT IS FURTHER ORDERED** that that Defendants' Motion to Dismiss, (Doc. 22), is **GRANTED IN PART AND DENIED IN PART** in that Counts Three and Four of Plaintiff's Complaint, (Doc. 1), under Title II of the ADA and the Rehabilitation Act are **DISMISSED WITHOUT PREJUDICE** except as to claims for failure to reasonably accommodate ITP detainees who have received assessment and are deemed to require further treatment. The motion to dismiss is **DENIED** as to Counts One and Two of Plaintiff's Complaint, (id.); those claims for violations of substantive and procedural due process under the Fourteenth Amendment shall survive.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Preliminary Injunction and Request for Oral Argument, Doc. 15), is **DENIED.**

This the 30th day of March, 2026.

_____
United States District Judge

- 24 -